BART H. WILLIAMS (SBN 134009)
bwilliams@proskauer.com
KYLE A. CASAZZA (SBN 254061)
kcasazza@proskauer.com
SETH H. VICTOR (SBN 329341)
svictor@proskauer.com
ALYSON C. TOCICKI (SBN 336179)
atocicki@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
Telephone:    (310) 284-4520
Facsimile:    (310) 557-2193

JEFFREY D. NEUBURGER (applying for *pro hac vice* admission)
jneuburger@proskauer.com
WAI L. CHOY (applying for *pro hac vice* admission)
wchoy@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:    (212) 969-3000
Facsimile:    (212) 969-2900

Attorneys for Plaintiff,
MIRAMAX, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIRAMAX, LLC,<br><br>                              Plaintiff,<br><br>          vs.<br><br>QUENTIN TARANTINO; VISIONA ROMANTICA, INC.; and DOES 1–50,<br><br>                              Defendants. | Case No. _____<br><br>**COMPLAINT FOR**<br><br>1.    **BREACH OF CONTRACT**<br><br>2.    **COPYRIGHT INFRINGEMENT**<br><br>3.    **TRADEMARK INFRINGEMENT**<br><br>4.    **UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

1.    Eager to cash in on the non-fungible token ("NFT") boom, as widely reported in the media, Quentin Tarantino recently announced plans to auction off seven "exclusive scenes" from the 1994 motion picture *Pulp Fiction* in the form of NFTs.  According to the official website for the sale, https://tarantinonfts.com/, "[t]he collection holds secrets from Pulp Fiction," and "[e]ach NFT contains one or more previously unknown secrets of a specific iconic scene from Pulp Fiction."  The "privileged" purchasers "will get a hold of those secrets."

2.    Tarantino kept his Pulp Fiction NFT plans secret from Miramax, his long-time financier and collaborator on multiple critically and commercially successful films, including *Pulp Fiction*, *Jackie Brown*, and *Kill Bill: Volumes 1 and 2*.  He made no efforts to contact Miramax prior to his coordinated press campaign, despite having what were likely extensive negotiations with third parties to develop and sell the NFTs.

3.    The fact that Tarantino kept Miramax out of the loop is particularly problematic because he granted and assigned nearly all of his rights to *Pulp Fiction* (and all its elements in all stages of development and production) to Miramax in 1993, including the rights necessary for the "secrets from Pulp Fiction" that he intends to sell.  Tarantino's limited "Reserved Rights" under the operative agreements are far too narrow for him to unilaterally produce, market, and sell the Pulp Fiction NFTs.

4.    Upon learning of Tarantino's plan, Miramax sent him a cease and desist letter setting forth, in great detail, Tarantino's disregard of Miramax's broad rights to *Pulp Fiction*.  Wrongly claiming that his narrow Reserved Rights are sufficient, Tarantino remains undeterred and has refused to comply with Miramax's demands to cancel the sale of Pulp Fiction NFTs.

5.    Days after being told to cease and desist, Tarantino's initial plans to sell NFTs relating to Miramax's intellectual property intensified and expanded.  According to a promotional Twitter account for the sale, @TarantinoNFTs, the Pulp

Fiction NFTs, which will include scans of some pages of the *Pulp Fiction* script, will be sold in December 2021, and Tarantino will also sell "the Artifacts Collection of up to ten iconic props from Tarantino's films," including "one from Pulp Fiction." The account is using an animated scene from another Miramax film, *Kill Bill: Vol. 2*, as well as unauthorized images and graphics from or relating to *Pulp Fiction*, to promote the sale.

6. Tarantino's conduct has forced Miramax to bring this lawsuit against a valued collaborator in order to enforce, preserve, and protect its contractual and intellectual property rights relating to one of Miramax's most iconic and valuable film properties. Left unchecked, Tarantino's conduct could mislead others into believing Miramax is involved in his venture. And it could also mislead others into believing they have the rights to pursue similar deals or offerings, when in fact Miramax holds the rights needed to develop, market, and sell NFTs relating to its deep film library.

## **THE PARTIES**

7. Plaintiff Miramax, LLC is a Delaware limited liability company with its principal place of business in Los Angeles, California.

8. Defendant Quentin Tarantino, upon information and belief, is a United States citizen who currently resides in Israel. On information and belief, Tarantino owns a home and multiple businesses within Los Angeles, California, including the New Beverly Cinema and the Vista Theatre.

9. Defendant Visiona Romantica, Inc. is a California corporation with its principal place of business in Los Angeles, California. On information and belief, during all relevant times, Tarantino acted as an authorized agent of Visiona Romantica, Inc., which is his loan-out corporation and of which he is the founder and CEO.

10. The true names and capacities, whether individual, corporate, associate, or otherwise, of DOES 1 through 50, inclusive, are unknown to Miramax, who

therefore sues said Defendants by such fictitious names and will ask leave to amend the Complaint to show their true names and capacities when they have been ascertained.  Miramax is informed and believes and thereon alleges that each of the Defendants designated herein as DOE is responsible in some manner for the events and happenings referred to in this Complaint.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over Miramax's federal copyright infringement, trademark infringement, and unfair competition claims pursuant to 28 U.S.C. §§ 1331, 1338(a), 17 U.S.C. § 501(b), and 15 U.S.C. §1121, and supplemental jurisdiction over Miramax's breach of contract claim relating to and arising from the same set of facts as Miramax's federal claims pursuant to 28 U.S.C. § 1367.

12.    This Court has personal jurisdiction over Quentin Tarantino given both Tarantino's continuous and systematic affiliations with the forum state, including his ownership interests in a home and multiple businesses, and his specific conduct at issue in this lawsuit.  Tarantino also consented to personal jurisdiction of this Court pursuant to the June 23, 1993 Original Rights Agreement.  *See* ¶¶ 19-22; Ex. A (Original Rights Agreement), ¶ 29.

13.    This Court has personal jurisdiction over Visiona Romantica, Inc. because it is incorporated in California and has an office located at 11812 San Vicente Boulevard, 4th Floor, Los Angeles, California, 90049.

14.    Venue is proper under 28 U.S.C. §§ 1391(b) and (c) because Defendants are both subject to personal jurisdiction within this district, and because a substantial part of the events giving rise to Miramax's claims occurred here.

## TARANTINO'S GRANT OF RIGHTS TO MIRAMAX

15.    Miramax is a global film and television studio best known for its award-winning and original content.

16.   Miramax's unrivaled library of more than 700 titles has received 278 Academy Award® nominations and 68 Oscars®, including four Best Picture awards.   Miramax's *Pulp Fiction* (1994) is one of the most influential films in history.

17.   *Pulp Fiction* won the prestigious Palme d'Or at the 1994 Cannes Film Festival.   The film went on to gross over $213,000,000 at the worldwide box office (which would be hundreds of millions of dollars more, if adjusted for inflation), and garnered widespread critical acclaim in the process.   *Pulp Fiction* was Miramax's first major release following the independent studio's acquisition by Disney, and Miramax's success in developing, marketing, and distributing *Pulp Fiction* was a watershed moment for independent films and spawned countless imitators eager to replicate Miramax's results.

18.   *Pulp Fiction* was written and directed by Quentin Tarantino, and produced by Lawrence Bender, in collaboration with Brown 25 Productions, Inc. ("B25 Productions").

19.   Effective as of June 23, 1993, Tarantino and Bender entered into an agreement (the "Original Rights Agreement") with Miramax Film Corp., predecessor in interest to Miramax,[1] "relating to the production and financing" of *Pulp Fiction* "and the acquisition by Miramax of the Film."   *See* Ex. A (Original Rights Agreement).

20.   Under the Original Rights Agreement, Tarantino and Bender granted to Miramax, in exchange for valuable consideration, in perpetuity throughout the universe, "all rights (including all copyrights and trademarks) in and to the Film (and all elements thereof in all stages of development and production) now or hereafter known including without limitation the right to distribute the Film in all media now or hereafter known (theatrical, non-theatrical, all forms of television,

---

[1] The Complaint refers to both Miramax entities as "Miramax," as Miramax, LLC acquired the rights at issue from Miramax Film Corp. through a series of transactions.

home video, etc.),” excluding only a limited set of “Reserved Rights” which were reserved to Tarantino as an individual.  Ex. A, ¶¶ 2-4.

21.    Tarantino’s Reserved Rights were limited to the “soundtrack album, music publishing, live performance, print publication (including without limitation screenplay publication, ‘making of’ books, comic books and novelization, in audio and electronic formats as well, as applicable), interactive media, theatrical and television sequel and remake rights, and television series and spinoff rights.”  *Id.*, ¶ 2.    Those Reserved Rights were further “subject to restrictions set forth elsewhere” in the Original Rights Agreement, including Miramax’s rights of first negotiation and last matching rights with respect to certain deals.  *Id.*, ¶¶ 2, 9.

22.    While Miramax’s rights include “all rights . . . now or hereafter known . . . in all media now or hereafter known,” Tarantino’s Reserved Rights, which are a narrowly-drafted, static exception to Miramax’s broad, catch-all rights, do not contain any forward-looking language.    Tarantino’s Reserved Rights do not encompass any rights or media that were not known at the time of the Original Rights Agreement.

23.    As of July 10, 1993, Tarantino and B25 Productions entered into a letter agreement regarding *Pulp Fiction* (the “B25 Agreement”), under which Tarantino granted B25 Productions the right to acquire certain of his rights “in, to, and underlying the original screenplay.”  *See* Ex. B (B25 Agreement).  Pursuant to the Original Rights Agreement, this transfer required Miramax’s consent.

24.    In a letter to Tarantino’s counsel also dated as of July 10, 1993, Miramax consented to Tarantino’s “transfer of certain rights” pursuant to the B25 Agreement, subject to the conditions that “nothing contained in the [B25 Agreement] shall diminish or derogate from the rights granted to Miramax under the [Original Rights Agreement],” and “[i]n the event of any conflict between the [B25 Agreement] and the [Original Rights Agreement], the [Original Rights

Agreement] shall control." *See* Ex. C (Miramax Limited Consent Letter). Neither Tarantino nor Tarantino's counsel refuted or rejected Miramax's letter.

25. Tarantino, Bender, B25 Productions, and Miramax also signed a letter agreement written by B25 Productions (the "B25 Productions Letter"), acknowledging that the rights granted by Tarantino to B25 Productions in the B25 Agreement "are not inconsistent with the rights granted by Tarantino to Miramax under the [Original Rights Agreement]." *See* Ex. D (B25 Productions Letter), ¶ 2. The B25 Productions Letter also acknowledged that upon delivery of *Pulp Fiction* and Miramax Films' related payment, Miramax would "acquire all of [B25 Productions'] rights in and to the Picture (other than any rights [B25 Productions] may have in any Tarantino Reserved Rights) . . . ." *Id.*, ¶ 4.

26. Notwithstanding the B25 Productions Letter, on July 15, 1993, Tarantino executed a notarized assignment (the "Tarantino-Miramax Assignment") dated as of June 23, 1993, for the benefit of Miramax, in which Tarantino assigned to Miramax the:

> sole and exclusive right under copyright, trademark or otherwise to distribute, exhibit and otherwise exploit all rights (other than the [Tarantino Reserved Rights]) in and to the motion picture entitled "Pulp Fiction" (the "Work") (and all elements thereof in all stages of development and production) now or hereafter known including, without limitation, the right to distribute the Work in all media now or hereafter known (theatrical, non-theatrical, all forms of television and "home video") in perpetuity, throughout the Universe, as more particularly set forth and upon and subject to the terms and conditions in [the Original Rights Agreement].

Ex. E (Tarantino-Miramax Assignment).

27. Under the Tarantino-Miramax Assignment, Tarantino also agreed "to secure or cause to be secured all United States copyrights in and to the Work, including renewals thereof, if applicable, and hereby assigns the rights under said renewal copyrights to [Miramax] . . . ." *Id.* The Tarantino-Miramax Assignment was recorded with the U.S. Copyright Office on August 6, 1993 as document number V2917P169.

28.    Consistent with the Original Rights Agreement, in the Tarantino-Miramax Assignment, Tarantino again reserved rights only to the "soundtrack album, music publishing, live performance, print publication (including, without limitation, screenplay publication, 'making of' books, comic books and novelization, in audio and electronic formats as well, as applicable), interactive media, theatrical and television sequel and remake rights, and television series and spinoff rights." *Id.*

29.    On September 3, 1993, despite having already assigned to Miramax sole and exclusive rights to *Pulp Fiction* (other than his Reserved Rights) under the Original Rights Agreement and the Tarantino-Miramax Assignment, Tarantino purported to assign to B25 Productions, in a Short-Form Assignment Agreement executed only by Tarantino (the "Void Tarantino-B25 Assignment") "all rights (other than [Tarantino's Reserved Rights] and those certain distribution rights in the motion picture project currently entitled 'Pulp Fiction' . . . granted to Miramax Film Corp.) . . . in, to, and underlying the original screenplay . . . ." Ex. F (Void Tarantino-B25 Assignment).  Miramax was not involved with the Void Tarantino-B25 Assignment in any way, and did not consent to it.

30.    On September 27, 1993, B25 Productions executed a notarized Notice, dated as of September 20, 1993, acknowledging the terms of the Original Rights Agreement and Miramax's broad rights under it.

31.    In addition to the rights Miramax acquired from Tarantino in the Original Rights Agreement and the Tarantino-Miramax Assignment, as of July 1, 1994, B25 Productions executed an Instrument of Transfer granting to Miramax "all rights of any kind and nature whatsoever in all media (other than [Tarantino's Reserved Rights]), in and to the theatrical motion picture currently entitled 'PULP FICTION' (the 'Picture') and as further specified in [the Original Rights Agreement, as amended] . . . for any and all media and by any means whether now known or hereafter devised throughout the entire universe" (the "B25 Instrument of

Transfer"), which was recorded with the U.S. Copyright Office on July 14, 1994 as Document Number V3005P270.

32.    Having completed its purpose of producing *Pulp Fiction*, delivering the film to Miramax, and assigning to Miramax all of B25 Productions' rights relating to *Pulp Fiction* and all its elements in all stages of development and production (including, without limitation, all versions of the screenplay), excluding Tarantino's Reserved Rights, B25 Productions was dissolved on January 8, 1996.

33.    Among its broad rights to *Pulp Fiction*, Miramax owns various registered and unregistered trademark rights in the name "PULP FICTION," including, without limitation, a United States registered trademark with Serial Number 85883773 and Registration Number 5581017 (the "Pulp Fiction Mark"), as well as the valid and subsisting United States copyrights registered with the U.S. Copyright Office with Registration Numbers PA0000704507 and VA0001224051.

34.    In line with these rights, Miramax has continuously used the Pulp Fiction Mark in commerce throughout the United States in connection with the sale, marketing, advertising, and promotion of a wide array of goods relating to *Pulp Fiction*.  Examples include the following:









COMPLAINT

**TARANTINO'S INFRINGING CONDUCT**

35.   On November 2, 2021, Secret Network (a.k.a. SCRT Labs) issued a press release[2] (the "Press Release") announcing that Tarantino "will auction off 7 uncut Pulp Fiction Scenes as Secret NFTs."

36.   An NFT (or non-fungible token) is a unique, non-fungible digital asset recorded on a blockchain (a type of distributed ledger) that can, as in the case of the Pulp Fiction NFTs, represent and certify its owner's right to, and enable its owner to, access specific digital content associated with the NFT.

37.   Despite the sweeping rights granted to Miramax under the Original Rights Agreement, the Tarantino-Miramax Assignment, and the B25 Instrument of Transfer, Tarantino did not consult Miramax regarding his sale of the Pulp Fiction NFTs.

38.   The Press Release also noted that the initial auctions would "occur on OpenSea, the world's largest NFT marketplace" and described the Pulp Fiction NFTs as containing "one-of-a-kind" content that had "never been seen or heard before, . . . includ[ing]: the uncut first handwritten scripts of 'Pulp Fiction' and

---

[2] https://www.globenewswire.com/news-release/2021/11/02/2325448/0/en/Quentin-Tarantino-Revealed-as-Iconic-Artist-Behind-First-Ever-Secret-NFTs-Showcasing-Never-Before-Seen-Work-Revealed-Only-to-NFT-Owner.html

exclusive custom commentary from Tarantino, revealing secrets about the film and its creator." Moreover, according to the Press Release, even "[t]he public metadata of the NFT – the 'front cover' of this exclusive content – is rare in its own right." In other words, each of the seven Pulp Fiction NFTs would be "a unique, never-before-seen, public-facing work of art."

39.   Tarantino publicly expressed his excitement around the Pulp Fiction NFTs, and was quoted in the Press Release as being "excited to be presenting these exclusive scenes from PULP FICTION to fans." He also reportedly announced the Pulp Fiction NFTs at the NFT.NYC crypto-art conference in New York City on November 2, 2021.[3]   The substance of the Press Release and Tarantino's announcement were widely reported in the media.

40.   In collaboration with SCRT Labs, Tarantino established a website promoting the Pulp Fiction NFTs: https://tarantinonfts.com/ (the "Website"). The promotional website prominently uses the film's name, "Pulp Fiction," and uses unauthorized images of characters from the film: Jules Winnfield (played by Samuel L. Jackson), Vincent Vega (played by John Travolta), and Mia Wallace (played by Uma Thurman).



---

[3] https://news.artnet.com/art-world/quentin-tarantino-is-minting-seven-pulp-fiction-scenes-as-nfts-that-will-reveal-secrets-about-his-vision-for-the-film-2029816

 

41.   According to the Website, "[t]he collection holds secrets from Pulp Fiction, one of the most influencing artworks of the '90s.  Each NFT contains one or more previously unknown secrets of a specific iconic scene from Pulp Fiction. The privileged person who will purchase one of these few and rare NFTs will get a hold of those secrets and a glimpse into the mind and the creative process of Quentin Tarantino."   The site notes that Tarantino "is enamored with Pulp Fiction – a timeless creation, and as such wanted to give the public a new glimpse into the iconic scenes of the film."

42.   In short, Defendants seek to capitalize, unilaterally, on Miramax's rights to *Pulp Fiction*.  Defendants' infringing acts have caused and are likely to cause confusion, mistake, and deception among the relevant consuming public as to the source of the Pulp Fiction NFTs, and have deceived and are likely to deceive the relevant consuming public into believing, mistakenly, that the Pulp Fiction NFTs originate from, are associated or affiliated with, or are otherwise authorized by Miramax.

**TARANTINO'S REFUSAL TO STOP THE UNLAWFUL CONDUCT**

43.   On November 4, 2021, Miramax sent a cease and desist letter to Tarantino asserting, *inter alia*, Miramax's rights (subject only to Tarantino's Reserved Rights) in *Pulp Fiction*, including, without limitation, all versions of the screenplay (including all scenes and elements thereof, regardless of whether they were filmed and/or incorporated into the film) (the "Cease & Desist Letter").  The

Cease & Desist Letter also put Tarantino on notice that his purported licensing of rights to develop and sell the Pulp Fiction NFTs constitutes a material breach of the Original Rights Agreement, as well as copyright infringement.

44.    In the Cease & Desist Letter, Miramax demanded that Tarantino (i) immediately discontinue and terminate any and all efforts to offer and/or make available for sale and/or sell any Pulp Fiction NFTs or any other elements of *Pulp Fiction*, (ii) to the extent that Tarantino has entered into any agreement therefor, that it be immediately withdrawn and terminated, and (iii) issue a public statement that the previously announced launch and sale of the Pulp Fiction NFTs is cancelled and will not proceed.   The Cease & Desist Letter also demanded that Tarantino provide a copy of any agreement(s) entered into by Tarantino relating to the sale of the Pulp Fiction NFTs and confirmation of their termination.

45.    The next day, Tarantino's counsel emailed Miramax, confirming several statements from the Press Release, namely, that the Pulp Fiction NFTs would be a "collection consisting of 7 NFTs, each containing a high-resolution digital scan of Quentin's original handwritten screenplay pages for a single scene from his screenplay for Pulp Fiction."

46.    According to Tarantino's counsel, there would be "no other embellishment or additions to the actual screenplay scans themselves."   However, each NFT will include a "drawing that will be inspired by some element from the scene."   Tarantino's counsel has contended that Tarantino was acting within his "Reserved Rights," specifically the right to "screenplay publication" (which is written in the definition of Tarantino's Reserved Rights as a subset of his "print publication" Reserved Right).   However, the proposed sale of a few original script pages or scenes as an NFT is a one-time transaction, which does not constitute publication, and in any event does not fall within the intended meaning of "print publication" or "screenplay publication."   The right to sell NFTs of such excerpts

of any version of the screenplay to Pulp Fiction is owned and controlled by Miramax.

47.    Days after being told to cease and desist, Tarantino's plans to sell NFTs relating to Miramax's intellectual property intensified and expanded.  On November 11, 2021, a Twitter account for the sale—@TarantinoNFTs—announced, with unauthorized images of characters from *Pulp Fiction*, that the Pulp Fiction NFTs will be sold in December 2021, and that Tarantino will also sell "the Artifacts Collection of up to ten iconic props from Tarantino's films," including "one from Pulp Fiction."

48.    In a tweet claiming that the Artifacts Collection "is curated and directed by" Tarantino, the account uses an animated scene from a different Miramax film, *Kill Bill: Vol. 2*, depicting the character Pai Mei (played by Gordon Liu).



49.    In another tweet, @TarantinoNFTs promotes the sale of Pulp Fiction's "'Royale with Cheese' scene," using a fake Pulp Fiction VHS tape with unauthorized imagery from the film.



50. As of the date of filing of this Complaint, the media continues to report Tarantino's impending release of the *Pulp Fiction* NFTs, and Tarantino and Tarantino's counsel have not complied with the Cease & Desist Letter's demands, necessitating the filing of this lawsuit. Tarantino's conduct may mislead other creators into believing they have rights to exploit Miramax films through NFTs and other emerging technologies, when in fact Miramax holds those rights for its films.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract)

51. Miramax repeats and realleges paragraphs 1 through 50 hereof, as if fully set forth herein.

52. Pursuant to the Original Rights Agreement and the subsequent Tarantino-Miramax Assignment, Tarantino, in exchange for valuable consideration, granted and assigned to Miramax in perpetuity throughout the universe, "all rights (including all copyrights and trademarks) in and to the Film (and all elements

thereof in all stages of development and production) now or hereafter known including without limitation the right to distribute the Film in all media now or hereafter known (theatrical, non-theatrical, all forms of television, home video, etc.)," excluding only a limited set of Tarantino's "Reserved Rights."

53.  Those grants and assignments prohibit Defendants from exploiting or licensing those same rights to develop and sell the Pulp Fiction NFTs.  Miramax has been damaged and will continue to sustain damages from Defendants' exploitation of rights to *Pulp Fiction* that belong to Miramax.  Defendants' conduct in connection with the development and sale of the Pulp Fiction NFTs is a substantial factor in causing Miramax's harm.

## SECOND CLAIM FOR RELIEF

### (Copyright Infringement Under 17 U.S.C. § 501)

54.  Miramax repeats and realleges paragraphs 1 through 53 hereof, as if fully set forth herein.

55.  The finished motion picture *Pulp Fiction* and all elements thereof in all stages of development and production are all original works containing copyrightable subject matter for which copyright protection exists under the Copyright Act, 17 U.S.C. § 101, et. seq.  Except for Tarantino's limited set of Reserved Rights, Miramax is the exclusive owner of rights under copyright in and to the motion picture *Pulp Fiction*, and all elements thereof in all stages of development and production.  Miramax owns copyrights in and to *Pulp Fiction* (and, pursuant to the Original Rights Agreement and the Tarantino-Miramax Assignment, "all elements thereof in all stages of development and production"), including, without limitation, the registered United States copyrights thereto with U.S. Copyright Office registration numbers PA0000704507 and VA0001224051, and the copyrights assigned to Miramax in the Tarantino-Miramax Assignment and the B25 Instrument of Transfer, which are recorded with the U.S. Copyright Office as document numbers V2917P169 and V3005P270, respectively.

56. Through Defendants' conduct alleged herein, including Defendants' sale of rights relating to *Pulp Fiction*, and preparation and reproduction of derivative works based on *Pulp Fiction* without Miramax's permission, Defendants have directly infringed Miramax's exclusive rights in *Pulp Fiction* and the elements thereof in violation of Section 501 of the Copyright Act, 17 U.S.C. § 501.

57. Defendants' infringing conduct alleged herein was and continues to be willful and with full knowledge of Miramax's rights relating to *Pulp Fiction*, and has enabled Defendants illegally to obtain profit therefrom.

58. As a direct and proximate result of Defendants' infringing conduct alleged herein, Miramax has been harmed and is entitled to damages in an amount to be proven at trial. Pursuant to 17 U.S.C. § 504(b), Miramax is also entitled to recovery of Defendants' profits attributable to Defendants' infringing conduct alleged herein, including from any and all sales of products incorporating or embodying the copyrighted work, and an accounting of and a constructive trust with respect to such profits.

59. Alternatively, Miramax is entitled to the maximum statutory damages pursuant to 17 U.S.C. § 504(c) for Defendants' willful infringing conduct, and for such other amount as may be proper pursuant to 17 U.S.C. § 504(c).

60. As a direct and proximate result of the Defendants' infringing conduct alleged herein, Miramax has sustained and will continue to sustain substantial, immediate, and irreparable injury, for which there is no adequate remedy at law. On information and belief, unless Defendants' infringing conduct is enjoined by this Court, Defendants will continue to infringe the copyrighted work. Miramax therefore is entitled to permanent injunctive relief restraining and enjoining Defendants' ongoing infringing conduct.

**THIRD CLAIM FOR RELIEF**

**(Trademark Infringement Under 15 U.S.C. § 1114)**

61.    Miramax repeats and realleges paragraphs 1 through 60 hereof, as if fully set forth herein.

62.    Defendants' unauthorized use of the Pulp Fiction Mark alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of the Pulp Fiction NFTs, and is likely to cause consumers to believe, contrary to fact, that the Pulp Fiction NFTs are sold, authorized, endorsed, or sponsored by Miramax, or that Defendants are in some way affiliated with or sponsored by Miramax.    Defendants' conduct therefore constitutes trademark infringement in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

63.    Upon information and belief, Defendants have committed the foregoing acts of infringement with full knowledge of Miramax's prior rights in the Pulp Fiction Mark and with the willful intent to cause confusion and trade on Miramax's goodwill.

64.    Defendants' conduct is causing immediate and irreparable harm and injury to Miramax, and to its goodwill and reputation, and will continue to both damage Miramax and confuse the public unless enjoined by this court.    Miramax has no adequate remedy at law.

65.    Miramax is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

**FOURTH CLAIM FOR RELIEF**

**(Unfair Competition Under 15 U.S.C. § 1125(a))**

66.    Miramax repeats and realleges paragraphs 1 through 65 hereof, as if fully set forth herein.

67.   Defendants' unauthorized use of the Pulp Fiction Mark alleged herein is likely to deceive consumers as to the origin, source, sponsorship, or affiliation of the Pulp Fiction NFTs, and is likely to cause consumers to believe, contrary to fact, that the Pulp Fiction NFTs are sold, authorized, endorsed, or sponsored by Miramax, or that Defendants are in some way affiliated with or sponsored by Miramax.

68.   Defendants' unauthorized use in commerce of the Pulp Fiction Mark as alleged herein constitutes use of a false designation of origin and misleading description and representation of fact.

69.   Upon information and belief, Defendants' conduct as alleged herein is willful and is intended to and is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of Defendants with Miramax.

70.   Defendants' conduct as alleged herein constitutes unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

71.   Defendants' conduct is causing immediate and irreparable harm and injury to Miramax, and to its goodwill and reputation, and will continue to both damage Miramax and confuse the public unless enjoined by this court.  Miramax has no adequate remedy at law.

72.   Miramax is entitled to, among other relief, injunctive relief and an award of actual damages, Defendants' profits, enhanced damages and profits, reasonable attorneys' fees, and costs of the action under Sections 34 and 35 of the Lanham Act, 15 U.S.C. §§ 1116, 1117, together with prejudgment and post-judgment interest.

COMPLAINT

1  **<u>PRAYER FOR RELIEF</u>**

2  WHEREFORE, Plaintiff prays that the Court enter judgment ordering as

3  follows:

4  Damages in an amount to be determined at trial, or (at Miramax's election)

5  the maximum allowable statutory damages and such other amounts as may be

6  proper, together with prejudgment and post-judgment interest;

7  Declaratory relief that Defendants have breached their agreements with

8  Miramax, infringed Miramax's copyrights in and to *Pulp Fiction*, and infringed

9  Miramax's trademark rights in and to *Pulp Fiction*;

10  Injunctive relief preventing further violations of Miramax's rights in and to

11  *Pulp Fiction*;

12  Attorneys' fees;

13  Miramax's costs of suit; and

14  Such other relief as the Court may deem just.

15

16

17

18  Dated:  November 16, 2021     PROSKAUER ROSE LLP
                                  BART H. WILLIAMS
19                                KYLE A. CASAZZA
                                  SETH H. VICTOR
20                                ALYSON C. TOCICKI

21  JEFFREY D. NEUBURGER
    (applying for *pro hac vice*
22  admission)
    WAI L. CHOY
23  (applying for *pro hac vice*
    admission)

24                                By: _____
                                       /s/ Bart. H. Williams
25                                         Bart H. Williams

26                                Attorneys for Plaintiff,
                                  MIRAMAX, LLC

27

28

COMPLAINT

1

## **DEMAND FOR JURY TRIAL**

2          Plaintiff hereby demands a jury trial in the above-entitled action on all claims

3     for relief for which plaintiff is entitled to a trial by jury.

4

5

6

7

8

9     Dated:  November 16, 2021          PROSKAUER ROSE LLP
10                                        BART H. WILLIAMS
                                          KYLE A. CASAZZA
11                                        SETH H. VICTOR
                                          ALYSON C. TOCICKI
12
      JEFFREY D. NEUBURGER
13    (applying for *pro hac vice*
      admission)
14    WAI L. CHOY
      (applying for *pro hac vice*
15    admission)
                                          By:
16                                               /s/ Bart H. Williams
                                                 Bart H. Williams
17
                                          Attorneys for Plaintiff,
18                                        MIRAMAX, LLC

19

20

21

22

23

24

25

26

27

28

COMPLAINT