# Exhibit A

JUL 02 '93 12:24AM MIRAMAX FILMS                P.2





P14237

As of June 23, 1993

VIA FAX:   (310) 280-4411 - LB
            (310) 545-6184 - MS (h)
            (310) 859-4115 - MS (o)
            (310) 205-6990 - CG

Mike Simpson
William Morris Agency
151 El Camino Drive
Beverly Hills, CA 90212

RE:   PULP FICTION (the "Film")

Dear Mike:

When fully executed, the following will confirm the agreement of Quentin Tarantino ("Tarantino") and Lawrence Bender ("Bender") (Tarantino and Bender are collectively referred to herein as "Producer") on the one hand and Miramax Film Corp. ("Miramax") on the other relating to the production and financing of the Film and the acquisition by Miramax of the Film on the terms and conditions set forth below.

1.    The Film:   The motion picture PULP FICTION, to be produced by Producer in color, 35mm, in the English language, in the 2.35:1 aspect ratio conforming to the specifications set forth herein and containing the elements required hereunder.

2.    Grant of Rights:   The rights granted to Miramax herein are hereinafter referred to as the "Rights". Producer hereby grants to Miramax for the "Territory" and "Term" (both defined below) all rights (including all copyrights and trademarks) in and to the Film (and all elements thereof in all stages of development and production) now or hereafter known including without limitation the right to distribute the Film in all media now or hereafter known (theatrical, non-

theatrical, all forms of television, home video, etc.) but excluding only the
following rights ("Reserved Rights") which are reserved to Tarantino: soundtrack
album, music publishing, live performance, print publication (including without
limitation screenplay publication, "making of" books, comic books and
novelization, in audio and electronic formats as well, as applicable), interactive
media, theatrical and television sequel and remake rights, and television series and
spinoff rights. Exercise of certain of the Reserved Rights is subject to restrictions
set forth elsewhere in this agreement. Tarantino shall have the right to use the title
of the Film in connection with the exploitation of the Reserved Rights. For the
purpose of this agreement, "interactive media" means any interactive device or
mechanism, such as a computer game based on the Film, which may include
literary or character elements used in the Film but shall not be a substantial
replication or viewing of the Film. Interactive media rights, if not hereafter
acquired by Miramax, shall be subject to a holdback to be negotiated in good faith,
with a particular view to avoiding competition with home video. Miramax may
publish for promotional purposes excerpts up to 7500 words from the screenplay
on a not-for-sale basis.

3.    Territory:    Universe.

4.    Term:    Perpetuity.

5.    Minimum Guarantee/Negative Cost:    In consideration of the aforesaid grant
of rights, Miramax agrees to pay on "Delivery" (defined below) an amount (the
"Minimum Guarantee") equal to the lesser of the actual cost and 100% of the
Film's "Approved Budget" (defined below), which in no event shall exceed
$10,000,000 including contingency, bond and the following items to be added
hereafter to the budget previously submitted to and approved by Miramax:
financing charges (including bank legal fees), interest, the TriStar rights payment
in an amount not to exceed $135,000 plus interest thereon and an amount not to
exceed $100,000 for overhead of Jersey Films allocated to the project by TriStar,
and the reasonable cost of the administration and payment of all fees, expenses and
taxes associated with maintaining and dissolving the shell production services
entity until the earlier of its dissolution by Producer and six months after Delivery.
Producer shall use best efforts to cause TriStar to reduce the Jersey Films overhead
allocation. The payment of the Minimum Guarantee shall be secured either (at

Miramax's sole discretion) by a "bankable" letter of credit or a "bankable" corporate guarantee in the amount of the Approved Budget.

6.     Cross Collateralization:   All proceeds derived from the Rights in all parts of the Territory are fully cross collateralized.

7.     Application of Gross Receipts:   "Gross Receipts" from all sources other than U.S. home video shall mean all sums received by or credited to Miramax and earned from the exploitation of the Rights. "Gross Receipts" with respect to U.S. home video is defined in paragraph 11 hereof. Non-returnable sums shall be deemed earned when received by Miramax. Gross Receipts shall be applied as follows: First to the payment of Distribution Fees; next to the recoupment of Distribution Expenses; next to the recoupment of the Minimum Guarantee with interest thereon (charged at prime + 2 percentage points). The balance remaining (the "Back End") shall be split 50% to Producer and 50% to Miramax. Profit participations will be borne out of the Back End in accordance with paragraph 24 hereof.

8.     Merchandising:   Any item to be merchandised directly or indirectly by Miramax shall be pre-approved by Producer, such approval not to be unreasonably withheld. In the event Producer wants Miramax to enter into a merchandising agreement for any specific item, and Miramax refuses to do so, Producer shall be entitled to enter into such agreement (provided such agreement is not inconsistent with existing merchandising agreements which shall in any event not purport to extinguish Producer's rights under this paragraph) and receive the proceeds therefrom and Miramax shall be entitled to a 25% fee on Producer's non-refundable gross receipts from such exploitation.

9.     Certain Reserved Rights/First and Last:   Miramax shall have the right of first negotiation and last matching rights to any and all deals for soundtrack album, novelization, "making of" books and interactive media. If Miramax does not hereafter acquire those Reserved Rights, Miramax shall receive 25% of Tarantino's non-refundable gross receipts from third party deals for those Reserved Rights, but Miramax's 25% fee for such soundtrack album deals is limited as set forth below. If Tarantino makes a third party novelization or "making of" book deal in accordance herewith, the publisher of the novelization shall have a free license to

Exhibit A
Page 25

use artwork from the Film. As regards soundtrack albums, in the event Miramax is unable to match the creative elements that Tarantino designates (in Tarantino's sole discretion subject to good faith consultation with Miramax), Tarantino may enter into a third party deal. In the event Tarantino receives an advance for the soundtrack album, then once he has spent the budget allocation for songs, Tarantino in his sole discretion may spend all or a portion of such advance on songs for the Film. Any unspent soundtrack album advance shall first be paid to Miramax until such amount paid to Miramax equals the actual amount spent for songs. Thereafter Producer shall pay Miramax a fee of 25% of Producer's non-refundable gross receipts from any royalties or advances in excess of the amounts spent for songs or paid to Miramax pursuant to the preceding sentence. "Songs" as used herein refers to both song compositions and master recordings thereof and for convenience also refers to non-song underscoring.

10.   Distribution Fees: Distribution Fees hereunder shall be:

| U.S. all media (except home video): | 20% |
| U.S. home video: | 25% (calculated on U.S. home video Gross Receipts as defined in paragraph 11 hereof) |
| Canada: | 20% |
| Foreign: | 20% |

For the sake of clarification, Miramax's 20% Distribution Fee shall be calculated "at the source" for media/territories in which Miramax distributes directly and for U.S. theatrical whether or not Miramax uses sub-distributors for U.S. theatrical. In media/territories in which Miramax does not distribute directly (other than U.S. theatrical if Miramax does not distribute directly in such medium), Miramax's 20% Distribution Fee shall be calculated on Gross Receipts received by Miramax (except that with respect to Gross Receipts from U.S. home video Miramax's applicable Distribution fee shall be 25% in accordance with paragraph 11 hereof).

11.   U.S. Home Video:   "Gross Receipts" with respect to U.S. home video shall be deemed to be the following net sum: the wholesale price on all units sold, paid for, and not returned, multiplied by the number of such units, less a reasonable and customary reserve for returns, less the actual home video distributor's fee of up

to 25% of its gross receipts, less the actual home video distributor's expenses including manufacturing, freight, marketing, publicity, collection, and any and all other direct out-of-pocket costs related to the home video exploitation of the Film in the U.S. Miramax's U.S. home video Distribution Fee of 25% set forth in paragraph 10 hereof shall be calculated on such net sum and shall be in addition to the fee of the actual U.S. home video distributor. The actual U.S. home video distributor shall be Buena Vista Home Video, unless Miramax in its sole discretion elects to designate another U.S. home video distributor.

12. Distribution Expenses: Distribution Expenses in connection with the Film shall mean all direct costs and expenses incurred by Miramax in connection with the advertising, promotion, exploitation and distribution of the Film in the Territory, and including without limitation all actual direct out of pocket expenses customarily treated as distribution expenses in the motion picture industry. In the territory outside the U.S. and Canada, Miramax's deductible expenses as sales agent shall not exceed $750,000.

13. Final Cut/Running Time/Audience Screenings: Provided the Film (a) conforms strictly to the Approved Screenplay except for changes authorized under paragraph 14, in the section beginning "Screenplay", and non-material changes due to the exigencies of production, as well as all other specifications set forth herein and contains the elements required hereunder; (b) is completed under Tarantino's supervision as director; and further provided (c) Tarantino is not in continuing material breach hereof; and further (d) subject to the requirements of the completion bond guarantor for the Film; then subject to paragraph 19 hereof, Tarantino shall have final cut of the Film. However, Miramax shall have the right to make cuts ("Miramax Cutting Rights") for standards and practices of free television and airlines (including length requirements), for governmental censorship anywhere in the world, to avoid legal claims, and for an "R" rating in accordance with paragraph 19 hereof. Tarantino shall be offered the opportunity to supervise all such cutting within Miramax's reasonable time frame on notice which is reasonable under the circumstances at no cost to Miramax other than reasonable out-of-pocket expenses including transportation if necessary. Producer shall shoot the entire Approved Screenplay. Producer may deliver the Film to Miramax with a running time not to exceed 2 hours 40 minutes. If requested by Miramax, Producer shall give good faith consideration to, and will meaningfully consult with

\* with respect to free television
and airlines

Miramax about, reducing the running time of the Film, but this process shall not delay acceptance of Delivery of the Film. In any event, except for the Miramax Cutting Rights* as they pertain to length, Tarantino's decision as to length up to 2 hours 40 minutes shall be final. Miramax shall not permit audience polling at recruited and invitational screenings until after the final answer print is delivered. Miramax will not conduct more than three formal recruited audience screenings prior to the answer print being delivered. Producer will be given notice by Miramax of all recruited and invitational screenings held by Miramax, and Producer shall not at any time conduct recruited audience screenings nor paid previews without the prior written consent of Miramax.

14. <u>Production Approvals</u>: Miramax shall have prior approval of all the following elements as well as any replacements or changes suggested by Producer.

| <u>Elements</u> | <u>The following have been pre-approved</u> |
|---|---|
| Screenplay | May 1993, 159 pages. (Except that Quentin Tarantino may make minor revisions that do not materially affect the storyline or characters or increase the Approved Budget. Miramax may not alter screenplay). |
| Number of Shooting Days | 50 days. Subject to completion bond company approval. |
| Approved Budget | June 15, 1993. ($8,537,972) Subject to completion bond company approval. |
| Shooting Locale | Los Angeles and vicinity |
| Writer/Director | Quentin Tarantino |
| Producer | Lawrence Bender |
| Executive Producers | Danny De Vito, Michael Shamberg, Stacey Sher |

| | |
|---|---|
| Cast | Pre-Approved Cast List attached hereto. |
| Completion Bond Company | To be approved by Miramax (including the applicable agreements) |
| Production Lender | To be approved by Miramax (including the applicable agreements) |
| Production Auditor | To be approved by Miramax |
| Interest rate charged by Production Lender | To be approved by Miramax |
| Insurance package (including essential elements) | To be approved by Miramax |
| Production Counsel | Lichter, Grossman & Nichols |

In addition, Miramax shall be afforded full and meaningful consultation regarding any proposed changes to the Screenplay and all material aspects of the production including, but not limited to, production and post-production schedules, access to all pre-production, production and post-production activities, including access to the set, screening of all dailies, rough cuts and (starting with the director's first cut) assemblies, and the selection of crew, production facilities and actors. However, Producer's decision shall be final within the Approved Budget. Producer shall provide Miramax on a regular basis with daily production reports, call sheets, weekly cost reports and such other information as is made available to the bond company.

15. <u>Marketing/Distribution Controls:</u>   Miramax shall have exclusive control over marketing and distribution of the Film. Miramax shall consult with Producer in good faith, beginning at conceptualization and continuing through finalization, regarding the U.S. theatrical and home video marketing and distribution of the Film, the worldwide marketing of the Film, and the theatrical distribution of the Film in any international territories in which Miramax or a related company distributes directly, with Miramax having the right of final decision. Miramax shall pay or reimburse the reasonable business class travel and first class hotel for

July 2, 1993/1:21 AM                7

JUL-14-1993 17:27

Tarantino, Bender and each of the Executive Producers to attend the Cannes Film Festival if the Film is selected for official competition or comparable official screening.

16.   Cast Approval:   Notwithstanding the foregoing and the attached pre-approved cast list, Producer shall cast at least two actors among the roles of 'Jules,' 'Vincent,' 'Butch,' 'Wolf' and 'Mia' of comparable stature to Sean Penn, Harvey Keitel, Gary Oldman, Matt Dillon, Bridget Fonda, Debra Winger and Marisa Tomei.  Miramax agrees to consider in good faith any names not included in the Pre-Approved Cast List suggested by Tarantino and/or Bender and Miramax shall not unreasonably withhold its approval.

17.   Essential Elements:   Bender, Tarantino, and the actors for the roles of "Jules," "Vincent," "Butch," and "Wolf" shall all be absolutely essential elements under the completion bond agreement and for the purposes of production insurance.

18.   Miramax Credits:  In the main titles and in the billing block (or in the case of the logo, adjacent to the billing block) in all paid ads and in all forms of exploitation (including without limitation packaging for videocassettes, soundtrack albums, merchandise and interactive media, and reserved print media) wherever Tarantino and Bender receive credit (except congratulatory or award ads in which Tarantino or Bender are the subject of such congratulation or award):  Miramax logo (first position on screen; use of the Miramax logo in the billing block in connection with Reserved Rights not hereafter acquired by Miramax shall be subject to the approval of the third party distributor exercising such Reserved Rights); "Miramax Films presents" first card on screen and first credit in billing block; and "Richard N. Gladstein, Harvey Weinstein, and Robert Weinstein Co-Executive Producer" credit in the same size and manner as, and in the position immediately prior to, the "Executive Producers" credits.

19.   Rating:   The Film shall be delivered with a rating no more restrictive than "R".  If the initial rating is more restrictive than "R", Tarantino shall recut to an "R" and if he fails or refuses to do so on a timely basis, Miramax shall have the right to recut to an "R".  Acceptance of Delivery by Miramax of an unrated or NC-17 rated version shall not be deemed a waiver of Miramax's right after Delivery to

July 2, 1993/1:21 AM

8

require Tarantino to recut to an "R" or for Miramax to so recut if Tarantino fails or refuses to do so. Rating certificate to be a budgeted cost.

20.   Residuals:   Miramax responsible for SAG and AF of M only, to be treated as a Distribution Expense hereunder. No other guilds to have jurisdiction. Although Tarantino and Roger Avary ("Avary") are not members of the WGA, Miramax, as more fully set forth below, shall pay Tarantino and Avary an amount equal to the WGA residuals Tarantino and Avary would have received if they were WGA members, had worked as a team, the WGA Basic Agreement ("BA") were applicable, and Tarantino and Avary were the sole writers entitled to residuals on the Film. Tarantino and Avary shall share such residuals 50/50. Similarly, although Tarantino is not a member of the DGA, Miramax, as more fully set forth below, shall pay Tarantino an amount equal to the residuals Tarantino would have received if he were a DGA member and the DGA BA were applicable. Notwithstanding anything contained in the WGA and DGA BA's, these WGA and DGA residual type payments with respect to home video exploitation shall be calculated based on a home video royalty equal to 20% of wholesale in accordance with major studio residual practices for affiliated home video distributors, and not actual home video gross receipts. Tarantino and Avary shall only receive such portion of the WGA and DGA residuals as are payable to individual WGA members or, in the case of the DGA residuals, payable to the director of a film. They shall not be entitled to any portion of WGA and DGA residuals payable to the WGA itself and the DGA itself, as opposed to the individual members; or payable to pension, health and welfare funds; or in the case of Tarantino, any amounts payable to job categories under DGA jurisdiction other than the director.

21.   Sequels/Remakes/Series/Spin-Offs:   Miramax shall have a right of first negotiation and matching last refusal. Holdbacks to be negotiated in good faith.

22.   Principal Photography:   It is the essence of this agreement that Producer and Miramax shall use reasonable best efforts to cause principal photography to commence prior to October 15, 1993. If the production loan does not fund on or prior to October 1, 1993, subject to force majeure delays in the aggregate not to exceed eight weeks ("Loan Cut-Off Date"), and provided Producer and each of them have used reasonable best efforts to cause the production loan to fund on or prior to the Loan Cut-Off Date, including without limitation using reasonable best

efforts to cause an approved actor to commit to each of the roles of "Jules",
"Vincent", "Butch" and "Wolf" and once actors are committed to those roles, using
reasonable best efforts to cause an approved actor to commit to each of the other
roles listed on the Pre-Approved Cast List attached hereto for a fee consistent with
the Approved Budget and a profit participation, if any, consistent with paragraph
24 hereof, and using reasonable best efforts to cause a bond company to issue a
completion guarantee in favor of Production Lender, and provided Producer is not
in continuing material breach hereof, then on the date ("Reversion Date") which is
15 calendar days after the date of written notice of the foregoing to Miramax by
Producer, the Rights shall automatically revert to Tarantino, subject to a first
priority lien in favor of Miramax (subject to the TriStar lien, if not previously
extinguished) to secure repayment in an amount equal to all direct costs actually
paid by Miramax in connection with the Film, plus interest thereon at the rate of
prime plus two percentage points (such repayment to be made on the initial
production funding of the project elsewhere, but in any event not later than the
commencement of principal photography), and further subject to the following.
The Reversion Date shall be postponed so long as Miramax advances all necessary
pre-production and production expenses required by Producer until either the
production loan subsequently funds or Miramax makes available to Producer in
escrow an amount equal to the Approved Budget (less all prior advances paid by
Miramax pursuant to paragraph 34 hereof) to enable Producer to produce and
deliver the Film, on or before the date specified in paragraph 23 hereof, in either of
which events there shall be no reversion of the Rights but rather the Rights shall
continue to belong to Miramax.

23.  **Delivery:**  "Delivery" means delivery and acceptance in accordance with a
delivery schedule, to be negotiated in good faith. Producer shall deliver all the
items included in such delivery schedule prior to July 1, 1994. Such date shall be
extended day-for-day by the number of days (if any) after October 15, 1993 on
which principal photography actually starts, as well as customary extension for
events of force majeure. Producer shall use reasonable best efforts to have a
version (which may not be the final mixed version) of the Film ready for screening
at the 1994 Cannes Film Festival. The cost of any delivery items required by
Miramax not included in the Approved Budget will be paid for and treated as a
Distribution Expense by Miramax and will not be bonded. Upon Delivery
Miramax will sign SAG and, if applicable, AF of M assumption agreements.

July 2, 1993/1:21 AM                    10

Exhibit A
Page 32

24.   Profit Participations:   Any profit participation to actors shall be borne 60% by Miramax and 40% by Producer from the Back End (as defined above). The actors shall receive in the aggregate no more than 26% of 100% of the Back End and no one actor shall receive more than 2% of 100% of the Back End. — OK Miramax shall administer and pay directly all actors' and other profit participations consistent herewith as they become due in accordance with the accounting procedures in Miramax's standard net profit definition or a more favorable accounting procedure accorded Producer in the long form agreement. All other third party participations, if any, granted by Producer shall be borne out of Producer's share of the Back End.

25.   Title: PULP FICTION shall be used in all English speaking territories. Miramax shall use reasonable efforts to cause this title to be used by all distributors in other territories and in Italy, reasonable efforts for the title to be "Giallo Fiction." This paragraph is subject to legal clearance of the title in the U.S. and other parts of the Territory. If the title "Pulp Fiction" is not clearable, Tarantino shall propose a title which is legally clearable and Miramax shall accept such title unless Miramax believes in good faith that such title would impair the marketability of the Film whereupon Tarantino shall propose a new title and the process shall repeat. In the event a title is not selected in this manner, Miramax shall have the right to designate a new title at such time as it becomes necessary to do so to meet the exigencies of release.

26.   Video Masters:   Tarantino will supervise video mastering for videocassette and laser disc in both letterboxed and panned and scanned versions, the cost of which shall be included in the Approved Budget.

27.   Press Release:   Producer and Miramax shall have prior advance mutual approval of the press release announcing the Film and all press releases issued prior to Delivery.

28.   Miscellaneous Credits:   The following credits shall appear on screen following the Miramax logo and Miramax presentation card and in the billing block following the Miramax presentation credit:

July 2, 1993/1:21 AM                    11

A Jersey Films Production
in association with
A Band Apart Productions

A Quentin Tarantino Film

"Pulp Fiction"

The following credits will appear on screen at the end of the main titles and at the
end of the billing block:

Executive Producers
Danny DeVito
Michael Shamberg
Stacey Sher

Stories by
Quentin Tarantino
Roger Avary

Produced by
Lawrence Bender

Written and Directed by
Quentin Tarantino

The above credits shall be subject to guild requirements, if any, and the applicable
services and rights agreements for the individuals and entities to be credited, and
will appear on screen each on a separate card and in the billing block of all paid ads
wherein any non-cast credits other than Miramax's logo appears including so-called
"excluded ads" other than award or congratulatory ads featuring only the subject of
the award or congratulation. These credits may not be shared with anyone else,
whether on screen or in paid ads. On screen (if main titles appear at the head of the
Film, which shall be at Tarantino's election) and in paid ads, these credits shall be
presented in the order indicated. In the alternative, at Tarantino's election, the main
titles shall appear at the head of the Film except for "Written and Directed by

Exhibit A
Page 34

Quentin Tarantino" and such credit shall be the first credit in the end credits. In the
further alternative, also at Tarantino's election, the main titles shall appear at the
end of the Film, the order on screen shall be reversed, beginning with Tarantino's
"Written and Directed by" credit, and the occurrence and placement of Tarantino's
possessory credit shall be at Tarantino's option, subject to guild requirements, if
any. Tarantino will designate size and style of credits on screen consistent with
agreements for persons rendering services on the Film, applicable guild restrictions
and the provisions hereof. In paid ads the above credits will be 100% of the
regular title or the Miramax presentation credit in the billing block (whichever is
larger), and no less than 20% of the size of any artwork title. Miramax and
Tarantino shall have mutual approval of any credits which appear in paid ads as
part of the artwork title (other than the Miramax logo and Miramax presentation
credit). If any credit appears in or above the artwork title other than the Miramax
logo and "Miramax Films Presents", Tarantino shall at his option be accorded a
credit in the form "A Quentin Tarantino Film" above the artwork title, size to be
not less than 25% of size of artwork title. Miramax shall notify subdistributors of
the aforesaid credits. No casual or inadvertant failure by Miramax to accord the
foregoing credits, and no failure by anyone else to accord such credits, shall be
deemed a breach hereof. Miramax shall use reasonable efforts to prospectively
cure, and to cause others to prospectively cure, any failure to accord the aforesaid
credits.

29. Remedies/Forum: In the event of any dispute relating to the subject matter
hereof, Producer shall be limited to its remedies at law for monetary damages, if
any, actually sustained by Producer, or an accounting, and Producer agrees that it
shall not be entitled to enjoin the distribution, advertising or exploitation of the
Film or to terminate or rescind this agreement. All disputes arising prior to
acceptance of Delivery by Miramax and at any time regarding cutting rights shall
be submitted exclusively to arbitration in Los Angeles before a single arbitrator
under the then-prevailing expedited rules of the American Arbitration Association
("AAA") with the arbitrator selected at random from the first arbitrator on the then-
current DGA list who is available within seven business days to commence
hearing (and in the absence of an arbitrator from the DGA list who is available on
that time basis, the then-current WGA and SAG lists, in that order, on that time
basis, failing which, the AAA shall appoint a single arbitrator in accordance with
its expedited rules). All other disputes shall be under the exclusive jurisdiction of

July 2, 1993/1:21 AM                    13

the state and federal courts located in Los Angeles County, and the parties hereby consent to the personal jurisdiction of such courts.

30.   Warranties: Representations and warranties customarily included in negotiated long form agreements in the U.S. motion picture industry are hereby incorporated.

31.   Confidentiality:   Producer and Miramax shall maintain the confidentiality of the terms and condition hereof in accordance with a standard confidentiality provision to be negotiated in good faith as part of the long form agreement.

32.   Audit/Accounting:   Producer shall have customary audit rights which shall be subject to good faith negotiations. Accounting provisions shall be negotiated in good faith. Miramax shall have customary rights to audit production costs and the proceeds of Reserved Rights in which Miramax is entitled to share hereunder.

33.   Print:   Subject to customary print loan agreements, Miramax, at its sole cost, shall permanently loan a new 35mm print of the Film to Tarantino and a separate new 35mm print of the Film to Bender.

34.   Pre-Production Costs:   Miramax agrees to advance to Producer $50,000 for pre-production costs upon signature of this agreement, receipt of a copyright mortgage and short form assignment and approval of chain of title. The parties shall negotiate in good faith a cash flow for pre-production expenses prior to the time the Production Lender begins to loan funds to Producer. Any and all pre-production amounts advanced to Producer by Miramax shall be re-paid to Miramax upon the first day Producer is entitled to borrow funds from the Production Lender. All such advances shall be secured by a first priority security interest in favor of Miramax (subject to the TriStar lien, if not previously extinguished).

35.   Pay-or-Play:   At such time as Producer submits to Miramax documentation evidencing a completion bond company's commitment to bond the Film subject only to conditions which are standard for such agreements; a financial institution's commitment to provide production funding subject only to conditions which are standard for such agreements; and notifies Miramax in writing that an

Exhibit A
Page 36

approved actor is committed (pending receipt of a pay-or-play offer) to each of the roles of Jules, Vincent, Butch and Wolf for a fixed fee consistent with the Approved Budget and a profit participation (if any) consistent with paragraph 24 hereof, Miramax shall simultaneously make pay-or-play commitments to all four such actors in accordance herewith and with the Approved Budget. None of such offers shall be conditional on acceptance of another of such offers. Miramax shall thereafter make pay-or-play commitments to actors for each of the other roles listed on the Pre-Approved Cast List as actors for such roles are engaged in accordance herewith.

36.    Theatrical Release:    Miramax will release the Film theatrically (prior to releasing it in any other medium) in a first class manner consistent with other Miramax released films.

37.    Related Companies:    Any agreements between Miramax and related companies will be on an arm's length basis.

38.    Condition Precedent:    It is a condition precedent to Miramax's obligations that Producer furnish chain of title satisfactory to Miramax in its sole judgment including evidence that TriStar has agreed to relinquish all of its rights in and to the project. Miramax shall have seven full business days after execution hereof by Producer to approve or disapprove on written notice chain-of-title for the Film. During such seven business day period, Producer and each of them shall make reasonable best efforts to resolve any questions concerning chain-of-title, including (as appropriate) executing, and causing others to execute, additional and curative chain-of-title documents, if any, approved by Producer's counsel. If Miramax disapproves chain-of-title on written notice within such seven business day period, this agreement shall be null and void. If Miramax fails to approve or disapprove on written notice chain-of-title within such seven business day period, Miramax shall be deemed to have approved chain-of-title. Within three business days after Miramax approves or is deemed to have approved chain-of-title, Miramax shall pay to TriStar the amounts (not to exceed the amounts set forth paragraph 5 hereof) necessary to cause TriStar to relinquish all of its rights in and to the project.

39.    Binding Agreement:    This is a binding agreement. While the parties intend to enter into a more formal agreement incorporating Miramax's standard

terms and conditions, to be negotiated in good faith, if such agreement is not executed for any reason, this letter agreement will continue to be a binding agreement and any omitted provision shall be deemed to be in accordance with the custom and usage of negotiated agreements in the U.S. motion picture industry.

Sincerely yours,

MIRAMAX FILM CORP.

By: Robert Weinstein
Co-Chairman

AGREED AND ACCEPTED:

Lawrence Bender

AGREED AND ACCEPTED:

Quentin Tarantino

Exhibit A
Page 38

terms and conditions, to be negotiated in good faith, if such agreement is not
executed for any reason, this letter agreement will continue to be a binding
agreement and any omitted provision shall be deemed to be in accordance with the
custom and usage of negotiated agreements in the U.S. motion picture industry.

Sincerely yours,

MIRAMAX FILM CORP.

By:   Robert Weinstein
Co-Chairman

AGREED AND ACCEPTED:

Lawrence Bender

AGREED AND ACCEPTED:

Quentin Tarantino

Exhibit A
Page 39

PULP FICTION - PRE-APPROVED CAST LIST

### PUMPKIN:
Tim Roth
Johnny Depp
Christian Slater
Gary Oldman
Nick Cage
Eric Stolz
John Cusack

### HONEY BUNNY:
Amanda Plummer
Patricia Arquette
Lili Taylor
Jennifer Jason Leigh
Bridget Fonda
Phoebe Cates
Marisa Tomei

### VINCENT:
Michael Madsen
John Travolta
Alec Baldwin
Gary Oldman
Jason Patric
Andy Garcia
Michael Keaton
Denzel Washington
Sean Penn
Tim Roth

17

## LANCE:
John Cusack
Eric Stolz
Michael Keaton
Christian Slater
Gary Oldman
Bill Paxton
Johnny Depp
Nick Cage
Sam Jackson

## JODY:
Patricia Arquette
Bridget Fonda
Jennifer Beals
Pam Grier
N'Bussia Wright
Cathy Griffin
Angel Aveles
Sofia Coppola
Jasime Guy
Trya Farrell
Lili Taylor
Jennifer Jason Leigh

## MIA:
Virginia Madsen
Marisa Tomei
Patricia Arquette
Phoebe Cates
Bridget Fonda
Angela Bassett
Debra Winger
Robin Wright
Meg Tilly

18

July 2, 1993/12:55 AM

## JULES:
Larry Fishburn
Sam Jackson
Eddie Murphy
Charles Dutton

## BUTCH:
Matt Dillion
Sean Penn
Nick Cage
Johnny Depp

## FABIAN:
Irene Jacob
Maria de Mederious
Julie Delpy
Emanuel Beart

## THE WOLF:
Harvey Keitel
Warren Beatty
Al Pacino
Danny DeVito
Sam Jackson
Alec Baldwin
Michael Keaton
Christopher Walken
Charles Dutton

19

Exhibit A
Page 42

### KOONS:
Christopher Walken
Sean Penn
Tommy Lee Jones
Michael Parks
William Devane
Sam Jackson
Charles Dutton
Robert De Niro
William Petersen
Al Pacino

### MARCELLUS WALLACE:
Ving Rames
Sam Jackson
Charles Dutton

20

Exhibit A
Page 43

Tarantino & Bender
Prod./Fin./Dist.
PULP FICTION