BART H. WILLIAMS (SBN 134009)
bwilliams@proskauer.com
KYLE A. CASAZZA (SBN 254061)
kcasazza@proskauer.com
SETH H. VICTOR (SBN 329341)
svictor@proskauer.com
ALYSON C. TOCICKI (SBN 336179)
atocicki@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA 90067-3010
Telephone:   (310) 284-4520
Facsimile:   (310) 557-2193

JEFFREY D. NEUBURGER (admitted *pro hac vice*)
jneuburger@proskauer.com
WAI L. CHOY (admitted *pro hac vice*)
wchoy@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:   (212) 969-3000
Facsimile:   (212) 969-2900

Attorneys for Plaintiff,
MIRAMAX, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| MIRAMAX, LLC,<br><br>                     Plaintiff,<br><br>     vs.<br><br>QUENTIN TARANTINO; VISIONA ROMANTICA, INC.; and DOES 1–50,<br><br>                     Defendants. | Case No. 2:21-cv-08979 FMO (JCx)<br><br>**SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS**<br><br>Date: April 12, 2022<br>Time: 9:30 a.m.<br>Place: Courtroom 705, 7th Floor<br>Judge: Hon. Jacqueline Chooljian<br><br>Discovery Cut-Off: August 17, 2022<br>Pretrial Conference: February 10, 2023<br>Trial: February 28, 2023<br><br>[*Filed Concurrently with the Declaration of Kyle A. Casazza in Support of Plaintiff's Supplemental Memorandum of Law*] |

1    Miramax filed this motion to compel because Defendants Quentin Tarantino and Visiona Romantica (Tarantino's loan-out company) are refusing to produce documents about their limited "Reserved Rights" to *Pulp Fiction*. Defendants already waited three months to produce any documents in this case. The documents they have now produced support Miramax's claims, and their unwillingness to produce documents they have admittedly already reviewed is surely out of concern that those documents will further bolster Miramax's claims.

Defendants' document production evidences that Mr. Tarantino's limited and static right to "screenplay publication," on which they claim to rely for minting and selling *Pulp Fiction* NFTs, was deliberately narrowed during the parties' 1993 negotiations. *See* Declaration of Kyle A. Casazza in Support of Plaintiff's Supplemental Memorandum of Law ("Casazza Decl."), Ex. D.

In documents relating to the *Pulp Fiction* NFTs, Defendants have admitted that they have only limited rights to *Pulp Fiction*. Regarding visual elements, they readily acknowledged they "really don't have the legal right to use anything other than the title Pulp Fiction itself – the fanciful designs of the Pulp Fiction lettering and the key art, for example, are owned by Miramax." Casazza Decl., Ex. B. They tried to advise Secret Labs, the company they partnered with on the NFTs, "to stay away from copying anything visual from the movie." *Id.*, Ex. C. Defendants have yet to produce a copy or even a simple photograph of the one NFT that was purportedly sold, or any of the promised "exclusive custom commentary from Tarantino, revealing secrets about the film and its creator," Complaint, ¶ 38, leaving Miramax to guess about the extent to which it and any other potential NFTs infringe Miramax's rights. But there can be no dispute that Defendants and Secret Labs relied heavily on Miramax's rights in promoting the sale of the NFTs, using multiple visual elements from *Pulp Fiction* and promising to reveal "secrets about the film." *See id.* ¶¶ 35-42.

To gather further evidence of Defendants' understanding of Tarantino's limited rights in and to *Pulp Fiction*, Miramax has requested from Defendants (1) "All

1   DOCUMENTS and COMMUNICATIONS CONCERNING any final or draft
2   agreements and draft provisions between YOU and any third parties involving YOUR
3   RESERVED RIGHTS under the [parties' 1993] ORIGINAL RIGHTS
4   AGREEMENT," and (2) "All DOCUMENTS and COMMUNICATIONS
5   CONCERNING any copyrights, trademarks, or other intellectual property rights that
6   YOU contend YOU have CONCERNING Pulp Fiction."

7   Defendants do not dispute there are "prior publication deals involv[ing] the
8   grant of publication rights," but they refuse to produce any documents responsive to
9   either request, claiming that only documents relating to NFT deals would be relevant.
10  Stip. at 8-10.  Defendants also admit that their previous exploitations of Tarantino's
11  limited rights were "all traditional publishing deals granting rights to publish the
12  screenplay in book format, and in one instance, the right to publish the screenplay in
13  book and electronic formats."  *Id.*  Making and selling one-of-a-kind NFTs with
14  handwritten screenplay excerpts is not a "traditional publishing deal" today, and could
15  not have been understood or contemplated to be "screenplay publication" in 1993.
16  Whether Tarantino's limited right to "screenplay publication" allows him to make
17  and sell *Pulp Fiction* NFTs is the crux of this lawsuit, and Miramax is entitled to see
18  all of Defendants' documents from prior deals where that limited right was exploited.

19  **FACTUAL BACKGROUND**

20  Pursuant to the Original Rights Agreement and the subsequent Tarantino-
21  Miramax Assignment, Tarantino, in exchange for valuable consideration, granted and
22  assigned to Miramax in perpetuity throughout the universe, "all rights (including all
23  copyrights and trademarks) in and to the Film (and all elements thereof in all stages
24  of development and production) now or hereafter known including without limitation
25  the right to distribute the Film **in all media now or hereafter known** (theatrical, non-
26  theatrical, all forms of television, home video, etc.)," excluding only a limited set of
27  Tarantino's fixed "Reserved Rights."  Complaint, ¶ 20 (emphasis added).

28  Miramax deliberately narrowed those Reserved Rights and expanded its own

2

rights throughout its negotiations with Tarantino, as shown both in the iterations of the Agreement produced to date and in the ultimately executed documents reflecting Tarantino's acquiescence and agreement. For instance, Tarantino's agent, Mike Simpson, initially proposed a deal structure under which "All rights not expressly granted [to Miramax] are reserved by Quentin Tarantino." *See* Casazza Decl., Ex. D at 37. Miramax rejected that structure, *see id.* at 36, and the parties ultimately agreed to enumerate a static and limited subset of Tarantino's "Reserved Rights," while granting Miramax all other "rights . . . now or hereafter known . . . in all media now or hereafter known." Complaint, ¶ 20. Even then, the Reserved Rights were tapered during negotiations, with the right to "screenplay publication" being narrowed to a mere example of "print publication" by July 1, 1993. *Id.* at 5.

To protect its rights to *Pulp Fiction*, Miramax filed this lawsuit on November 16, 2021. Miramax served document requests a month later, on December 16, 2021. Defendants produced their first documents three months later, on March 16, 2022, and only after being provided Miramax's Local Rule 37 joint stipulation.[1]

Defendants' production to date—a single 1,450-page PDF—is woefully deficient, and Miramax reserves all rights to challenge those deficiencies. Among other things, Miramax has not seen the contents of the *Pulp Fiction* NFT that was purportedly sold, and knows no more than the general public about the plans for future NFT sales. However, this motion concerns only Requests for Production numbers 13 and 24, and Defendants' refusal to produce documents responsive to either request.

## ARGUMENT

Because Defendants contend they have the contractual rights to make and sell the *Pulp Fiction* NFTs at issue in this lawsuit,[2] they should have to produce

---

[1] Defendants objected to Miramax's later revisions to the stipulation, so this is Miramax's first opportunity to address the documents Defendants have produced.

[2] Aside from this lawsuit, in the "NFT Revenue Sharing Agreement" relating to the NFTs at issue, Defendants wrongly represented to their partner in the venture that they had the intellectual property rights "necessary to make and sell the NFTs," and that their use of those rights would not infringe any third-party intellectual property rights. Casazza Decl., Ex. A at 7.

3
SUPPLEMENTAL MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS

documents evidencing their understanding of those contractual rights. Defendants admit that they have entered into "prior publication deals involv[ing] the grant of publication rights," but claim documents about those deals "would only reflect that Tarantino believed that he had rights to publish his Screenplay." Stip. at 9. The flaw in that logic is illustrated by documents in Defendants' production, which explicitly acknowledge the limited scope of Tarantino's rights to *Pulp Fiction* and discuss rights to *Pulp Fiction* that Tarantino does not have (and that belong to Miramax), despite Defendants' belief they have the necessary rights to make and sell the NFTs.

Defendants highlight the core issue in this case by admitting "the requested publishing agreements were all traditional publishing deals granting rights to publish the screenplay in book format, and in one instance, the right to publish the screenplay in book and electronic formats. None of these agreements mention NFTs." Stip. at 10. The limited terminology "screenplay publication," as it was understood in the context of the 1993 Original Rights Agreement, may cover those "traditional publishing deals." By distinguishing those "traditional publishing deals," Defendants necessarily agree that the NFT deal at issue in this case is <u>not</u> a "traditional publishing deal." That alone should be fatal to their defenses in this case, but in any event, Miramax should be able to see documents relating to those deals and the intellectual property rights that Defendants claim to have.

Defendants cite *Ivy Hotel* as support for the proposition that only deals related to NFTs could be relevant. Stip. at 9-10. However, the court in *Ivy Hotel* found that the request at issue was problematic because it would require the defendant "to produce all its files relating to [insurance] policies that <u>do not necessarily include the same provisions</u> as those at issue in this case." *Ivy Hotel San Diego, LLC v. Houston Cas. Co.*, 2011 WL 13240367, at *6 (S.D. Cal. Oct. 20, 2011) (emphasis added). The opposite is true here, as Miramax seeks documents concerning precisely the provision at issue in this case: the exploitation by Defendants of Tarantino's Reserved Rights. Supporting Miramax's position, the court in *Ivy Hotel* noted that documents

1 demonstrating the defendant's "application of the same policy language . . . would be
2 relevant to [the defendant's] intent and interpretation of the Policy." *Id.*

3       Miramax's Request No. 24 similarly relates to understanding Defendants' own interpretation of their rights. Defendants incorrectly assert in the Joint Stipulation they have "clearly and consistently" told Miramax they are relying solely on Defendants' right to publish his screenplay. Stip. at 12. In fact, the opposite is true; in their Answer, Defendants claimed Tarantino's counsel "correctly contended that Tarantino was acting within his 'Reserved Rights', *including* the right to publish" the screenplay. Answer at ¶ 47 (emphasis added). An obvious implication of the word "including" is Defendants are relying on other rights, and Miramax is entitled to probe their interpretation of those rights. If Defendants are willing to concede that they are relying only on the "Reserved Right" to "screenplay publication," Miramax is willing to limit both of its requests at issue to documents relating to that particular right.

      Defendants cannot credibly claim that either request is unduly burdensome or disproportional to the needs of the case. If they concede they are relying only on the "Reserved Right" to "screenplay publication," then Defendants' position from the stipulation demonstrates that they have already identified documents responsive to these requests, and identifying additional documents from their files relating to the rights at issue cannot be any great burden. If they do not make this concession, then Miramax is entitled to understand how Defendants have interpreted any other rights they are relying on in defending this action. Mr. Tarantino has had the same lawyer and agent since before he signed the Original Rights Agreement in 1993 (approaching 30 years), so documents relating to Defendants' interpretations of their intellectual property rights must be accessible. Regarding proportionality, Defendants and Secret Labs claim to have sold a *Pulp Fiction* NFT for $1.1 million, and announced plans to sell six others, so they cannot claim that the costs of reviewing their files are disproportionate to the potential damages in controversy.

| | | |
|---|---|---|
| 1 | Dated: March 29, 2022 | PROSKAUER ROSE LLP<br>BART H. WILLIAMS<br>KYLE A. CASAZZA<br>SETH H. VICTOR<br>ALYSON C. TOCICKI |
| 2 | | |
| 3 | | |
| 4 | JEFFREY D. NEUBURGER<br>(admitted *pro hac vice*)<br>WAI L. CHOY<br>(admitted *pro hac vice*) | |
| 5 | | |
| 6 | | By:   /s/ Bart H. Williams<br>              Bart H. Williams |
| 7 | | |
| 8 | | Attorneys for Plaintiff,<br>MIRAMAX, LLC |