FREEDMAN + TAITELMAN, LLP
Bryan J. Freedman, Esq. (SBN: 151990)
bfreedman@ftllp.com
Jesse A. Kaplan, Esq. (SBN: 255059)
jkaplan@ftllp.com
Theresa Troupson, Esq. (SBN: 301215)
ttroupson@ftllp.com
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Telephone: (310) 201-0005
Facsimile:  (310) 201-0045

IRELL & MANELLA, LLP
David Nimmer, Esq. (SBN: 97170)
dnimmer@irell.com
Connor He-Schaefer, Esq. (SBN: 341545)
che-schaefer@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 203-7079
Facsimile:  (310) 203-199

Attorneys for Defendants Quentin Tarantino
and Visiona Romantica, Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIRAMAX, LLC,<br><br>                    Plaintiff,<br><br>          vs.<br><br>QUENTIN TARANTINO; VISIONA ROMANTICA, INC.; and DOES 1-50,<br><br>                    Defendants. | **Case No. 2:21-cv-08979-FMO-JC**<br><br>[Assigned to Honorable Fernando M. Olguin]<br><br>**DEFENDANTS QUENTIN TARANTINO'S AND VISIONA ROMANTICA, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>[Request for Judicial Notice filed concurrently]<br><br>Date:   July 21, 2022<br>Time:   10:00 a.m.<br>Judge:  Hon. Fernando M. Olguin |

PLEASE TAKE NOTICE THAT defendants Quentin Tarantino and Visiona Romantica, Inc. (collectively "Defendants"), will move this honorable Court on July 21, 2022, at 10:00 a.m. at the United States District Court for the Central District of California, located at 350 W. 1st Street, 6th Floor, Courtroom 6D, Los Angeles, California 90012, before the Honorable Fernando M. Olguin, for Judgment on the Pleadings under Rule 12(c) of the Federal Rules of Civil Procedure as to all claims asserted in the Complaint of plaintiff Miramax, LLC ("Plaintiff").

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which occurred on June 7, 2022.

Dated:  June 21, 2022

IRELL & MANELLA, LLP

By:   /s/ David Nimmer
          David Nimmer
          Connor He-Schaefer
Attorneys for Defendants Quentin
Tarantino and Visiona Romantica, Inc.

FREEDMAN + TAITELMAN, LLP
          Bryan J. Freedman
          Jesse A. Kaplan
          Theresa Troupson
Attorneys for Defendants Quentin
Tarantino and Visiona Romantica, Inc.

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

## **TABLE OF CONTENTS**

I.      INTRODUCTION……………………………………………………1

II.     FACTS ...........................................................................................5

        A.    The Screenplay ......................................................................5

        B.    The Film. ...............................................................................5

        C.    The Tarantino/Miramax Film Assignment Agreement. ........6

        D.    The Film Rights Assignment. ...............................................6

        E.    The Tarantino/Brown 25 Screenplay Assignment Agreement. ...............7

        F.    The Screenplay Assignment. ................................................7

        G.    Brown 25/Miramax Film Assignment Agreement. ...............8

        H.    The NFTs. ...............................................................................9

III.    LEGAL STANDARDS .................................................................10

IV.     ARGUMENT ................................................................................11

        A.    Miramax's Copyright Claim Fails. .....................................11

              1.    The Screenplay Is The Original Underlying Copyrighted Work 11

              2.    The Film Is a Derivative Work Derived from the Screenplay ....13

              3.    No Copyrights To The Screenplay Were Ever Assigned To Miramax ..................14

              4.    Mr. Tarantino Specifically Reserved Rights In The Screenplay.16

              5.    The NFTs Are Derived From The Screenplay, Not The Film ....17

              6.    The NFTs Publish an Electronic Version of the Screenplay .......19

        B.    Miramax's Contract Claim Fails.........................................20

        C.    Miramax's Trademark and Unfair Competition Claims Fail. ...............22

V.      CONCLUSION .............................................................................23

i

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Bobbs-Merrill Co. v. Straus*,
   147 F. 15 (2d Cir. 1906), *aff'd*, 210 U.S. 339(1908) ......................................... 20

*Brown v. Tabb*,
   714 F.2d 1088 (11th Cir. 1983) .................................................................. 20

*Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*,
   462 F.3d 1072 (9th Cir. 2006) ................................................................... 12

*Garcia v. Google, Inc.*,
   786 F.3d 733 (9th Cir. 2015) (*en banc*) ..................................................... 12

*Grandma Moses Properties v. This Week Magazine*,
   117 F. Supp. 348 (S.D.N.Y. 1953) .............................................................. 20

*Kamakazi Music Corp. v. Robbins Music Corp.*,
   522 F. Supp. 125 (S.D.N.Y. 1981) .............................................................. 21

*Khoja v. Orexigen Therapeutics, Inc.*,
   899 F.3d 988 (9th Cir. 2018) ..................................................................... 10

*Konigsberg Intern. Inc. v. Rice*,
   16 F.3d 355 (9th Cir. 1994) ....................................................................... 15

*Oroamerica, Inc. v. D&W Jewelry Co., Inc.*,
   10 Fed. Appx. 516 (9th Cir. 2001) ............................................................... 5

*Palladium Music, Inc. v. EatSleepMusic, Inc.*,
   398 F.3d 1193 (10th Cir. 2005) .................................................................. 12

*Phillips v. Seattle Times Co.*,
   818 F. Supp. 2d 1277 (W.D. Wash. 2011) .................................................. 10

*Radio Television Espanola S.A. v. New World Entertainment, Ltd.*,
   183 F.3d 922 (9th Cir. 1999) ..................................................................... 15

*Ricordi & Co. v. Paramount Pictures*,
   189 F.2d 469 (2d Cir. 1951) ................................................................ 13, 17

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

DocuSign Envelope ID: ACAADD79-F39F-4A47-9383-1F8D92CE8CCA

*Van Buskirk v. Cable News Network, Inc.*,
   284 F.3d 977 (9th Cir. 2002) ................................................................. 10

**Statutes**

15 U.S.C. § 1114 ...................................................................................... 22

15 U.S.C. § 1125(a) .................................................................................. 22

17 U.S.C. § 101 ................................................................................. 13, 20

17 U.S.C. § 102 ................................................................................... 7, 12

17 U.S.C. § 106 ........................................................................................ 13

17 U.S.C. § 204(a) ................................................................................... 15

**Rules**

Fed. R. Civ. P. 12(c) ............................................................................... 10

**Other Authorities**

1 Nimmer on Copyright § 2.10[A] n.8 ..................................................... 12

H.R. Rep. No. 1476, 94th Cong., 2d Sess. 138 (1976) ........................... 20

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

1

**MEMORANDUM OF POINTS AND AUTHORITIES**

2

**I.   INTRODUCTION**

3       This case raises the question whether Quentin Tarantino, the author of the

4   screenplay "Pulp Fiction" (the "Screenplay"), has the right to publish portions of the

5   hand-written version of that Screenplay electronically through the sale of nonfungible

6   tokens ("NFTs"), which provide the purchaser with the ability to access electronic

7   images of the Screenplay.  Miramax claims that such publication of the Screenplay

8   violates copyrights Mr. Tarantino assigned to it in the motion picture PULP FICTION

9   (alternatively the "Film" or the "Picture") that was produced from the Screenplay.

10  Miramax is wrong.

11      Miramax's claims sound principally in copyright.  Although Miramax purports

12  also to assert contract and trademark claims, those claims rise or fall based on the

13  copyright claims.   For example, Miramax does not identify any affirmative

14  contractual obligation that Mr. Tarantino undertook that he failed to fulfill.  Rather,

15  Miramax merely asserts that Mr. Tarantino is wrongfully exercising rights that he

16  allegedly transferred to Miramax and therefore no longer has.  As a matter of law,

17  such claims sound in copyright, not contract.  Moreover, because Mr. Tarantino has

18  not violated Miramax's copyrights, he also has not failed to abide by the contracts as

19  alleged by Miramax.  And Mr. Tarantino expressly reserved the right to use the title

20  "Pulp Fiction" in connection with the exercise of certain rights he reserved under the

21  parties' agreements.   Because Mr. Tarantino's actions do not violate any of

22  Miramax's copyrights in the Film and are merely exercising the rights that he owns,

23  Mr. Tarantino's use of the title "Pulp Fiction" cannot be a trademark infringement or

24  constitute unfair competition.

25      Miramax's copyright claim fails because it misapprehends fundamental

26  principles of copyright law and ignores the clear language of the agreements and

27  assignments between and among Mr. Tarantino, Miramax and Brown 25 Productions,

28  Inc. ("Brown 25"), the motion picture production company that Mr. Tarantino and his

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

producing partner, Lawrence Bender, formed in order to produce and create the Film for delivery to Miramax.  First, Miramax's complaint assumes that an assignment of copyrights in a motion picture encompasses an assignment of exclusive rights in the underlying screenplay for that motion picture.  That turns copyright law on its head.  The screenplay for a film is an original copyrighted work that precedes the motion picture, and exclusive copyrights in the screenplay—including elements like the dialogue, characters, plot and scene descriptions—reside with the author of the screenplay.  The motion picture that is created from the screenplay is a derivative work thereof.  As a result, the copyrights in the motion picture extend only to the new elements of creative expression embodied therein that are not derived directly from the screenplay—including, for example, the specific audio-visual presentation that is fixed in the medium used to capture that presentation (in this case, 35mm film), the actors' interpretations of the characters, and any added music or sound effects.  The owners of the copyright in a motion picture own no exclusive rights in the underlying elements of the screenplay unless those rights are expressly assigned to them.

In its complaint, Miramax does not allege that the copyrights in the **_Screenplay_** were assigned to it.  Nor could it.  The agreements between Mr. Tarantino, Brown 25 and Miramax make clear that the only copyrights assigned to Miramax were in and to the completed **_Film_**.  As a result, Miramax has not alleged a factual basis to claim any exclusive rights in the Screenplay.

Second, even if Miramax could cobble together facts sufficient to allege that the assignment of the copyrights in the Film, under certain circumstances, would also transfer exclusive rights in the underlying Screenplay, such allegations are defeated in this case by the clear language of the agreements themselves.  At every turn, the parties bent over backwards to make clear that Mr. Tarantino was not assigning any rights in the Screenplay to Miramax.  In every relevant agreement and assignment, Mr. Tarantino made clear that he was reserving to himself the exclusive copyright in the underlying Screenplay, separate and apart from the specific assignment of rights

to distribute the Film—including reserving the copyright in "print publication (including without limitation screenplay publication, 'making of' books, comic books and novelization, in audio and *electronic formats as well*, as applicable), interactive media, theatrical and television sequel and remake rights and television and spinoff rights." Compl. at Ex. A [Miramax Letter Agreement dated June 23, 1993 ("Tarantino/Miramax Film Assignment Agreement"), at ¶ 2] (emphasis added); Ex. B [Brown 25 Letter Agreement dated July 10, 1993 ("Tarantino/Brown 25 Screenplay Assignment Agreement"), at ¶ 2]; Ex. D [Brown 25 Letter Agreement dated July 10, 1993 ("Brown 25/Miramax Film Assignment Agreement"), at ¶ 2]; Ex. E [Assignment dated June 23, 1993 ("Film Rights Assignment")]; Ex. F [Short Form Assignment dated September 3, 1993 ("Screenplay Assignment")]. As a result, Miramax was assigned no rights in the Screenplay (which rights cover the Screenplay itself, as well as the dialogue, the characters, the plot and storyline, etc., contained therein) except for the right to exploit those elements *as specifically embodied in the completed Film*. Rights in the Screenplay—including the right to publish the Screenplay itself, to remake a different motion picture using the Screenplay, and to make sequels, television shows and spinoffs using the same characters created in the Screenplay—were reserved to Mr. Tarantino.

The limitations on the assignment granted to Miramax by Mr. Tarantino are clear in the language of each agreement and each assignment. To the extent that Miramax claims that there is any ambiguity in the Tarantino/Miramax Film Assignment Agreement, however, the Brown 25/Miramax Film Assignment Agreement spelled out the limitations on what rights had been transferred to Miramax with exacting specificity, stating that the transfer was limited to "the right to distribute and otherwise exploit the completed Picture," and "did not include any literary rights in the Screenplay, the right to produce a motion picture based on the Screenplay, and/or any rights reserved by Tarantino under Paragraph 2 of the Miramax Agreement." Compl. at Ex. D [Brown 25/Miramax Film Assignment Agreement, at

1   ¶ 2].  Miramax's complaint ignores the plain language of the parties' agreements and

2   assignments.

3          Miramax's complaint thus does not allege facts that could support its copyright

4   claims.  Miramax's purported factual basis for the alleged acts of infringement relies

5   on a press release of November 2, 2021 ("Press Release"), announcing that Mr.

6   Tarantino planned to auction off 7 uncut Pulp Fiction Scenes as Secret NFTs.  The

7   announcement does not suggest that the NFTs will contain any content from the Film.

8   Rather, the announcement makes clear that what was being auctioned was merely "the

9   uncut first handwritten scripts of 'Pulp Fiction' and exclusive custom commentary

10  from Tarantino."  Compl. at ¶ 38.  The Press Release does not suggest that any

11  expression from the Film is connected in any way to the sale.  Miramax also

12  purportedly relies on the website www.tarantinonfts.com ("NFT Website") and

13  factual statements by Mr. Tarantino's counsel as the factual basis for Mr. Tarantino's

14  acts of copyright infringement.  Compl. at ¶ 40-46.  But that website makes clear that

15  the NFTs contain material from and relating to the **Screenplay**, not expression copied

16  from the Film, as confirmed by Mr. Tarantino's counsel.  As the Miramax complaint

17  acknowledges, "Tarantino's counsel emailed Miramax, confirming several statements

18  from the Press Release, namely, that the Pulp Fiction NFTs would be a 'collection

19  consisting of 7 NFTs, each containing a high-resolution digital scan of Quentin's

20  original handwritten screenplay pages for a single scene from his screenplay for Pulp

21  Fiction.'"  Compl. at ¶ 45.  Based solely on the Press Release, the NFT Website, and

22  statements by Mr. Tarantino's counsel, Miramax alleges that by creating electronic

23  images of the original Screenplay, Mr. Tarantino has engaged in "the preparation and

24  reproduction *of derivative works based on [the Film]* without Miramax's

25  permission," which violates Miramax's exclusive rights.  Compl. at ¶ 56.  But that

26  gets the law backwards. The Film is a derivative work created from the Screenplay,

27  not the other way around.  Because Mr. Tarantino never assigned any rights in the

28  Screenplay to Miramax, Miramax's copyright claim fails.

For these reasons, Mr. Tarantino is entitled to judgment on the pleadings as a matter of law.

## II. FACTS

### A. The Screenplay.

Mr. Tarantino is the author of the Pulp Fiction Screenplay, which he completed by May of 1993. Compl. at ¶ 18 and Ex. 1 [Tarantino/Miramax Film Assignment Agreement, ¶ 14]. On October 4, 1993, a copy of the Screenplay was deposited with the Copyright Office, which issued the copyright registration number Pau001810781. Request for Judicial Notice ("RJN"), at Ex. 1.[1] The certificate lists as authors Mr. Tarantino and his co-author Roger Avary. *Id*. A separate version of the Screenplay was registered by Mr. Tarantino as an original literary work in the Copyright Office on April 4, 1995 and was given copyright registration number TX0004031560. RJN at Ex. 2. No assignments of the copyright in the Screenplay to Miramax under either copyright registration have ever been executed by Mr. Tarantino or recorded in the Copyright Office, nor does the Miramax complaint so allege.

### B. The Film.

Between October of 1993 and October of 1994, Brown 25 produced the Film Pulp Fiction, which was based on the Screenplay. Compl. at ¶¶ 17, 18. The Film was directed by Mr. Tarantino, and distributed by Miramax. *Id*. The copyrights in the Film were registered on July 21, 1995, and given copyright registration number PA0000704507. *Id*. ¶ at 33. A prior assignment of future rights to Miramax under the Film Rights Assignment had previously been filed with the Copyright Office on August 6, 1993. *Id*. at ¶ 27.

The Film Pulp Fiction was released in October of 1994 and was an instant critical and commercial success. It won the Palme d'Or at the 1994 Cannes Film

---

[1] This registration for the Screenplay was not attached to the Complaint or referenced therein. However, it is well established that the Court may take judicial notice of registrations issued by the Copyright Office and consider them in the context of a motion to dismiss. *Oroamerica, Inc. v. D&W Jewelry Co., Inc*., 10 Fed. Appx. 516 (9th Cir. 2001) (taking judicial notice of copyright registration).

DocuSign Envelope ID: ACAADD78-E385-4A47-9383-1F8D92CF8CCA

Festival and grossed Miramax hundreds of millions of dollars at the worldwide box office.  Compl. at ¶ 17.  It has become known as one of the most influential films in history.  *Id.*

**C.**     **The Tarantino/Miramax Film Assignment Agreement.**

On June 23, 1993, after the Screenplay was completed and before the Film was created, Mr. Tarantino entered into the Tarantino/Miramax Film Assignment Agreement with Miramax regarding the making and distribution of the motion picture to be created from the Screenplay.  Compl. Ex. A.  Under this agreement, Mr. Tarantino agreed to grant to Miramax:

> … all rights (including all copyrights and trademarks) in and to ***the Film*** … but excluding only the following reserved rights ('Reserved Rights') which are reserved to Tarantino: soundtrack, album, music publishing, live performance, print publication (including without limitation screenplay publication, 'making of' books, comic books and novelization, in audio and electronic formats as well, as applicable), interactive media, theatrical and television sequel and remake rights and television and spinoff rights."

*Id.* at ¶ 2 (emphasis added). The agreement goes on to make clear that Miramax was given no rights in the Screenplay, and provided expressly that "Miramax may not alter screenplay," and would be given only "meaningful consultation regarding any proposed changes to the Screenplay" during the production of the Film, but that the Producer (originally Mr. Tarantino and Lawrence Bender, soon thereafter their company Brown 25) would have final say over the production, including the Screenplay.  *Id.* at ¶ 14.

The Tarantino/Miramax Film Assignment Agreement also makes clear that "Tarantino shall have the right to use the title of the Film in connection with the exploitation of the Reserved Rights."  *Id.* at ¶ 2.

**D.**     **The Film Rights Assignment.**

Also, on June 23, 1993, Mr. Tarantino memorialized the grant of rights by

executing the Film Rights Assignment, which granted to Miramax "the sole and exclusive right under copyright, trademark and otherwise to distribute, exhibit and otherwise exploit all rights (other than the rights reserved to Quentin Tarantino described hereinbelow) in and to **the motion picture** entitled 'Pulp Fiction' …"[2] Compl. Ex. E (emphasis added).  The rights reserved to Mr. Tarantino in the Film Assignment were the same as the reserved Rights identified in the Tarantino/Miramax Film Assignment Agreement.

### E. <u>The Tarantino/Brown 25 Screenplay Assignment Agreement</u>.

On July 10, 1993, by way of the Tarantino/Brown 25 Screenplay Assignment Agreement, Mr. Tarantino assigned certain aspects of the copyrights in and to the underlying Screenplay from which the Film was to be made to Brown 25 Productions. Compl. Ex. B.  This assignment allowed Brown 25 to produce the Film from the Screenplay.  By its terms, it granted to Brown 25 "all rights … in, to, and underlying the original screenplay written by you entitled 'Pulp Fiction' (the 'Screenplay')" except for certain rights reserved by Mr. Tarantino (which are the same Reserved Rights identified in the Tarantino/Miramax Film Assignment Agreement and the Film Assignment), and "those certain distribution rights in the Picture granted to Miramax" under the Tarantino/Miramax Film Assignment Agreement.  *Id.* at ¶ 1.

### F. <u>The Screenplay Assignment</u>.

In accordance with the Tarantino/Brown 25 Screenplay Assignment Agreement, Mr. Tarantino executed the Screenplay Assignment memorializing the limited grant of copyrights in the Screenplay to Brown 25 (as agreed to in the Tarantino/Brown 25 Screenplay Assignment Agreement).  Compl. Ex. F.  No assignment of rights in the Screenplay to Miramax was ever executed because no such

---

[2] At the time the Tarantino/Miramax Film Assignment Agreement and the Film Rights Assignment were executed, the Film had not yet been created.  Because copyrights are not created until a particular work is fixed in a tangible medium, 17 U.S.C. § 102, these agreements involved the transfer of future rights that would only come into existence upon the creation of the Film.

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

assignment was ever agreed upon or contemplated. On October 4, 1993, a copy of the Screenplay was deposited with the Copyright Office, which issued the copyright registration number Pau001810781. RJN at Ex. 1. No further assignments of copyrights in that version of the Screenplay have ever been made or recorded thereafter, nor does the Miramax complaint otherwise allege.

### G. Brown 25/Miramax Film Assignment Agreement.

Also, on July 10, 1993, (the same date as the Tarantino/Brown 25 Screenplay Assignment Agreement), Brown 25 agreed to assign all rights that it would have in and to the completed Film (referred to in this letter agreement as the 'Picture") to Miramax by way of the Brown 25/Miramax Film Assignment Agreement. Compl. Ex. D. Specifically, it stated that, "upon [Brown 25's] 'Delivery' of the Picture … Miramax shall acquire all of [Brown 25's] rights in and to the Picture (other than any rights Producer may have in any Tarantino Reserved Rights)." *Id.* at ¶ 4. Not only did the Brown/Miramax Film Assignment Agreement not purport to assign any rights to Miramax in the underlying Screenplay, it expressly acknowledged that no such assignment had ever been made. It stated that,

> It hereby further is acknowledged that, for the avoidance of doubt, the rights granted by Tarantino to Miramax pursuant to the Miramax Agreement are limited to the right to distribute and otherwise exploit the completed Picture as more particularly set forth in the [Tarantino/Miramax Film Assignment Agreement]. **Such grant of rights did not include any literary rights in the Screenplay**, the right to produce a motion picture based on the Screenplay, and/or any rights reserved by Tarantino under Paragraph 2 of the Miramax Agreement …. Accordingly, Miramax acknowledges that the rights granted by Tarantino to [Brown 25] are not inconsistent with the rights granted by Tarantino to Miramax under the Miramax Agreement.

*Id.* at ¶ 2. The Brown 25/Miramax Film Assignment Agreement was counter-signed by Miramax's Executive Vice President, acknowledging the limitations on any transfer of rights to rights in the completed Film. *Id.*

**H.    The NFTs.**

On November 2, 2021, Secret Network (a.k.a. SCRT Labs) issued the Press Release announcing that Mr. Tarantino would be auctioning off several non-fungible tokens (NFTs) containing portions of his original hand-written Screenplay.  Compl. at ¶ 35.  As alleged in Miramax's Complaint, an NFT "is a unique, non-fungible digital asset recorded on a blockchain (a type of distributed ledger) that can represent and certify its owner's right to, and enable its owner to access specific digital content associated with the NFT."  Compl. at ¶ 36.  In the case of the Tarantino NFTs, the Press Release makes clear that the digital content associated with the NFTs include digital images of portion of Mr. Tarantino's original hand-written Screenplay, as well as audio-recordings of Mr. Tarantino sharing his thoughts and secrets about himself and the film he directed.   The press release, which is cited and quoted in the Complaint, notes that each NFT:

> … will include: ***the uncut first handwritten scripts of "Pulp Fiction" and exclusive custom commentary from Tarantino, revealing secrets about the film and its creator.*** The public metadata of the NFT - the "front cover" of this exclusive content - is rare in its own right: a unique, never-before-seen, public-facing work of art.

https://www.globenewswire.com/news-release/2021/11/02/2325448/0/en/Quentin-Tarantino-Revealed-as-Iconic-Artist-Behind-First-Ever-Secret-NFTs-Showcasing-Never-Before-Seen-Work-Revealed-Only-to-NFT-Owner.html.  Compl. at ¶ 38 and n. 2. (emphasis added).

The NFT Website, at www.tarantinonfts.com, which was created to market the sale of the NFT collection, similarly identified the same content associated with the NFTs, as was confirmed by Tarantino's counsel, who indicated that, the NFTs would be a "collection consisting of 7 NFTs, each containing a high-resolution digital scan of Quentin's original handwritten screenplay pages for a single scene from his screenplay for Pulp Fiction."  Compl. at ¶ 45.  As admitted in the Miramax complaint,

1  Mr. Tarantino's counsel also confirmed that there would be, "no other embellishment
2  or additions to the actual screenplay scans themselves." Compl. at ¶ 35.

3      Neither the Press Release nor the NFT Website, nor Mr. Tarantino's counsel's
4  statements suggest in any way that the digital content associated with the NFTs is
5  copied from or in any other way derived from the Film, as opposed to the Screenplay.
6  Miramax's complaint identifies no other source or basis for its claims that the NFTs
7  relate to the Film rather than the Screenplay.

8  **III.  LEGAL STANDARDS**

9      The Court can issue a judgment on the pleadings based on plaintiff's complaint
10  under Fed. R. Civ. P. 12(c). Under the applicable standards, a motion for judgment
11  on the pleadings should be granted where the complaint "lacks a cognizable legal
12  theory, or where the allegations on their face 'show that relief is barred' for some
13  legal reason." *Phillips v. Seattle Times Co.*, 818 F. Supp. 2d 1277, 1283 (W.D. Wash.
14  2011) (quoting *Jones v. Bock*, 549 U.S. 199, 215 (2007)). In assessing whether claims
15  could be upheld based on the pleadings, the Court must accept as true all well-pleaded
16  factual allegations in the complaint, but the Court is "not required to accept as true
17  allegations that are merely conclusory, unwarranted deductions of fact, or
18  unreasonable inferences." *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1008
19  (9th Cir. 2018) (internal quotation marks omitted). "Nor is the Court required to
20  accept 'conclusory legal allegations cast in the form of factual allegations if those
21  conclusions cannot reasonably be drawn from the facts alleged.'" *Phillips*, 818 F.
22  Supp. 2d at 1283 (quoting *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55
23  (9th Cir. 1994)).

24      Moreover, while the Court is typically constrained to the four corners of a
25  complaint, the Court may "consider documents that were referenced extensively in
26  the complaint and were accepted by all parties as authentic." *Van Buskirk v. Cable
27  News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002). Multiple documents were so
28  referenced in the complaint. The complaint extensively refers to and attaches the

DocuSign Envelope ID: ACAADD78-5385-4AA7-8383-1F8D92CF8CCA

Tarantino/Miramax Film Assignment Agreement, the Tarantino/Brown 25 Screenplay Assignment Agreement, the Brown 25/Miramax Film Assignment Agreement, the Film Rights Assignment, and the Screenplay Assignment. The complaint also references and relies upon the NFT Press Release and the NFT Website as the basis of its claims.

## IV.   ARGUMENT

### A.   Miramax's Copyright Claim Fails.

Miramax's complaint fails to allege facts sufficient to sustain its copyright claim, which is based on a fundamental misconception of how copyright law operates. Miramax's misunderstanding of copyright law is highlighted in paragraph 56 of its complaint, where it incorrectly asserts that, "[t]hrough Defendant's conduct alleged herein, including Defendants' sale of rights relating to *Pulp Fiction*, ***and preparation and reproduction <u>of derivative works</u> based on Pulp Fiction*** without Miramax's permission, Defendants have directly infringed Miramax's exclusive rights in *Pulp Fiction* and the elements thereof in violation of Section 501 of the Copyright Act" (emphasis added). This is wrong as a matter of law. Indeed, it is a legal impossibility under copyright law. The images of the Screenplay published through the sale of NFTs are not derivative works of the Film. The Film is, instead, a derivative work of the Screenplay. No copyrights in the Screenplay were ever assigned to Miramax, and Mr. Tarantino reserved all rights in the Screenplay, except the right to create the film Pulp Fiction, which he assigned to Brown 25. As a result, Miramax's copyright claim cannot succeed.

### 1.   The Screenplay Is The Original Underlying Copyrighted Work

The Screenplay, written in early 1993, is an original work that is the subject of its own copyrights. As a matter of first principles, "Copyright protection subsists … in original works of authorship fixed in any tangible medium of expression … from which they can be perceived, reproduced, or otherwise communicated." 17 U.S.C. §

102.   The handwritten Screenplay created by Mr. Tarantino was an original work of authorship fixed in a tangible medium—pen on paper—from which it could be perceived and reproduced.   As such, it is the primary and independent copyrighted work at issue in this case.   17 U.S.C. § 102; *see also Garcia v. Google, Inc.*, 786 F.3d 733, 741 (9th Cir. 2015) (*en banc*) ("[The film] is an audiovisual work that is categorized as a motion picture and is derivative of the script"); *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005) ("a motion picture is a derivative work in relation to the novel or screenplay upon which it is based") (quoting 1 *Nimmer on Copyright* § 2.10[A] n.8, subsequently updated to § 2.10[A][1][b]).   The Screenplay is the further subject of copyright registration numbers Pau001810781 and TX0004031560.

Because the Screenplay is an original work that is the subject of copyright protection, the rights in all copyrightable elements of the Screenplay reside with the author (Mr. Tarantino) unless and until some or all of those rights are expressly assigned or licensed.   While the copyrightable elements in the Screenplay do not include ideas or *scènes à faire*, they do include the specific expression of those ideas. Thus, for example, while the copyright in the Screenplay would not give Mr. Tarantino the exclusive right to every story that involves L.A. gangsters and an attempt to fix a boxing match (and the mayhem that ensues), it does protect the Screenplay itself, as well as the specific expression of the story and characters embodied in his particular script.   These protected expressions include the specific story and plot told in the Screenplay, the dialogue written in the script, the specific characters as they are described in the Screenplay; and any scene direction or action specifically described in the Screenplay.   *See Funky Films, Inc. v. Time Warner Entertainment Co., L.P.*, 462 F.3d 1072, 1077-81 (9th Cir. 2006) (discussing protectable elements of screenplay, including plot, dialogue, characters, and sequence of dramatic events).   The rights in those elements remain with the copyright owner in the Screenplay even if a film is ultimately produced.

DocuSign Envelope ID: ACAADD78-E3B5-4AA7-8383-1F8D92CF8CCA

The Copyright Act gives the author of a screenplay specific exclusive rights in those protected elements, including the right to make and distribute copies of the screenplay itself, the right to make derivative works from that work (*e.g.*, the right to make a film from the screenplay), the right to distribute the work, and the right to perform the work publicly. 17 U.S.C. § 106. Thus, as its author and the original owner of the copyrights, unless and until he assigns some or all of these rights specifically in the Screenplay, Mr. Tarantino has the exclusive right to reproduce and make copies of the Screenplay (electronically or otherwise); to make a movie from the Screenplay; and to write new scripts or stories based on the characters or other elements of the Screenplay.

### 2. The Film Is a Derivative Work Derived from the Screenplay

The Film is a work based on the Screenplay (the preexisting work) and is therefore a derivative work. 17 U.S.C. § 101. Indeed, the Copyright Act specifically notes that Films are derivative works, stating that, "[a] 'derivative work' is a work based upon one or more preexisting works, such as a … motion picture version." *Id.* In this case, there is no question that the Film was created from the characters, stories and dialogue embodied in the Screenplay. The Film is the subject of separate copyright registration numbers PA0000704507 and VA0001224051.

The fact that the Film is a derivative work created from the Screenplay is critical in identifying what rights various parties have in the Screenplay. The creation of a derivative work does not divest any copyrights that an owner has in the underlying Screenplay itself. Nor does it transfer such exclusive rights in the Screenplay to the creator of the Film. Rather, the underlying rights in the original work remain vested in the author (or copyright owner) of that work, and the author of the derivative work owns exclusive rights only in what new and original creative expression has been added in the derivative work.

For example, in *Ricordi & Co. v. Paramount Pictures*, 189 F.2d 469 (2d Cir. 1951), the Second Circuit considered the relative rights in aspects of the opera

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

*Madame Butterfly*.  The opera had been written in 1904 based on a play of the same name.  That play, which was written in 1901, was based on the novel, "Madame Butterfly," which had been written in 1897.  The author of the opera had a license from both the novel's author and the play's author to create the opera.  The author of the opera then sought to make a motion picture version of the opera (yet another derivative work) but was opposed by the owner of the copyright in the novel.  The Second Circuit limited the rights owned by the author of the opera to "what was copyrightable *as a new matter* in its operatic version of the novel."  189 F.2d at 472 (emphasis added).  To create a *film* version of the opera, the author of the opera therefore had to obtain a license from the owner of the copyright of the novel to avoid infringing on the underlying creative expression from the novel.

Applying these principles to this case, any exclusive copyrights in the Film do not extend to the preexisting copyrightable expression in the Screenplay (including the Screenplay itself, the plot and storyline, the characters, the dialogue, etc.); rather they extend only to the new material that has been added to the preexisting work—in this case, for example, the audiovisual images themselves, the musical score, the film editing, and so on. (the "New Matter").  As a result, an assignment of copyrights in the Film does not convey any exclusive rights in the Screenplay (the original, preexisting work), it conveys only exclusive rights in the New Matter.  As a matter of copyright law, in order to prevent Mr. Tarantino from exercising dominion over the Screenplay, Miramax would have to allege that at some point it was assigned rights not *in the Film*, but *in the Screenplay*.  The Miramax complaint makes no such allegation, and the various agreements and assignments attached to the complaint disprove any such contention as a matter of law.

### 3.    No Copyrights To The Screenplay Were Ever Assigned To Miramax

There is no dispute that neither Mr. Tarantino nor any successor in interest ever transferred any exclusive rights in the Screenplay to Miramax.  In order for exclusive

rights in the Screenplay to be transferred, the assignment would have to have been in writing. *See* 17 U.S.C. § 204(a); *Radio Television Espanola S.A. v. New World Entertainment, Ltd.*, 183 F.3d 922, 926 (9th Cir. 1999) ("This court has consistently found copyright license agreements invalid that have not complied with § 204(a)."); *Konigsberg Intern. Inc. v. Rice*, 16 F.3d 355, 356–57 (9th Cir. 1994). Miramax does not identify any documentary transfer of rights to it in the Screenplay in its complaint, and the documents it does identify make clear that no such rights were actually assigned. The Assignment of Copyright, executed by Quentin Tarantino on June 23, 1993 assigns distribution and exploitation rights, "in and to **the motion picture** entitled 'Pulp Fiction' (the 'Work')." Compl. Ex. E. The Tarantino/Miramax Film Assignment Agreement, also dated June 23, 1993, between Mr. Tarantino and Lawrence Bender, on the one hand, and Miramax, on the other hand, by its terms transferred rights solely "in and to **the Film**." Compl. Ex. A at ¶ 2 (emphasis added). It further defined "The Film" as: "The motion picture PULP FICTION, to be produced by Producer in color, 35mm, in the English language, in the 2.35:1 aspect ratio conforming to the specifications set forth herein and containing the elements required hereunder." *Id.* The copyrights in the Screenplay were not conveyed to Miramax under any of the agreements.

Certain copyrights in the Screenplay were instead assigned to Brown 25, a corporation formed for the purpose of making the Film from the Screenplay. By its terms, that assignment granted to Brown 25 "all rights (other than the 'Reserved Rights' set forth below and those certain distribution rights in the motion picture project currently entitled 'Pulp Fiction' (the 'Picture') granted to Miramax Film Corp. … in, to and underlying the original screenplay written by you entitled 'Pulp Fiction' (the 'Screenplay')." Compl. at Ex. F. These documents, each attached to the complaint, make clear that the Screenplay and the Film are separate works, and that the rights to the Screenplay were never assigned to Miramax.

The same day that Mr. Tarantino assigned sufficient rights in the Screenplay to

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

Brown 25 so that it could create the Film, Brown 25 and Miramax also entered into a letter agreement, which confirmed that no rights in the Screenplay had been assigned to Miramax under the Tarantino/Miramax Film Assignment Agreement.  It expressly clarified that:

> It hereby further is acknowledged that, for the avoidance of doubt, the rights granted by Tarantino to Miramax pursuant to the Miramax Agreement are limited to the right to distribute and otherwise exploit the completed Picture as more particularly set forth in the Miramax Agreement.  ***Such grant of rights did not include any literary rights in the Screenplay***, the right to produce a motion picture based on the Screenplay, and/or any rights reserved by Tarantino under Paragraph 2 of the Miramax Agreement ....  Accordingly, Miramax acknowledges that the rights granted by Tarantino to [Brown 25] are not inconsistent with the rights granted by Tarantino to Miramax under the Miramax Agreement.

Compl. at Ex. D.  The Brown Letter Agreement specifically draws the distinction between the rights in the original Screenplay and the derivative work to be created, defined as "the motion picture entitled 'Pulp Fiction' (the 'Picture')."  The Agreement goes on to note that, once the Film (or "Picture") was created and delivered to Miramax, "Miramax shall acquire all of Producer's rights in and ***to the Picture*** (other than any rights Producer may have in any Tarantino Reserved Rights)."  *Id*. at ¶ 4. Under this assignment, Miramax took certain rights to the Film, but was not assigned any rights in the underlying Screenplay.

### 4.    Mr. Tarantino Specifically Reserved Rights In The Screenplay

Even if Miramax could stitch together language from the parties' various agreements that would suggest some ambiguity as to whether the assignment of rights in the Film somehow assigned some aspect of rights in the Screenplay, that ambiguity is foreclosed by the express reservation of rights that Mr. Tarantino made with respect to the Screenplay in each of those agreements.  As a result, there is no question that

1   the rights to the Screenplay were not assigned to Miramax.

2       In each of the operative agreements and assignments, Mr. Tarantino
3   specifically reserved rights in the Screenplay for himself, including rights to: "print
4   publication (including without limitation screenplay publication, 'making of' books,
5   comic books and novelization, in audio and electronic formats as well, as applicable),
6   interactive media, theatrical and television sequel and remake rights and television
7   and spinoff rights."  Compl. Ex. A [Tarantino/Miramax Film Assignment Agreement
8   at ¶ 2]; Ex. B [Tarantino/Brown 25 Screenplay Assignment Agreement at ¶ 2]; Ex. D
9   [Brown 25/Miramax Film Assignment Agreement at ¶ 2]; Ex. E [Film Rights
10  Assignment]; Ex. F [Screenplay Assignment].  Thus, the right to copy and distribute
11  the Screenplay was specifically reserved to Mr. Tarantino, as were other important
12  rights in the Screenplay—including the right to make sequels, television shows, and
13  further derivative works from the Screenplay.

14          **5.     The NFTs Are Derived From The Screenplay, Not The Film**

15      Because Miramax was only assigned rights in the Film, and not in the
16  underlying Screenplay, it has rights only in "what was copyrightable as a new matter"
17  in the Film (excluding the creative expression in the Screenplay).  *Ricordi*, 189 F.2d
18  at 472.  As a result, in order to state a claim for copyright infringement against Mr.
19  Tarantino, Miramax would have to allege that the NFTs in question copy the "New
20  Matter" that was in the Film, but not in the Screenplay.  This would include, for
21  example, clips of the audio-visual work, aspects of the action not contained in the
22  script, particular dramatic performances as recorded on tape, etc.  But Miramax has
23  made no such allegations.  And the documents concerning the NFTs upon which
24  Miramax relies for factual support for its claims make clear that the NFTs do not
25  contain any such material.

26      The primary document relied upon by Miramax in its complaint regarding the
27  nature of the NFTs in question is the Press Release dated November 2, 2021.  But
28  nothing in that Press Release suggests in any way that the content of the NFTs copies

or in any other way makes use of the New Matter from the Film. The complaint's allegations concerning the Press Release make clear that the material is from the Screenplay and/or new audio material—not New Matter original to the Film. The body of the Press Release explicitly promises "'one-of-a-kind' content that had 'never been seen or heard before, . . . includ[ing] **the uncut first handwritten scripts of 'Pulp Fiction'** and exclusive custom commentary from Tarantino, revealing secrets about the film and its creator.'" Compl. at ¶ 38 (emphasis added). Again, nothing in the Press Release states or in any way suggests that the NFTs contain any New Matter from the Film. Instead, it makes clear that the most important parts of the NFTs are the images of the Screenplay—a work in which Miramax was assigned no rights.

Miramax also refers to the NFT Website at www.tarantinonfts.com for the factual basis of its claims. But, once again, nothing to which the Miramax complaint cites on that website suggests that any New Matter from the Film is embodied in the NFTs such that the auction could constitute copyright infringement. Rather the descriptions of the NFTs on the NFT Website and the confirmations of those descriptions by Tarantino's counsel indicate the opposite. The complaint states:

> Tarantino's counsel emailed Miramax, confirming several statements from the Press Release, namely, that the Pulp Fiction NFTs would be a "collection consisting of 7 NFTs, each containing a high-resolution digital scan of Quentin's original handwritten screenplay pages for a single scene from his screenplay for Pulp Fiction."
>
> According to Tarantino's counsel, there would be "no other embellishment or additions to the actual screenplay scans themselves." However, each NFT will include a "drawing that will be inspired by some element from the scene."

Compl. at ¶¶ 45, 46.

Miramax relies on no other sources for the factual basis to support its copyright claims. Because the only allegations in Miramax's complaint make clear that the NFTs do not incorporate any New Matter from the Film over which Miramax could claim copyright ownership, its claims fail as a matter of law.

/ / /

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

### 6. The NFTs Publish an Electronic Version of the Screenplay

As noted above, Miramax's claims founder based on the confluence of two facts: (a) none of the underlying copyrights in the Screenplay were assigned to Miramax, meaning that the Film is a derivative work, and (b) none of the New Material embodied in the Film to qualify it as a derivative work is included in the NFTs. Yet, even if Miramax could claim some rights in the underlying Screenplay from which the Film was created as a result of an assignment of rights in the Film, which it cannot, Miramax's claims would still fail because Mr. Tarantino specifically reserved his rights to publish the Screenplay, and the auction sales of the NFTs are a publication of the Screenplay.

Mr. Tarantino expressly reserved rights in the publication of the Screenplay to himself in the clearest language possible. The Tarantino/Miramax Film Assignment Agreement specifically states that the Tarantino Reserved Rights include the rights to, "print publication (including without limitation screenplay publication, 'making of' books … in audio *and electronic formats as well*, as applicable)." Compl. at Ex. A [Tarantino/Miramax Film Assignment Agreement at ¶ 2] (emphasis added).

Distribution of digital copies of the Screenplay portions by way of NFTs constitutes a publication in an electronic format. As Miramax's own complaint admits, "An NFT (or non-fungible token) is a unique, non-fungible *digital* asset recorded on a blockchain (a type of distributed ledger) that can, as in the case of the Pulp Fiction NFT's, represent and certify its owner's right to, and *enable its owner to access specific digital content* associated with the NFT." Compl. at ¶ 36 (emphasis added). As Miramax's complaint further admits, the digital content associated with the NFTs in this case are copies of "the uncut first handwritten scripts of 'Pulp Fiction' and exclusive custom commentary from Tarantino, revealing secrets about the film and its creator." *Id*. at ¶ 38.

Section 101 of the Copyright Act defines "publication" as "the distribution of copies of a work to the public by sale or other transfer of ownership, or by rental,

lease or lending." 17 U.S.C. § 101. It is well established that the sale of a single copy constitutes publication for the purpose of copyright law. *See Brown v. Tabb*, 714 F.2d 1088 (11th Cir. 1983); *Bobbs-Merrill Co. v. Straus*, 147 F. 15, 19 (2d Cir. 1906), *aff'd*, 210 U.S. 339(1908) ("common-law right is lost by the general publication or unrestricted sale of a single copy"); *Grandma Moses Properties v. This Week Magazine*, 117 F. Supp. 348, 350 (S.D.N.Y. 1953). Indeed, both houses of Congress specifically signaled their intention in this regard: "Under the definition in section 101, a work is 'published' if ***one or more copies*** or phonorecords embodying it are distributed to the public . . . ." H.R. Rep. No. 1476, 94th Cong., 2d Sess. 138 (1976) (emphasis added); S. Rep. No. 473, 94th Cong., 1st Sess. 121 (1975) (same).

The allegations in Miramax's complaint make clear that the primary content associated with the NFTs to be auctioned off to the public consists of electronic copies of "the uncut first handwritten scripts of 'Pulp Fiction.'" Compl. at ¶ 38. There is no question that this constitutes an electronic publication—a distribution of one or more electronic copies—of the Screenplay. Because the rights to print publication were expressly reserved to Mr. Tarantino, this cannot constitute an infringement of Miramax's rights. Similarly, as noted above, there are no allegations in the complaint that the audio recordings of Mr. Tarantino's thoughts on his process of creating Pulp Fiction, or the cover art included in the NFTs, borrow or copy any New Matter from the Film. As a result, Miramax's copyright claim cannot survive.

**B.   Miramax's Contract Claim Fails.**

Miramax's contract claim fails as a matter of law as well. Miramax does not identify any contractual obligation undertaken by Mr. Tarantino that he has failed to satisfy, and the allegation that Mr. Tarantino exercised rights that he assigned to Miramax does not assert a breach of the assignment, but a violation of the copyrights allegedly assigned. Moreover, for the reasons set forth above, Mr. Tarantino's actions exercised rights that were not assigned and/or were reserved expressly within the language of the parties' agreements. As a result, Miramax's contract claims cannot

1    succeed as pled.

2           Copyrights are often the subject of assignments and licenses, and it is axiomatic

3    that those assignment and license contracts govern the rights that the contracting

4    parties possess in the underlying work that is the subject matter of the copyrights at

5    issue.   That does not mean that uses exceeding the terms of those agreements

6    constitute a breach of the assignment or license.  Rather, unless the use violates an

7    express covenant to refrain from a particular use, the violation sounds in copyright,

8    not in contract.  For example, in *Kamakazi Music Corp. v. Robbins Music Corp.*, 522

9    F. Supp. 125 (S.D.N.Y. 1981), the owner of copyrights in the music of Barry Manilow

10   brought an action against a music publisher that was a licensee of the print publication

11   rights in that music.  The plaintiff asserted that the defendant had printed and sold

12   copies of the music after the license had expired, thereby exceeding the terms of the

13   license.   The court was called upon to determine whether the action sounded in

14   copyright or contract.  The court found that "this action arises under the copyright

15   law, in that the complaint is directed against an offending use, and refers to the license

16   agreement only by way of anticipatory replication." *Id.* at 131.

17          In this case, Miramax does not assert that Mr. Tarantino failed to transfer the

18   rights identified in the parties' agreements or violated some express covenant to

19   refrain from particular action.   Rather, Miramax alleges that Mr. Tarantino fully

20   performed under the parties' agreements and transferred certain exclusive rights to

21   Miramax.  The complaint then alleges that Mr. Tarantino's sale of the NFTs violated

22   those exclusive rights that he previously assigned to Miramax.   That is not an

23   allegation of a contractual violation, but an allegation of infringement of copyright.

24   For that reason, the claim should be dismissed.

25          Moreover, as discussed above, Mr. Tarantino's actions in no way violated

26   Miramax's exclusive rights or exceeded rights that were retained by him under the

27   agreements, which assigned to Miramax only the rights in the Film, not in the

28   Screenplay.  That consideration furnishes an independent basis on which Miramax's

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

1   contract claim fails as a matter of law.

2   **C.**     <u>**Miramax's Trademark and Unfair Competition Claims Fail**</u>.

3   Finally, Miramax's trademark and unfair competition claims are similarly

4   deficient. Mr. Tarantino is the author of the Screenplay "Pulp Fiction" and assigned

5   no rights to the trademarks in that work.  To the contrary, he expressly reserved the

6   right to use the title to the Screenplay in association with the exploitation of rights he

7   reserved under the parties' agreements.  As a result, his use of the title "Pulp Fiction"

8   cannot constitute trademark infringement.

9   Miramax's claims for trademark infringement under 15 U.S.C. § 1114 and

10  unfair competition under 15 U.S.C. § 1125(a) are both based on Mr. Tarantino's use

11  of the "Pulp Fiction Mark."  Compl. at ¶¶ 62, 67 (asserting as the basis for both claims

12  that, "Defendants' unauthorized use of the Pulp Fiction Mark alleged herein is likely

13  to deceive consumers as to the origin, source, sponsorship, or affiliation of the Pulp

14  Fiction NFTs, and is likely to cause consumers to believe, contrary to fact, that the

15  Pulp Fiction NFTs are sold, authorized, endorsed, or sponsored by Miramax, or that

16  Defendants are somehow affiliated with or sponsored by Plaintiffs").  But, as

17  explained above, Mr. Tarantino is the author of the Screenplay, and assigned

18  copyrights and trademarks in and to only the Film, not the Screenplay.  Indeed, Mr.

19  Tarantino remains the owner of copyrights in the Screenplay under Copyright Reg.

20  No. Pau001810781.  As a result, he has the right to use the tile of the Screenplay in

21  exploiting his rights thereto.

22  Moreover, as also noted above, Mr. Tarantino expressly reserved his right to

23  use the "Pulp Fiction" title in connection with his reserved rights, including the

24  publication rights in the Screenplay.  Specifically, the Tarantino/Miramax Film

25  Assignment Agreement makes clear that "Tarantino shall have the right to use the title

26  of the Film in connection with the exploitation of the Reserved Rights."  Compl. Ex.

27  A at ¶ 2.  For these reasons, Miramax's trademark and unfair competition claims

28  cannot stand.

1   **V.    <u>CONCLUSION</u>**

2       For the foregoing reasons, Defendants' motion for judgment on the pleadings

3   should be granted.

4

5   Dated:  June 21, 2022

6

7                                       IRELL & MANELLA, LLP

8                                       By:  <u>/s/ David Nimmer</u>
                                            David Nimmer
9                                           Connor He-Schaefer
                                        Attorneys for Defendants Quentin
10                                      Tarantino and Visiona Romantica, Inc.

11                                      FREEDMAN + TAITELMAN, LLP

12

13                                          Bryan J. Freedman
                                            Jesse A. Kaplan
14                                          Theresa Troupson

15                                      Attorneys for Defendants Quentin
                                        Tarantino and Visiona Romantica, Inc.

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANTS' NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS**

# PROOF OF SERVICE

STATE OF CALIFORNIA            ]
                              ] ss.
COUNTY OF LOS ANGELES ]

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 1801 Century Park West, 5th Floor, Los Angeles, CA 90067.

On June 21, 2022, I served the following document(s) **DEFENDANTS QUENTIN TARANTINO'S AND VISIONA ROMANTICA, INC.'S NOTICE OF MOTION AND MOTION FOR JUDGMENT ON THE PLEADINGS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** on the interested parties in this action as follows:

[**X**]  by transmitting via electronic mail the document(s) listed above to the addresses set forth below on this date before 5:30 p.m. from cdavis@ftllp.com to bwilliams@proskauer.com; kcasazza@proskauer.com; svictor@proskauer.com; atocicki@proskauer.com; jneuburger@proskauer.com; and wchoy@proskauer.com. The transmission was completed without error.

| | |
|---|---|
| Bart H. Williams, Esq. | Jeffrey D. Neuburger, Esq. |
| Kyle A. Casazza, Esq, | (Admitted *Pro Hac Vice*) |
| Seth H. Victor, Esq. | Wai L. Choy, Esq. |
| Alyson C. Tocicki, Esq. | (Admitted *Pro Hac Vice*) |
| PROSKAUER ROSE LLP | PROSKAUER ROSE LLP |
| 2029 Century Park East, Suite 2400 | Eleven Times Square |
| Los Angeles, CA 90067-3010 | New York, NY 10036 |
| Telephone: (310) 284-4520 | Telephone: (212) 969-3000 |
| Facsimile: (310) 557-2193 | Facsimile: (212) 969-2900 |
| E-mail: bwilliams@proskauer.com; | E-mail: jneuburger@proskauer.com; |
| kcasazza@proskauer.com; | wchoy@proskauer.com |
| svictor@proskauer.com; | *Attorneys for Plaintiff MIRAMAX, LLC* |
| atocicki@proskauer.com | |
| *Attorneys for Plaintiff MIRAMAX, LLC* | |

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.

Executed on June 21, 2022, at Los Angeles, California.

DocuSigned by:

*Cortni' Davis*

4E06F15E9A69408

_____
Cortni' A. Davis