BART H. WILLIAMS (SBN 134009)
bwilliams@proskauer.com
KYLE A. CASAZZA (SBN 254061)
kcasazza@proskauer.com
SETH H. VICTOR (SBN 329341)
svictor@proskauer.com
ALYSON C. TOCICKI (SBN 336179)
atocicki@proskauer.com
PROSKAUER ROSE LLP
2029 Century Park East, Suite 2400
Los Angeles, CA  90067-3010
Telephone:    (310) 284-4520
Facsimile:    (310) 557-2193

JEFFREY D. NEUBURGER (admitted *pro hac vice*)
jneuburger@proskauer.com
WAI L. CHOY (admitted *pro hac vice*)
wchoy@proskauer.com
PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Telephone:    (212) 969-3000
Facsimile:    (212) 969-2900

Attorneys for Plaintiff,
MIRAMAX, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIRAMAX, LLC,<br><br>               Plaintiff,<br><br>vs.<br><br>QUENTIN TARANTINO; VISIONA ROMANTICA, INC.; and DOES 1–50,<br><br>               Defendants. | Case No. 2:21-cv-08979 FMO (JCx)<br><br>**PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS**<br><br>Date: July 21, 2022<br>Time: 10:00 a.m.<br>Judge: Hon. Fernando M. Olguin<br><br>Discovery Cut-Off: August 17, 2022<br>Pretrial Conference: February 10, 2023<br>Trial:  February 28, 2023<br><br>[*Filed concurrently with the Declaration of Kyle A. Casazza in Support of Miramax's Opposition, Plaintiff's Request for Judicial Notice, and [Proposed] Order Denying Defendants' Motion*] |

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ................................................................................... 3

A.    The 1993 Negotiations and Contractual Dealings ....................................... 3

B.    Defendants' Sale of Unauthorized NFTs ...................................................... 7

LEGAL STANDARD ............................................................................................... 9

ARGUMENT .......................................................................................................... 10

A.    Defendants Are Judicially Estopped From Alleging Any Rights to *Pulp Fiction* in This Litigation Other Than Tarantino's "Reserved Right" to "Screenplay Publication" ............................................................................... 12

B.    Miramax Has Alleged Facts Sufficient to Establish a Claim for Copyright Infringement .............................................................................................. 13

       a.    Miramax Has a Textbook Copyright Infringement Claim .................. 13

           i.    Miramax Alleges Ownership of a Valid Copyright ................. 13

           ii.    Tarantino's "Screenplay Publication" Right Was Intended to Cover Book Versions of the Final Screenplay ......................... 15

           iii.    Any Contractual Ambiguities Would Preclude Resolution on a Motion for Judgment on the Pleadings ..................................... 18

       b.    Miramax Alleges Defendants Copied and Utilized Original Elements From *Pulp Fiction* Belonging to Miramax .......................... 20

C.    Miramax Has Alleged Facts Sufficient to Establish a Claim for Breach of Contract ..................................................................................................... 22

D.    Miramax Has Alleged Facts Sufficient to Establish a Claim for Trademark Infringement and Unfair Competition ............................................................ 23

CONCLUSION ....................................................................................................... 24

i

1

## **<u>TABLE OF AUTHORITIES</u>**

2

**Page(s)**

3

**C**ASES

4

*Adom v. City of Los Angeles*,
    2022 WL 2189516 (C.D. Cal. May 4, 2022) .......................................................... 24

5

6

*Burch v. Premier Homes, LLC*,
    199 Cal. App. 4th 730 (2011) ................................................................... 19

7

8

*Cafasso v. Gen. Dynamics C4 Sys.*,
    637 F.3d 1047 (9th Cir. 2011) ................................................................. 9

9

*Castaneda v. Dura-Vent Corp.*,
    648 F.2d 612 (9th Cir. 1981) ................................................................ 18

10

11

*CBS Broadcasting Inc. v. Counterr Group*,
    2008 WL 11350274 (S.D.N.Y. Aug. 26, 2008) ................................... 23

12

13

*Chavez v. United States*,
    683 F.3d 1102 (9th Cir. 2012) ................................................................. 9

14

15

*Dworkin v. Hustler Magazine, Inc.*,
    867 F.2d 1188 (9th Cir. 1989) ................................................................. 9

16

17

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
    499 U.S. 340 (1991) .............................................................................. 13

18

19

*First Nat. Mortg. Co. v. Fed. Realty Inv. Tr.*,
    631 F.3d 1058 (9th Cir. 2011) ............................................................... 19

20

21

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) (en banc) ................................................ 15

22

23

*Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*,
    887 F.2d 228 (9th Cir. 1989) ................................................................... 9

24

25

*Hal Roach Studios, Inc. v. Richard Feiner & Co.*,
    896 F.2d 1542 (9th Cir. 1989) ................................................................. 9

26

27

*Harris v. County of Orange*,
    682 F.3d 1126 (9th Cir. 2012) ............................................................... 24

28

ii

*Indep. Living Ctr. of S. Cal. v. City of Los Angeles*,
    205 F. Supp. 1105 (C.D. Cal. 2016) ............................................................ 20

*Kamakazi Music Corp. v. Robbins Music Corp.*,
    522 F. Supp. 125 (S.D.N.Y. 1981) ............................................................... 23

*KST Data, Inc. v. Northrop Grumman Sys. Corp.*,
    2019 WL 2619638 (C.D. Cal. Apr. 17, 2019) ............................................ 19

*Lucasfilm Ltd. LLC v. Ren Ventures Ltd.*,
    2018 WL 5310831 (N.D. Cal. June 29, 2018) ........................................... 22

*Monsanto Co. v. PacifiCorp*,
    144 F. App'x 597 (9th Cir. 2005) ............................................................... 18

*Morey v. Vannucci*,
    64 Cal. App. 4th 904 (1998) ....................................................................... 19

*New Hampshire v. Maine*,
    532 U.S. 742 (2001) .................................................................................... 12

*Pinkerton Tobacco Co., LP v. Art Factory AB*,
    2020 WL 8515015 (C.D. Cal. Dec. 24, 2020) ........................................... 19

*S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*,
    74 Cal. App. 4th 1232 (1999) ............................................................... 16, 19

*Stilstaf, Inc. v. CVS Caremark Corp.*,
    669 F.3d 1005 (9th Cir. 2012) .................................................................... 15

*Thomas v. Kent*,
    2019 WL 2590170 (C.D. Cal., May 30, 2019) ..................................... 12, 13

**STATUTES**

17 U.S.C. § 204(a) .............................................................................................. 15

17 U.S.C. § 410 .................................................................................................. 13

Cal. Civ. Code § 1636 ........................................................................................ 15

**OTHER AUTHORITIES**

1 Nimmer on Copyright § 6.05 ............................................................................ 4

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
ON THE PLEADINGS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **INTRODUCTION**

Defendants are roughly half right about the rights to *Pulp Fiction*.  As one of the authors of what would become the blockbuster movie, Quentin Tarantino at one point *had* extensive rights to some elements that ultimately comprised the film.  But he assigned and transferred virtually all of those rights to Miramax in June 1993, carving out only a specifically enumerated, limited set of "Reserved Rights" far narrower than Defendants' 12(c) Motion (the "Motion") suggests.[1]  Shockingly, Defendants try to excuse their infringing behavior through multiple mischaracterizations of the parties' rights, including overlooking dispositive language from the operative agreements in their moving papers.

Defendants omit crucial contractual language in their description of Tarantino's broad grant of rights to Miramax.  Defendants claim that "Mr. Tarantino agreed to grant to Miramax: . . . all rights (including all copyrights and trademarks) in and to ***the Film*** . . . but excluding only the following reserved rights."  Motion, ECF 29, at 6 (alterations and emphasis in original).

However, Defendants' ellipses misleadingly gloss over language that is fatal to their motion.  The actual language of the Original Rights Agreement states that Tarantino granted to Miramax "all rights (including all copyrights and trademarks) in and to the Film ***(and all elements thereof in all stages of development and production) now or hereafter known including without limitation the right to distribute the Film in all media now or hereafter known (theatrical, non-theatrical, all forms of television, home video, etc.)*** but excluding only the following reserved rights."  Complaint, Ex. A, ECF 1-1 ("Original Rights Agreement"), ¶ 2 (emphasis added).  This language, in which Tarantino assigned to Miramax the rights to "all elements" of the Film including "the right to distribute the Film in all media now or hereafter known," illustrates why Defendants' Motion must be denied.  Miramax

---

[1] While not at issue in this Motion, discovery in this case has exposed that the narrowing of Tarantino's reserved rights was at the core of the parties' negotiations back in 1993.

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

acquired broad rights to the *Pulp Fiction* screenplay and other elements of the film, as well as rights to use those elements in new technologies like non-fungible tokens.

Defendants argue that "[a]s a matter of copyright law, in order to prevent Mr. Tarantino from exercising dominion over the Screenplay, Miramax would have to allege that at some point it was assigned rights not **in the Film**, but **in the Screenplay**." Motion at 14. Miramax has alleged precisely that by quoting the complete language Defendants conveniently omit from the Original Rights Agreement and other relevant agreements where Tarantino assigned to Miramax the rights to *Pulp Fiction* "and all elements thereof in all stages of development and production," including "all copyrights and trademarks." Miramax has also alleged that Defendants' sale of Pulp Fiction NFTs incorporated pictures of a handwritten screenplay and other elements of *Pulp Fiction* owned by Miramax—which Defendants billed as "secrets" of the "film"—and that Defendants used visual elements from both *Pulp Fiction* and another Miramax film in their marketing of the NFTs without Miramax's consent. Miramax's allegations are sufficient to support Miramax's claims for copyright infringement, breach of contract, and trademark infringement/unfair competition.

Defendants' arguments rely on an incomplete, misleading factual history of their contractual rights and a strained reading of those limited rights. Put simply, non-fungible tokens, which host and display unique content using blockchain technology, were not (and could not have been) contemplated by the parties in 1993. The reason is simple: *that technology did not exist.* Rather, Tarantino's right to "print publication," a subset of which is "screenplay publication," is naturally understood to account for formats that actually existed at the time the Original Rights Agreement was entered into, namely print and electronic versions of books. While Defendants are trying to use this lawsuit to expand their "screenplay publication" rights, all of their prior "screenplay publication" deals have been "traditional publishing deals" for paper and electronic books of the complete, final screenplay to *Pulp Fiction*.

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

1    The plain meanings of "print publication" and "screenplay publication" in the

2  relevant agreements at the time control interpretation nearly three decades later, and

3  while there should be no question that the relevant agreements prohibit what

4  Defendants did here, any ambiguities or other disputed factual issues make resolution

5  under Rule 12(c) impossible.  In short, Defendants have not met their heavy burden

6  of showing that they are entitled to judgment as a matter of law.  Their Motion must

7  be denied.

8                          **FACTUAL BACKGROUND**

9         A.    The 1993 Negotiations and Contractual Dealings

10    The 1994 Miramax film *Pulp Fiction* was written and directed by Quentin

11  Tarantino, and produced by non-party Lawrence Bender, in collaboration with Brown

12  25 Productions, Inc. ("B25 Productions").  Complaint, ECF 1 ("Complaint"), ¶ 18.

13  The film was also based in part on earlier material written by non-party Roger Avary.

14  Original Rights Agreement, ¶ 12; Request for Judicial Notice, ECF 29-1

15  ("Defendants' RFJN"), Ex. 1 at 1.  To make the film, Tarantino and Bender assigned

16  virtually all of their rights in and to *Pulp Fiction* to Miramax Film Corp., predecessor-

17  in-interest to Miramax.  Complaint, ¶ 19.

18    Effective as of June 23, 1993, Tarantino, Bender, and Miramax entered into the

19  Original Rights Agreement, "relating to the production and financing" of *Pulp Fiction*

20  "and the acquisition by Miramax of the Film."  Original Rights Agreement, ¶ 1;

21  Complaint, ¶ 19.  The Original Rights Agreement defines the "Film" as "[t]he motion

22  picture PULP FICTION, to be produced by [Tarantino and Bender] in color, 35mm,

23  in the English language, in the 2.35:1 aspect ratio conforming to the specifications set

24  forth herein *and containing the elements required hereunder*."   Original Rights

25  Agreement, ¶ 1 (emphasis added).  Some of those "elements" are listed in the Original

26  Rights Agreement, and explicitly include the "Screenplay."  *Id.*, ¶ 14.[2]

27  ────────────────────
28  [2] This kind of arrangement was—and still is—customary in the film industry.  A
    treatise co-authored by one of Defendants' counsel explains: "A motion picture is a
    joint work consisting of a number of contributions by different 'authors,' including

                                        3
─────────────────────────────────────────
PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
                    ON THE PLEADINGS

Under the Original Rights Agreement, Tarantino and Bender granted to Miramax "all rights (including all copyrights and trademarks) in and to the Film (**and all elements thereof in all stages of development and production**)." *Id.*, ¶ 2 (emphasis added). Accordingly, subject only to Tarantino's limited "Reserved Rights" (discussed below), Miramax generally owns the rights to any versions of the *Pulp Fiction* screenplay—including any early handwritten versions or portions thereof. *Id.*; Complaint, ¶¶ 20-21, 46. The broad grant of rights to Miramax was forward-looking and expansive, including "all rights . . . to the Film . . . now or hereafter known including without limitation the right to distribute the Film in all media now or hereafter known." Original Rights Agreement, ¶ 2.

Tarantino carved out for himself only a static, limited, specifically enumerated set of "Reserved Rights," one of which is the right to "print publication." *Id.* The right to "print publication" includes a still-narrower right to "screenplay publication." *Id.* The Original Rights Agreement does not define "print publication" or "screenplay publication." *See generally* Original Rights Agreement. As one of the enumerated "Elements" under the Original Rights Agreement, "Screenplay" is defined: "May 1993, 159 pages." *Id.*, ¶ 14.

After assigning away nearly all his rights in *Pulp Fiction* to Miramax, including most of his rights to the screenplay, as of July 10, 1993, Tarantino and B25 Productions entered into a letter agreement regarding *Pulp Fiction* under which

---

the writer of the screenplay, the director, the photographer, the actors, and, arguably, other contributors such as the set and costume designers, etc. The screenplay (*i.e.*, the script containing the precise dialogue and action) becomes a part of such joint work when it is recast into the audiovisual form of the resulting motion picture." 1 Nimmer on Copyright § 6.05. As noted above, the motion picture *Pulp Fiction* was based in part on Tarantino's screenplay, and also based in part on earlier material written by non-party Roger Avary, which had been previously registered with the U.S. Copyright Office as "Pandemonium Reigned." Original Rights Agreement, ¶ 12; Defendants' RFJN, Ex. 1 at 1. The book version of the screenplay from RFJN, Ex. 2, refutes Defendants' claim that the Pulp Fiction screenplay was completed before the June 23, 1993 effective date of the Original Rights Agreement, by explicitly noting that the screenplay was revised three additional times after that date. *See* Motion at 6; Casazza Decl., ¶ 10 & Ex. I (indicating that the May 1993 version of the screenplay was revised three additional times: August 18, 1993, September 8, 1993, and October 5, 1993).

4

Tarantino granted B25 Productions, in connection with the production of the film, the right to acquire certain of his rights "in, to, and underlying the original screenplay." *See* Complaint, Ex. B, ECF 1-2 ("B25 Agreement"). Both the Original Rights Agreement and B25 Agreement incorporated by reference the then-applicable WGA [Writer's Guild of America] Basic Agreement. Original Rights Agreement, ¶ 20; B25 Agreement ¶¶ 4, 7.[3] Under Paragraph 4 of the B25 Agreement, in which Tarantino represented and warranted that he was the "sole owner and author of the Screenplay," Tarantino also agreed that his representation and warranty would be "subject to the substantive provisions of Article 28 of the WGA Agreement (as if the WGA Agreement applied to [that] agreement)." B25 Agreement, ¶ 4.

Under the operative WGA Agreement, "[t]he term 'screenplay' means the **final script** with individual scenes, full dialogue and camera setups." Declaration of Kyle A. Casazza in Support of Miramax's Opposition ("Casazza Decl."), Ex. A (emphasis added).[4]

Pursuant to the Original Rights Agreement, the transfer of Tarantino's limited rights in the screenplay under the B25 Agreement required Miramax's consent. Complaint, ¶ 23. In a letter to Tarantino's counsel also dated as of July 10, 1993, Miramax consented to Tarantino's "transfer of certain rights" pursuant to the B25 Agreement, subject to the conditions that "nothing contained in the [B25 Agreement] shall diminish or derogate from the rights granted to Miramax under the [Original Rights Agreement]," and "[i]n the event of any conflict between the [B25 Agreement] and the [Original Rights Agreement], the [Original Rights Agreement] shall control." *See* Complaint, Ex. C, ECF 1-3 ("Miramax Limited Consent Letter"). Accordingly, to the extent Tarantino purported to assign rights in the *Pulp Fiction* screenplay to B25 Productions that he had already assigned to Miramax, the assignment to Miramax in the Original Rights Agreement controls. *See id.*

---

[3] While Tarantino was not a WGA member, the agreements memorialized his intent to be treated as one. *See* B25 Agreement, ¶ 7.
[4] The industry definition remains the same today. Casazza Decl., Ex. B.

5

1       In another letter agreement effective as of July 10, 1993, written by B25

2  Productions, Tarantino, Bender, B25 Productions, and Miramax acknowledged that

3  the rights granted by Tarantino to B25 Productions in the B25 Agreement "are not

4  inconsistent with the rights granted by Tarantino to Miramax under the [Original

5  Rights Agreement]." *See* Complaint, Ex. D, ECF 1-4 ("B25 Productions Letter"),

6  ¶ 2.  The B25 Productions Letter noted that while Bender and Tarantino were jointly

7  identified as the "Producer" granting rights under the Original Rights Agreement, "as

8  of the date of the [Original Rights Agreement], as between Tarantino and Bender,

9  Tarantino *was* the sole and exclusive owner of all rights in the Screenplay and the

10  Picture." *Id.*, ¶ 1 (emphasis added).  The B25 Productions Letter acknowledged that

11  upon delivery of *Pulp Fiction* and Miramax Films' related payment, Miramax would

12  "acquire all of [B25 Productions'] rights in and to the Picture (other than any rights

13  [B25 Productions] may have in any Tarantino Reserved Rights) subject to the terms

14  and conditions of the Inter-Party Agreement." *Id.*, ¶ 4.[5]

15       On July 15, 1993, Tarantino executed a notarized assignment dated as of June

16  23, 1993, for the benefit of Miramax, in which Tarantino again assigned to Miramax

17  the

18      sole and exclusive right under copyright, trademark or otherwise to

19      distribute, exhibit and otherwise exploit all rights (other than the [Tarantino
    Reserved Rights]) in and to the motion picture entitled "Pulp Fiction" (the

20      "Work") (and all elements thereof in all stages of development and
    production) now or hereafter known including, without limitation, the right

21      to distribute the Work in all media now or hereafter known (theatrical, non-

22  [5] The B25 Productions Letter incorporates by a reference an "Inter-Party
Agreement, dated as of September 20, 1993, by and among [B25 Productions],

23  Miramax, Film Finances, Inc., and Bank of American National Trust and Savings
Association." B25 Productions Letter at 1. A related "Notice" dated as of

24  September 20, 1993, signed by Bender for B25 Productions, acknowledges that
Miramax acquired "the sole and exclusive right under copyright, trademark or

25  otherwise to distribute, exhibit and otherwise exploit all rights (other than
[Tarantino's "Reserved Rights"]) in and to the motion picture entitled 'Pulp Fiction'

26  (the 'Work') (and all elements thereof in all stages of development and production)
now or hereafter known including, without limitation,, [sic] the right to distribute

27  the Work in all media now or hereafter known (theatrical, nontheatrical, all forms of
television and 'home video' in perpetuity, throughout the Universe, as more

28  particularly set forth and upon and subject to the terms and conditions in the
[Original Rights Agreement]."  Complaint, ¶ 30; Casazza Decl., Ex. C.

theatrical, all forms of television and "home video") in perpetuity, throughout the Universe, as more particularly set forth and upon and subject to the terms and conditions in [the Original Rights Agreement].

Complaint, Ex. E, ECF 1-5 ("Tarantino-Miramax Assignment"). Under the Tarantino-Miramax Assignment, Tarantino also agreed "to secure or cause to be secured all United States copyrights in and to the Work, including renewals thereof, if applicable, and hereby assigns the rights under said renewal copyrights to [Miramax] . . . ." *Id.* The Tarantino-Miramax Assignment was recorded with the U.S. Copyright Office on August 6, 1993 as document number V2917P169. Complaint, ¶ 27.

Prior to this dispute, Defendants' only purported exploitations of Tarantino's Reserved Right to screenplay publication "were all traditional publishing deals granting rights to publish the screenplay in book format, and in one instance, the right to publish the screenplay in book and electronic formats." ECF 25-1 ("Joint Stip.") at 12. The copyright registration related to Exhibit 2 to Defendants' Request for Judicial Notice relates to the 1994 book version of "Pulp Fiction: A Screenplay" published by Hyperion. Defendants' RFJN, Ex. 2 at 2 (listing the "Copyright Claimant" as "Quentin Tarantino c/o Hyperion"); Casazza Decl., Ex. G (identifying Hyperion as a publisher).

### B.    Defendants' Sale of Unauthorized NFTs

On November 2, 2021, eager to cash in on a then-red-hot market for NFTs, Tarantino and Secret Network (a.k.a. SCRT Labs) announced Defendants' plan to "auction off 7 uncut Pulp Fiction Scenes as Secret NFTs." Complaint, ¶¶ 1, 35. The Press Release included a quote from Tarantino himself, expressing his "excite[ment] to be presenting these exclusive scenes from PULP FICTION to fans." Complaint, ¶ 39. These "exclusive scenes from PULP FICTION" were not marketed as complete versions of the final *Pulp Fiction* screenplay. *See generally* Complaint, ¶¶ 38-41. A promotional website for the NFTs (the "Website") also launched, claiming:

> The collection holds secrets from Pulp Fiction, one of the most influencing artworks of the '90s. Each NFT contains one or more previously unknown secrets of a specific iconic scene from Pulp Fiction. The privileged person who will purchase one of these few and rare NFTs will get a hold of those secrets and a glimpse into the mind and the creative process of Quentin Tarantino.

Complaint, ¶¶ 1, 41. The Website noted that Tarantino "is enamored with Pulp Fiction – a timeless creation, and as such wanted to give the public a new glimpse into the iconic scenes of the film." *Id.* The Website prominently used the "Pulp Fiction" name, and included unauthorized likenesses of *Pulp Fiction* characters Jules Winnfield (played by Samuel L. Jackson), Vincent Vega (played by John Travolta), and Mia Wallace (played by Uma Thurman). *See* Complaint, ¶ 40.

Miramax controls the rights to use those characters' likenesses, and never consented to the use of them or any other Miramax-owned elements from *Pulp Fiction* in connection with the NFT sale. Complaint, ¶ 37. Miramax was not even contacted by Tarantino or any of his representatives prior to the November 2, 2021 announcement. *Id.* Shortly after the announcement, Miramax sent a cease-and-desist letter. Complaint, ¶ 43. But days later, misuse of Miramax's intellectual property intensified, as the Twitter account for the NFT sale used not only unauthorized imagery relating to *Pulp Fiction*, but also an animated scene from a different Miramax film. Complaint, ¶¶ 47-48.

To protect its rights to *Pulp Fiction*, Miramax filed this lawsuit on November 16, 2021. In January of 2022, Defendants nonetheless went forth with their auction. On January 24, 2022, SCRT Labs reported that the first of seven NFTs, "Royale with Cheese," sold for $1.1 million to "Secret Network's very first NFT collective."[6] The second NFT, "Pumpkin and Honey Bunny," was posted for sale but was never sold, and there were no reports of that NFT attracting any bids. SCRT Labs instead

---

[6] *See SCRT Labs Announces Triumphant Sale of First Never-Before-Seen-Or-Heard Tarantino NFT for $1.1 Million*, Business Wire (Jan. 24, 2022, 7:00 AM), https://www.businesswire.com/news/home/20220121005513/en/SCRT-Labs-Announces-Triumphant-Sale-of-First-Never-Before-Seen-Or-Heard-Tarantino-NFT-for-1.1-Million.

announced that it was postponing the sale of the remaining six NFTs.[7]

While Defendants have contended that the seven NFTs contain "no other embellishment or additions to the actual screenplay scans themselves," Defendants have maintained that they cannot provide complete copies of the content associated with the NFTs, including the "never . . . seen or heard," "uncut first handwritten scripts of 'Pulp Fiction' and exclusive custom commentary from Tarantino, revealing secrets about the film and its creator." Complaint, ¶ 38; *see* Casazza Decl., ¶ 12.

## **LEGAL STANDARD**

Judgment on the pleadings is appropriate only in rare instances where there are no unresolved issues of fact and the moving party is entitled to judgment as a matter of law. *Hal Roach Studios, Inc. v. Richard Feiner & Co.*, 896 F.2d 1542, 1550 (9th Cir. 1989). Because Rule 12(c) is "functionally identical" to Rule 12(b)(6), the same standard of review applies to motions brought under either rule. *Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, n.4 (9th Cir. 2011) (quoting *Dworkin v. Hustler Magazine, Inc.*, 867 F.2d 1188, 1192 (9th Cir. 1989)). All allegations of fact by the opposing party must be accepted as true and construed in the light most favorable to that party. *Gen. Conf. Corp. of Seventh-Day Adventists v. Seventh-Day Adventist Congregational Church*, 887 F.2d 228, 230 (9th Cir. 1989). It is therefore well-settled that a motion under Rule 12(c) must be denied where there are allegations in the complaint that, if proved, would permit recovery. *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012).

The Motion must be denied here because Defendants' conduct permits recovery on all of Miramax's claims. Defendants have done their best to obfuscate both Miramax's rights and Defendants' conduct. However, Miramax has stated viable claims, and at most, Defendants present contractual ambiguities and factual disputes, which are both fatal to a 12(c) motion.

---

[7] *See* @LegendaoNFT, Twitter (Jan. 28, 2022, 3:59 PM), https://twitter.com/LegendaoNFT/status/1487168591556456448.

1

**ARGUMENT**

2      Defendants' disingenuous motion depends entirely on the false premise that

3   Miramax's rights in and to *Pulp Fiction* go no further than the 154-minute motion

4   picture.  For the first time, Defendants claim that "[n]o copyrights in the Screenplay

5   were ever assigned to Miramax, and Mr. Tarantino reserved **all** rights in the

6   Screenplay, except the right to create the film Pulp Fiction, which he assigned to [B25

7   Productions]," Motion at 11 (emphasis added), but unambiguous contract language

8   contradicts that claim.

9      Since June 1993, Miramax has held "all rights (including all copyrights and

10  trademarks) in and to [*Pulp Fiction*] **(and all elements thereof in all stages of**

11  **development and production)**," subject to Tarantino's limited "Reserved Rights."

12  Original Rights Agreement, ¶ 2 (emphasis added).  The Original Rights Agreement is

13  explicit that the "Screenplay" is one of those many "elements" to which Miramax

14  owns the rights, so Miramax holds virtually all rights to the *Pulp Fiction* screenplay

15  "in all stages of development and production," aside from Tarantino's "Reserved

16  Rights," which include a static right to "print publication" (including "screenplay

17  publication"), as those terms were understood in 1993.  *See id.*, ¶¶ 2, 14.  Unlike

18  Tarantino's "Reserved Rights," the broad grant of rights to Miramax was forward-

19  looking, including "all rights . . . now or hereafter known including without limitation

20  the right to distribute the Film in all media now or hereafter known."  Original Rights

21  Agreement, ¶ 2.  Tarantino's "Reserved Rights," including specifically his right to

22  "print publication," are further restricted by the Original Rights Agreement.  *Id.*[8]

23      After wrongly claiming that Miramax does not have the rights to most elements

24  of *Pulp Fiction*, Defendants then claim, contrary to Miramax's allegations, that

25  "nothing in the Press Release [for the NFT sale] states or in any way suggests that the

26

27  _____

[8] For example, Miramax has its own limited right to screenplay publication for
promotional purposes.  Original Rights Agreement, ¶ 2.  Miramax also has "the

28  right of first negotiation and last matching rights to any and all deals for
. . . novelization, [and] 'making of' books."  *Id.*, ¶ 9.

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT
ON THE PLEADINGS

NFTs contain any New Matter from the Film," and "nothing to which the Miramax complaint cites on [the Pulp Fiction NFT] website suggests that any New Matter from the Film is embodied in the NFTs such that the auction could constitute copyright infringement."  Motion at 18.  The complaint contradicts those claims, and for purposes of a 12(c) motion, Defendants' unverified claim that the NFTs themselves do not utilize elements of *Pulp Fiction* owned by Miramax cannot defeat Miramax's allegations otherwise.[9]  Also, there is no genuine dispute that Defendants' contractual partner in the NFT sale used visual elements of *Pulp Fiction* and footage from another Miramax film in connection with the NFT sale, which is copyright infringement by itself.   Further, even if—contrary to the marketing materials for the NFTs—the NFTs contain literally no elements of *Pulp Fiction* other than scans of some handwritten pages of a draft screenplay, "pen on paper," Motion at 12, Defendants do not have the rights under the Original Rights Agreement to mint and sell digital collectibles based on those images.

Defendants' 12(c) motion is defective as to each of Miramax's claims. Miramax states a textbook copyright infringement claim based on the use of elements of a film Miramax acquired by contract (as well as elements of another Miramax film).  Defendants' breaches of that contract give rise to Miramax's breach of contract claim, and while Defendants have limited rights to use the "Pulp Fiction" mark in connection with authorized uses of Tarantino's "Reserved Rights," Defendants have no such rights in connection with the unauthorized uses here.  Defendants' motion should be denied.

---

[9] Defendants' failure to produce complete copies of the content associated with the NFTs should also preclude Defendants from maintaining—contrary to Miramax's allegations—that the content does not include elements of *Pulp Fiction* owned by Miramax.  *See* Casazza Decl., ¶ 12.

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

A.     Defendants Are Judicially Estopped From Alleging Any Rights to *Pulp Fiction* in This Litigation Other Than Tarantino's "Reserved Right" to "Screenplay Publication"

A party that "assumes a certain position in a legal proceeding, and succeeds in maintaining that position," may not then take a contrary legal position.  *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  A party is judicially estopped from making an argument that contradicts an earlier argument that was the basis for their success.  *See Thomas v. Kent*, 2019 WL 2590170, at \*3 (C.D. Cal., May 30, 2019) (Olguin, J.).

Earlier this year, Defendants successfully evaded production of all documents concerning any intellectual property rights Defendants contend they have in *Pulp Fiction* by claiming that with respect to the Pulp Fiction NFTs, they were relying **only** on the Reserved Right of screenplay publication.[10]  *See* Casazza Decl., Ex. D. Magistrate Judge Chooljian ruled that Miramax was entitled to document discovery only on Defendants' exploitation of their "screenplay publication" right, based on Defendants' representations.

> THE COURT: Okay. So, for part one, the portion of the screenplay, that particular content, the only thing Defendant is relying on is the screen right publication reserved right and, to the extent the title is used, the provision of that which allows Mr. Tarantino to use the title for -- in connection with that dissemination. Is that right?
>
> MR. KAPLAN: That's correct, your Honor.

Casazza Decl., Ex. D at 15:17-24; *see also id.* at 14:16-15:5.

In their 12(c) motion, Defendants repeatedly take a very different position, arguing instead that Miramax has no rights to the *Pulp Fiction* screenplay, and that Tarantino has essentially unfettered control of any copyrights in and to that screenplay.  Specifically, Defendants now claim that Tarantino never assigned "**any** rights in the Screenplay to Miramax," that he has "the exclusive copyright in the

---

[10] Specifically, Miramax requested "All DOCUMENTS and COMMUNICATIONS CONCERNING any copyrights, trademarks, or other intellectual property rights that YOU contend YOU have CONCERNING *Pulp Fiction*." Joint Stip. at 10.

12

underlying Screenplay," that the *Pulp Fiction* screenplay "is the primary and independent copyrighted work at issue in this case," that "No Copyrights To The Screenplay Were Ever Assigned To Miramax," that "neither Mr. Tarantino nor any successor in interest ever transferred **any** exclusive rights in the Screenplay to Miramax," and that "the copyrights in the Screenplay were not conveyed to Miramax under any of the agreements." Motion at 2, 12, 14-16 (emphases added).

These claims are all verifiably false and directly contradicted by documents attached to Miramax's Complaint. But having prevailed by arguing that a limited, "Reserved Right" to "screenplay publication" is the "only thing [Tarantino] is relying on," Defendants are estopped from arguing that a different, broader set of rights excuse their unauthorized conduct. *See, e.g.*, *Thomas*, 2019 WL 2590170 at *3.

     B.    <u>Miramax Has Alleged Facts Sufficient to Establish a Claim for Copyright Infringement</u>

          a.   <u>Miramax Has a Textbook Copyright Infringement Claim</u>

In order to bring an action for copyright infringement, a copyright holder need only allege facts sufficient to demonstrate (1) ownership of a valid copyright and (2) copying of original elements from the protected work. *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991). Miramax has done both.

          i.   <u>Miramax Alleges Ownership of a Valid Copyright</u>

Pursuant to the Original Rights Agreement, and as set forth in the Complaint, Miramax owns "all rights (including all copyrights and trademarks) in and to [*Pulp Fiction*] (**and all elements thereof in all stages of development and production**)." Original Rights Agreement, ¶ 2 (emphasis added); Complaint, ¶ 20 (emphasis added). Again, those elements explicitly include the screenplay. Original Rights Agreement, ¶ 14. Miramax went on to memorialize its rights by, among other things, registering copyrights with the U.S. Copyright Office bearing Registration Numbers PA0000704507 and VA0001224051. Complaint, ¶ 33. These facts alone are sufficient to demonstrate ownership of a valid copyright. *See* 17 U.S.C. § 410. In

13

fact, Defendants do not dispute (nor could they) that these copyrights were validly registered.  *See* Motion at 5.

Defendants oversimplify the parties' rights to *Pulp Fiction* by arguing that Miramax holds only some rights to the finished motion picture, while alleging that Tarantino holds virtually all rights to the screenplay and even rights to make derivative works from elements of the screenplay.  Defendants misleadingly claim that Tarantino granted to Miramax all rights "in and to ***the Film*** . . . but excluding only the following reserved rights."  Motion at 6 (emphasis and alterations in original).  But, that ellipsis omits pertinent contractual language and covers up a key conveyance of rights: Miramax obtained broad rights to "all elements" of *Pulp Fiction*, including "all elements thereof in all stages of development and production."  Original Rights Agreement, ¶ 2.  Tarantino retained limited "Reserved Rights," including to "print publication," but Miramax's rights necessarily include *at least some* rights to the screenplay.  *See* Complaint, ¶ 32.

As a matter of contract interpretation, that must be the case.  Otherwise, Tarantino's reservation of more limited, specific rights makes no sense.  If the parties' intent were for Tarantino to retain the unencumbered copyright to the screenplay, and for Miramax to not have broad rights to that screenplay, then there would have been no reason for Tarantino to reserve more limited and specific rights to "print publication" or "screenplay publication."  The same goes for almost all of Tarantino's Reserved Rights—there would be no need to enumerate them if Tarantino retained broad rights to elements of *Pulp Fiction*.  *See id.*, ¶ 21.

Defendants go on to argue that "[b]ecause the Screenplay is an original work that is the subject of copyright protection, the rights in all copyrightable elements of the Screenplay reside with the author (Mr. Tarantino) **unless and until some or all of those rights are expressly assigned or licensed**."  Motion at 12 (emphasis added).  That assignment is exactly what happened here.  In the Original Rights Agreement, Tarantino expressly granted to Miramax all rights to *Pulp Fiction* "and all elements

14

thereof in all stages of development and production"—*i.e.*, the rights in all copyrightable elements that Tarantino once held.  Original Rights Agreement, ¶ 2. The language of the Original Rights Agreement could not have been more clear, expressly including "all copyrights and trademarks" in those elements in the grant to Miramax.  *Id.*[11]

As a practical matter, this sweeping grant of rights was necessary for the production of the motion picture.  The Ninth Circuit Court of Appeals has recognized this "reality," acknowledging that "contracts . . . govern much of the big-budget Hollywood performance and production world."  *Garcia v. Google, Inc.*, 786 F.3d 733, 743 (9th Cir. 2015) (en banc).  Put another way, contracts—like the Original Rights Agreement here—are necessary to prevent disputes about who owns each and every copyrightable element in a finished work.  Defendants' theory of this case ignores this reality, and instead "make[s] Swiss cheese [out] of copyrights."  *Id.* at 742.

ii. Tarantino's "Screenplay Publication" Right Was Intended to Cover Book Versions of the Final Screenplay

Contracts must be interpreted in line with the parties' intent at the time of contracting.  *See* Cal. Civ. Code § 1636; *see also Stilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1014-15 (9th Cir. 2012) ("Under California law, the fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed *at the time of contracting*.") (emphasis added) (internal quotation marks and citations omitted).  To determine intent, courts routinely look to (1) "the circumstances surrounding formation of the agreements"; (2) "the construction given the contract by the acts and conduct of the parties with knowledge of its terms . . . before any

---

[11] Defendants argue that "for exclusive rights in the screenplay to have been transferred, the assignment would have to have been in writing," and that "Miramax does not identify any documentary transfer of rights to it in the Screenplay in its complaint."  Motion at 15 (citing 17 U.S.C. § 204(a)).  This argument is not true. As set forth throughout the Complaint, Tarantino transferred most of his rights in the screenplay to Miramax, *in writing*, in the Original Rights Agreement.

1  controversy arises as to its meaning"; and (3) "trade usage and custom or standard of

2  the industry."  *S. Pac. Transp. Co. v. Santa Fe Pac. Pipelines, Inc.*, 74 Cal. App. 4th

3  1232, 1242 (1999).

4         Throughout the Motion, Defendants overstate the few rights Tarantino *actually*

5  "reserved."    Tarantino's Reserved Rights, as set forth in the Original Rights

6  Agreement and alleged in the Complaint, are a static, specifically enumerated set of

7  rights, one of which is the limited right to **print** publication.   Original Rights

8  Agreement, ¶ 2 (emphasis added).  The right to "screenplay publication" appears only

9  in a parenthetical list of examples of "print publication."[12]  *Id.*  Neither of those terms

10  would have been understood in 1993 to include digital collectibles depicting visual

11  images of parts of an earlier draft screenplay—and Defendants claim that the contents

12  associated with the NFTs in question primarily consist of visual images of parts of

13  the "pen on paper" draft screenplay.

14         The terms "print publication" and "screenplay publication" would have been

15  understood in 1993[13] to refer to book versions of screenplays (like the one depicted

16  at the end of this paragraph). Consistent with that understanding, Tarantino's prior

17  exploitations of those rights were book versions of the final *Pulp Fiction* screenplay

18  in its entirety.  Joint Stip. at 10 ("These publishing agreements simply reflect that

19  Tarantino believed that he had at least the right to publish his screenplay in book or

20  electronic format.").  Likewise, the copyright identified in Exhibit 2 to Defendants'

21  Request for Judicial Notice is for a paperback book of the screenplay, published by

22  Miramax Books and Hyperion:

23

24

---

25  [12] The Reserved Rights' subsequent reference to "audio and electronic formats" is
    discussed (*see infra* Section B.a.ii.) in detail below.

26  [13] Defendants claim "publication," as used in the Original Rights Agreement, is
    synonymous with "publication" under the Copyright Act.  *See* Motion at 19-20.

27  But, if Tarantino's "publication" rights were the same as the statutory right to
    "publication" under the Copyright Act, the parties' spelling out of specific

28  publication rights would be superfluous.  *See generally* Original Rights Agreement,
    ¶ 2.

16

1
2
3
4
5
6
7
8
9
10

 

11  Casazza Decl,. Exs. E, F.

12       Defendants make much of the fact that Tarantino's reservation of the right to

13  "print publication" includes reference to "audio and electronic formats."  Motion at

14  19.  But non-fungible tokens were not (nor could they have been) contemplated by

15  the parties while negotiating the Original Rights Agreement.  The parties therefore

16  could not have intended "audio and electronic formats" to include non-fungible

17  tokens, which host and display associated content on a ledger called the blockchain.

18  Non-fungible tokens and blockchain technology, particularly for film-related

19  collectibles, could not have been contemplated in 1993.

20       Rather, the reference to "audio and electronic formats" is naturally understood

21  to account for formats that existed and were used at the time of the Original Rights

22  Agreement, such as audiobooks and electronic novels.  Consistent with this

23  construction, prior to November 2021, Defendants' exploitations of Tarantino's

24  "Reserved Rights" to the screenplay "were all traditional publishing deals granting

25  rights to publish the screenplay in book format, and in one instance, the right to

26  publish the screenplay in book and electronic formats."  Joint Stip. at 12.  Likewise,

27  the parties were well aware of the necessity to include specific language should they

28  wish to grant forward-looking rights accounting for the emergence of new

17

technologies, as evidenced by the forward-looking rights granted to Miramax in the same paragraph of the same agreement. *See* Original Rights Agreement ¶ 2 (granting to Miramax "all rights . . . in and to the Film . . . **now or hereafter known**") (emphasis added). The absence of this language in the Reserved Rights rebuts any argument by Defendants that the reference to "electronic versions" was intended to cover film-related collectibles accessible through blockchain technology.[14]

iii.  <u>Any Contractual Ambiguities Would Preclude Resolution on a Motion for Judgment on the Pleadings</u>

To the extent there is any question whether the 1993 "Reserved Right" to "screenplay publication" could ever extend beyond book versions of the complete *Pulp Fiction* screenplay and encompass collectible non-fungible tokens associated with scans of selected pages from an earlier handwritten draft, there is a contractual ambiguity that defeats Defendants' motion. *See, e.g., Monsanto Co. v. PacifiCorp*, 144 F. App'x 597, 599 (9th Cir. 2005) (affirming denial of judgment on the pleadings and associated finding that contract was ambiguous as a matter of law because the disputed provision was "reasonably susceptible to conflicting interpretations").

"A contract or a provision of a contract is ambiguous if it is reasonably susceptible of more than one construction or interpretation." *Casteneda v. Dura-Vent Corp.*, 648 F.2d 612, 619 (9th Cir. 1981). California courts determine whether an

---

[14] Additionally, the "Reserved Right" to "screenplay publication" is further narrowed by the meaning of "screenplay." The Original Rights Agreement makes clear that the "screenplay" at issue is the one from "May 1993, 159 pages." Original Rights Agreement, ¶ 14. This is further supported by the WGA definition of "screenplay," which is "the **final script** with individual scenes, full dialogue and camera setups." Casazza Decl., Ex. A (emphasis added). As such, in the negotiations surrounding the Original Rights Agreement, the parties understood the right to "screenplay publication," as a subset of "print publication," to mean the right to publish the ***complete, final*** version of the screenplay. And again, Defendants' conduct prior to the NFT sale is consistent with that construction. Joint Stip. at 12. The screenplay-specific copyright registrations identified by Defendants refer to the same 159-page screenplay, and a 160-page book, respectively. Defendants' RFJN, Exs. 1, 2. By virtue of having "never been seen," the handwritten script pages included with the NFTs cannot be part of the 159-page "Screenplay" identified in the Original Rights Agreement or deposited with the Copyright Office, or the 160-page screenplay published as a book by Hyperion. *See* Complaint, ¶ 38; Original Rights Agreement, ¶ 14; Defendants' RFJN, Exs. 1, 2.

18

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

1   ambiguity exists by not only looking at the face of the contract, but also any extrinsic

2   evidence that supports a reasonable interpretation.  *See First Nat. Mortg. Co. v. Fed.*

3   *Realty Inv. Tr.*, 631 F.3d 1058, 1067 (9th Cir. 2011) (citing *Morey v. Vannucci*, 64

4   Cal. App. 4th 904, 912 (1998)).  And California law provides that extrinsic evidence

5   can be offered not only where it is obvious that a contract term is ambiguous, but also

6   to expose a latent ambiguity.  *S. Pac. Transp. Co.*, 74 Cal. App. 4th at 1241.

7       Unless a court can say for certain, and by a mere reading of the document itself,

8   what the correct interpretation is, "extrinsic evidence becomes admissible as an aid .

9   . . and may prevent a court from definitively interpreting the contract as a matter of

10  law" on a motion to dismiss or motion for judgment on the pleadings.  *KST Data, Inc.*

11  *v. Northrop Grumman Sys. Corp.*, 2019 WL 2619638, at *6 (C.D. Cal. Apr. 17, 2019)

12  (quoting *Burch v. Premier Homes, LLC*, 199 Cal. App. 4th 730, 741-42 (2011)); *see*

13  *also Pinkerton Tobacco Co., LP v. Art Factory AB*, 2020 WL 8515015, at *3 (C.D.

14  Cal. Dec. 24, 2020) (denying motion for judgment on the pleadings, and likewise

15  finding that "a 12(c) motion is an improper vehicle to resolve the meaning of the

16  agreement," because extrinsic evidence was needed to interpret the scope of disputed

17  provisions).  "Indeed, it is reversible error for a trial court to refuse to consider such

18  extrinsic evidence on the basis of the trial court's own conclusion that the language

19  of the contract appears to be clear and unambiguous on its face."  *First Nat. Mortg.*

20  *Co.*, 631 F.3d at 1067.

21      For all of the reasons set forth in this Section, a reasonable interpretation of the

22  Original Rights Agreement requires one to conclude that  Tarantino's Reserved

23  Rights do not—and, as a practical matter, could not—give him the right unilaterally

24  to sell the Pulp Fiction NFTs.  But at the very least, it is evident that an ambiguity

25  might exist as to the meaning the parties assigned as to the right to "print publication,"

26  including "screenplay publication."  *Compare, e.g.*, Motion at 19 ("Mr. Tarantino

27  specifically reserved his rights to publish the Screenplay, and the auction sales of the

28  NFTs are a publication of the Screenplay."), *with* Complaint, ¶ 46 ("[T]he proposed

1    sale of a few original script pages or scenes as an NFT is a one-time transaction, which
2    does not constitute publication, and in any event does not fall within the intended
3    meaning of 'print publication' or 'screenplay publication.'").

4        For a 12(c) motion, the Court must accept as true Miramax's allegation that
5    "the proposed sale of a few original script pages or scenes as an NFT . . . does not fall
6    within the *intended* meaning of 'print publication' or 'screenplay publication'" as
7    contemplated by the parties at the time they entered into the Original Rights
8    Agreement." Complaint, ¶ 46; *see Indep. Living Ctr. of S. Cal. v. City of Los Angeles*,
9    205 F. Supp. 1105, 1108 (C.D. Cal. 2016) (Olguin, J.) (On a 12(c) motion, "[t]he
10   court must accept all factual allegations in the complaint as true, and construe them
11   in the light most favorable to the non-moving party."). The evidence from the 1993
12   negotiations will show as much, and Defendants' Motion should be denied
13   accordingly.[15]

14        b.   Miramax Alleges Defendants Copied and Utilized Original Elements
15             From *Pulp Fiction* Belonging to Miramax

16        Miramax has also alleged facts sufficient to satisfy the second element of its
17   copyright claim—*i.e.*, that Defendants copied original elements of *Pulp Fiction* in
18   their minting and sale of Pulp Fiction NFTs. As already noted above, with the
19   exception of a handful of Reserved Rights, Tarantino's grant of rights to Miramax

20   ────────────────
21   [15] Defendants' reliance on the short-form assignment dated September 3, 1993
     further illustrates why their Motion must be denied. Although Defendants refer to
22   this document as the "Screenplay Assignment," Miramax alleges that this
     assignment—which was attached to the Complaint as Exhibit F—was void.
     *Compare* Motion at 7, *with* Complaint, ¶ 29 (referring to Exhibit F as the "Void
23   Tarantino-B25 Assignment"). Defendants argue that Tarantino executed the Void
     Tarantino-B25 Assignment to "memorializ[e] the limited grant of copyrights in the
24   Screenplay to Brown 25." Motion at 7. However, Miramax plausibly alleges that it
     was not involved with this assignment and did not consent to it, thus making it
25   void. *See* Complaint, ¶ 29. Defendants' reliance on a document which the
     complaint alleges was void raises a factual dispute that must be resolved in favor of
26   Miramax at this stage, so Defendants' Motion must be denied. In any event, to the
     extent any of Tarantino's rights in and to *Pulp Fiction* other than his "Reserved
27   Rights" belonged to B25 Productions after the Original Rights Agreement, B25
     Productions assigned any of its remaining rights in and to *Pulp Fiction* upon
28   delivery of the film in 1994. *See* B25 Productions Letter, ¶ 4; Casazza Decl., Exs.
     C, E-F.

was a grant of "all rights" to *Pulp Fiction*, including "all elements . . . in all stages of development and production."  Original Rights Agreement, ¶ 2.

Miramax plausibly alleges, based on the Press Release and Website for the NFT auction, that the seven NFTs incorporate original elements of *Pulp Fiction* to which Miramax holds the rights.  Promotional materials for the NFTs claim that:

> The collection holds secrets from Pulp Fiction, one of the most influencing artworks of the '90s.  Each NFT contains one or more previously unknown secrets of a specific iconic scene from Pulp Fiction.  The privileged person who will purchase one of these few and rare NFTs will get a hold of those secrets and a glimpse into the mind and the creative process of Quentin Tarantino.

Complaint, ¶¶ 1, 41.  The marketing materials claim that the inspiration for this project was the fact that Tarantino was "enamored" with *Pulp Fiction* and that the NFTs would include "secrets about the film."  Complaint, ¶¶ 38, 41.

These materials suggest that the content associated with the Pulp Fiction NFTs consists of more than just "electronic images of the Screenplay," as Defendants suggest.[16]   Motion at 1.   Rather, buyers were promised that "[t]he collection holds secrets from Pulp Fiction," and "[e]ach NFT contains one or more previously unknown secrets of a specific iconic scene from Pulp Fiction, and that "privileged" purchasers "will get a hold of those secrets."  Complaint, ¶ 1.  Those "secrets" are elements of *Pulp Fiction* which belong to Miramax, and not to Defendants, and including them as content associated with non-fungible tokens therefore infringes on Miramax's rights.

Miramax's Complaint also conclusively shows that in marketing the NFTs, Defendants used "unauthorized images of characters from the film," including "Jules Winnfield (played by Samuel L. Jackson), Vincent Vega (played by John Travolta), and Mia Wallace (played by Uma Thurman)."  Complaint, ¶ 40.  These allegations

---

[16] Despite Miramax's efforts to obtain copies of the content associated with the NFTs through discovery in this case, Defendants have stonewalled their efforts repeatedly.  Casazza Decl., ¶ 12.  As a result, Miramax remains in the dark as to the precise content that has been sold or was created in connection with the sale of the Pulp Fiction NFTs.

PLAINTIFF MIRAMAX, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS

1   alone should defeat Defendants' motion.  *Lucasfilm Ltd. LLC v. Ren Ventures Ltd.*,

2   2018 WL 5310831, at *1 (N.D. Cal. June 29, 2018) (finding copyright infringement

3   was established as a matter of law where "defendants used images and dialogue from

4   [plaintiff's] two movies and television episode on a Facebook page and Twitter

5   account" to market their product).

6       Further, even if the *Pulp Fiction*-related content associated with each NFT

7   consisted only of some pictures of the "pen on paper" screenplay, Miramax's

8   allegations remain sufficient to state a claim for copyright infringement.  Again,

9   despite Defendants' misleading use of ellipses to obfuscate the pertinent language,

10  Tarantino granted to Miramax "all elements [of *Pulp Fiction*] . . . in all stages of

11  development and production," including the screenplay in all versions from start to

12  finish.  Original Rights Agreement, ¶¶ 2, 14.  Defendants plainly admit to copying at

13  least portions of the screenplay in the very first paragraph of their answer,

14  acknowledging that "an NFT version of a portion of [the] original screenplay would

15  be offered at auction."  *See* Answer, ECF 17, ¶ 1; *see also* Motion at 9 ("In the case

16  of the Tarantino NFTs, the Press Release makes clear that the digital content

17  associated with the NFTs include digital images of portion [sic] of Mr. Tarantino's

18  original hand-written Screenplay.").

19      C.    Miramax Has Alleged Facts Sufficient to Establish a Claim for Breach

20            of Contract

21      Defendants conspicuously avoid citing either the Original Rights Agreement

22  or Miramax's Complaint in claiming that Miramax has failed to state a breach of

23  contract claim.  *See* Motion at 20-22.  Both the Original Rights Agreement and

24  Complaint are clear that Tarantino's contractual grants and assignments of virtually

25  all of his rights in and to *Pulp Fiction*, pursuant to Paragraph 2 of the Original Rights

26  Agreement, "prohibit Defendants from exploiting or licensing those same rights to

27  develop and sell the Pulp Fiction NFTs."  Complaint, ¶ 53.   There are also questions

28  in this case regarding whether Defendants' sale of the Pulp Fiction NFTs breached

Miramax's rights and Defendants' obligations under the Original Rights Agreement, which govern "Merchandising" and Miramax's right of first negotiation and last matching rights to certain of Tarantino's "Reserved Rights."

Defendants cite no authority for the proposition that Miramax cannot bring both a copyright infringement claim and a related breach of contract claim.[17]   The lone case Defendants cite is no exception, and was distinguishing a contract claim and a copyright claim in evaluating whether the dispute had been properly subject to a contractual arbitration provision.  *See Kamakazi Music Corp. v. Robbins Music Corp.*, 522 F. Supp. 125, 131 (S.D.N.Y. 1981) (holding that the contractual arbitration clause covered claims for "copyright infringement, interference with contractual rights and related violations of state law").  Here there is no dispute that Miramax brought its claims in accordance with the Original Rights Agreement's provision governing "Remedies/Forum," pursuant to which the parties consented to the personal jurisdiction of this Court for "any dispute relating to the subject matter" of the Original Rights Agreement.  Original Rights Agreement, ¶ 29.

D.   Miramax Has Alleged Facts Sufficient to Establish a Claim for Trademark Infringement and Unfair Competition

Defendants' only argument in the Motion regarding Miramax's trademark and unfair competition claims is circular, and wholly dependent on Defendants' flawed premise that they had the right to mint and sell the Pulp Fiction NFTs.  Miramax agrees with Defendants that Tarantino can refer to the title of the film *Pulp Fiction* "in association with the exploitation of rights he reserved under the parties'

---

[17] "Under California law, there are four elements of a breach of contract claim: (1) a valid contract between the parties; (2) performance by the plaintiff (3) an unjustified or unexcused failure to perform by the defendant; and (4) damages to plaintiff caused by the breach.  State law breach of contract claims are generally <u>not</u> preempted by the Copyright Act, so long as the claim is based on allegations of a contractual right not existing under copyright law."  *CBS Broadcasting Inc. v. Counterr Group*, 2008 WL 11350274, at *8 (S.D.N.Y. Aug. 26, 2008) (internal quotation marks and citations omitted).  Thus, perhaps unsurprisingly, Defendants do not argue that Miramax's contract claim is preempted by the Copyright Act.

agreements." Motion at 22. Paragraph 2 of the Original Rights Agreement expressly grants this: "Tarantino shall have the right to use the title of the Film in connection with the exploitation of the Reserved Rights." *That* limited grant of rights to Tarantino would be superfluous if his rights in and to *Pulp Fiction* were as broad as Defendants claim throughout their papers.

Because Defendants have not shown as a matter of law that all of their conduct is covered by Tarantino's "Reserved Rights," this argument fails.

## CONCLUSION

Based on the foregoing, Miramax respectfully requests that this Court deny Defendants' motion for judgment on the pleadings. Should the Court disagree, Miramax respectfully requests leave to amend. *See, e.g.*, *Harris v. County of Orange*, 682 F.3d 1126, 1131 (9th Cir. 2012) (Under Rule 12(c), "dismissal with prejudice and without leave to amend is not appropriate unless it is clear . . . that the complaint could not be saved by amendment."); *Adom v. City of Los Angeles*, 2022 WL 2189516, at *2 (C.D. Cal. May 4, 2022) ("[A] district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." (internal quotation marks omitted)).

Dated:  June 30, 2022                PROSKAUER ROSE LLP
                                     BART H. WILLIAMS
                                     KYLE A. CASAZZA
                                     SETH H. VICTOR
                                     ALYSON C. TOCICKI

JEFFREY D. NEUBURGER
(admitted *pro hac vice*)
WAI L. CHOY
(admitted *pro hac vice*)

                                     By: _____ /s/ Bart H. Williams _____
                                               Bart H. Williams

                                     Attorneys for Plaintiff,
                                     MIRAMAX, LLC

24