FREEDMAN + TAITELMAN, LLP
Bryan J. Freedman, Esq. (SBN: 151990)
bfreedman@ftllp.com
Jesse A. Kaplan, Esq. (SBN: 255059)
jkaplan@ftllp.com
Theresa Troupson, Esq. (SBN: 301215)
ttroupson@ftllp.com
1801 Century Park West, 5th Floor
Los Angeles, CA 90067
Telephone: (310) 201-0005
Facsimile:  (310) 201-0045

IRELL & MANELLA, LLP
David Nimmer, Esq. (SBN: 97170)
dnimmer@irell.com
Connor He-Schaefer, Esq. (SBN: 341545)
che-schaefer@irell.com
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Telephone: (310) 203-7079
Facsimile:  (310) 203-199

Attorneys for Defendants Quentin Tarantino
and Visiona Romantica, Inc.

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

MIRAMAX, LLC,

                   Plaintiff,

     vs.

QUENTIN TARANTINO; VISIONA ROMANTICA, INC.; and DOES 1-50,

                   Defendants.

**Case No. 2:21-cv-08979-FMO-JC**

[Assigned to Honorable Fernando M. Olguin]

**DEFENDANTS' REPLY TO PLAINTIFF'S OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS; AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**

[Declaration of Jesse Kaplan filed concurrently]

Date:   July 21, 2022
Time:   10:00 a.m.
Judge:  Hon. Fernando M. Olguin

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    ARGUMENT ........................................................................................3

    A.    Allegations that Contradict Contractual Language Cannot be
         Credited. ........................................................................................3

    B.    The Original Rights Agreement Conveyed Only Narrow Rights to
         the Screenplay. ..............................................................................4

    C.    The Limited Nature of the Transfer of Rights Was Clarified in the
         July 10, 1993 Agreement. .............................................................7

    D.    An NFT is an Electronic Publication. ...........................................8

         1.    There is no contractual ambiguity. .....................................8

         2.    Future technologies are presumptively reserved by grantors.9

         3.    WGA Basic Agreements are irrelevant at bar. ...................12

    E.    The Complaint Fails to Allege that the NFTs Copied Original
         Elements from the Film..................................................................13

    F.    The Alleged Infringement Based on the Marketing Materials. ......14

    G.    Miramax's Claim for Breach of Contract Fails. ...........................15

    H.    Defendants are Not Judicially Estopped. ......................................16

         1.    Defendants have not taken inconsistent positions. ...............16

         2.    The Court did not accept Defendants' position. ..................18

         3.    Defendants did not obtain any unfair advantage. ................19

III.    CONCLUSION ...................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Chavez v. United States*,
    683 F.3d 1102 (9th Cir. 2012) ................................................................ 3

*Cohen v. Paramount Pictures Corp.*,
    845 F.2d 851 (9th Cir. 1988) ................................................................ 11

*Garcia v. Google, Inc.*,
    786 F.3d 733 (9th Cir. 2015) .................................................................. 8

*Gen. Star Int'l Indemnity Ltd. v. The Chase Manhattan Bank*,
    2002 WL 32818241 (S.D.N.Y. 2002) ................................................... 5

*Hamilton v. State Farm Fire & Casualty Co.*,
    270 F.3d 778 (9th Cir. 2001) ................................................................ 16

*Hill v. Norfolk & Western Ry.*,
    814 F.2d 1192 (7th Cir. 1987) ................................................................ 7

*Horror Inc. v. Miller*,
    335 F. Supp. 3d 273 (D. Conn. 2018), *aff'd*, 15 F.4th 232 (2d Cir.
    2021) ....................................................................................................... 13

*Minden Pictures, Inc. v. John Wiley & Sons, Inc.*,
    795 F.3d 997 (9th Cir. 2015) .................................................................. 9

*Moss v. United States Secret Service*,
    572 F.3d 962 (9th Cir. 2009) ................................................................ 14

*Muller v. Walt Disney Productions*,
    871 F. Supp. 678 (S.D.N.Y. 1994) ...................................................... 11

*Navarro v. Procter & Gamble Co.*,
    515 F. Supp. 3d 718 (S.D. Ohio 2021) ................................................ 14

*Platinum Record Co., Inc. v. Lucasfilm, Ltd.*,
    566 F. Supp. 226 (D. N.J. 1983) .......................................................... 11

*Rissetto v. Plumbers and Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ................................................................. 16

*Rooney v. Columbia Pictures Industries, Inc.*,
    538 F. Supp. 211 (S.D.N.Y. 1982) ........................................................ 11

*Skilstaf, Inc. v. CVS Caremark Corp.*,
    669 F.3d 1005 (9th Cir. 2012) .............................................................. 3

*Stone v. Writer's Guild of America West, Inc.*,
    101 F.3d 1312 (9th Cir. 1996) .............................................................. 12

*Wexley v. KTTV, Inc.*,
    108 F. Supp. 558 (S.D. Cal. 1952), *aff'd*, 220 F.2d 438 (9th Cir.
    1955) ...................................................................................................... 11

**State Cases**

*Greenfield v. Philles Records, Inc.*,
    98 N.Y.2d 562 (N.Y. 2002) .................................................................. 11

**Federal Statutes**

17 U.S.C.
    § 101 ....................................................................................................... 8
    § 106 .................................................................................................... 5, 6
    § 106(1) .................................................................................................. 4
    § 106(2) .................................................................................................. 5
    § 106(3) .................................................................................................. 5
    § 106(4) .................................................................................................. 5

DEFENDANTS' REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Quentin Tarantino and Visiona Romantica, Inc. (collectively "Defendants"), respectfully submit this Reply to plaintiff Miramax, LLC's ("Plaintiff" or "Miramax) Opposition to Defendants' Motion for Judgment on the Pleadings.

## I.   INTRODUCTION

Miramax's Opposition to the Motion for Judgment on the Pleadings does not dispute the fundamental legal principles upon which the motion is premised: (1) the Screenplay is a copyrighted work of authorship in which all rights were originally owned by Mr. Tarantino and exist separate and apart from the copyrights in the Film; (2) the Film is a derivative work of the Screenplay, and the copyrights therein extend only to new matter added to the original work (*i.e.* the audiovisual presentation of the performance); and (3) as a result, Miramax must demonstrate that Mr. Tarantino specifically assigned his copyrights in the Screenplay to Miramax in order for Miramax to claim copyright ownership and to state a claim in its Complaint. Miramax claims to have so alleged, but those allegations are directly contradicted by the clear language of the contracts that govern the rights of the parties. As a result, judgment should issue as a matter of law based on the pleadings.

The only document that Miramax identifies in which it claims that an assignment in the Screenplay was made is the Tarantino/Miramax Film Assignment Agreement dated June 23, 1993 ("Original Rights Agreement"). But the language of that agreement forecloses the possibility that any broad rights in the screenplay were transferred, other than those necessary to exploit the distribution of the Film. Miramax's attempt to create an ambiguity by arguing that the agreement assigned rights to the "elements" of the Film, and that the term "elements" encompassed the Screenplay cannot succeed because Mr. Tarantino's reservation of rights makes clear that, other than the right to distribute the Film based on the Screenplay, every exclusive right available under the Copyright Act was retained by Mr. Tarantino.

1    Moreover, "elements" is not a defined term under the agreement and the rest of the

2    agreement's terms countermand any interpretation resulting in a broad transfer of

3    rights.  Moreover, any possible ambiguity was specifically clarified by the parties

4    themselves in the Brown 25/Miramax Film Assignment Agreement dated July 10,

5    1993, which states:

6             It hereby further is acknowledged that, ***for the avoidance of***
               ***doubt***, the rights granted by Tarantino to Miramax pursuant
7              to the Miramax Agreement are limited to the right to
               distribute and otherwise exploit the completed Picture as
8              more particularly set forth in the Miramax Agreement.  ***Such***
               ***grant of rights did not include any literary rights in the***
9              ***Screenplay***, the right to produce a motion picture based on
10             the Screenplay, and/or any rights reserved by Tarantino under
               Paragraph 2 of the Miramax Agreement.…
11

12

13   Complaint Ex. 2, Brown 25/Miramax Film Assignment Agreement at ¶ 2 (emphasis

14   added).  The July 10, 1993, Agreement was counter-signed by Miramax's Executive

15   Vice President, acknowledging the limitations on any transfer of rights to rights in the

16   completed Film.  Miramax refuses to address this express clarification at all in its

17   Opposition.  It makes no attempt to explain how this language can possibly be

18   consistent with its assertion that the Original Rights Agreement somehow granted

19   broad rights in the Screenplay.  Miramax's silence on this point is deafening.

20          Because Miramax has no legally cognizable response to the merits of Mr.

21   Tarantino's motion, it instead opens its Opposition with an incoherent argument that

22   Mr. Tarantino should be judicially estopped from making the arguments on the merits.

23   This gambit reveals the weakness of Miramax's position.  Mr. Tarantino has always

24   asserted that the rights in the Screenplay were reserved and never assigned.  Mr.

25   Tarantino is not now altering his argument, he is merely pointing out that an

26   assignment in the copyright to a Film does not assign rights in the underlying

27   Screenplay unless those rights are expressly assigned.  In this case, the plain language

28   of the parties' agreements makes clear that any such rights were not assigned and were

DEFENDANTS' REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

specifically reserved.  Miramax cannot avoid this legal reality through a baseless procedural ploy.  The agreements that govern the rights of the parties make clear that Mr. Tarantino assigned rights in the Film to Miramax, but the only rights granted in the Screenplay were those rights necessary to exploit the rights in the Film.

## II.   ARGUMENT

### A.   Allegations that Contradict Contractual Language Cannot be Credited.

A motion for judgment on the pleadings "is properly granted when, accepting all factual allegations in the complaint as true, there is no issue of material fact in dispute, and the moving party is entitled to judgment as a matter of law."  *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012) (quoting *Fleming v. Pickard*, 581 F.3d 922, 925 (9th Cir. 2009)).  Miramax attempts to muddle the Court's evaluation of Defendants' Motion by suggesting that the agreements among Miramax, Mr. Tarantino, and Brown 25 Productions leave room for interpretation as to the rights Mr. Tarantino reserved; it further misstates the law by asserting that the Court must accept Miramax's erroneous reading of those agreements based on the procedural posture of this case.  (Opp., p. 15).

In truth, although Miramax's *factual* allegations in the complaint must be accepted on a motion for judgment on the pleadings, the Court need not accept its *interpretation* of the contracts at the heart of this case.  Instead, it should reject that interpretation to the extent that it is legally erroneous.  Miramax subtly conflates these issues by asserting that the Court must resolve any possible ambiguities in a contract in favor of the non-moving party, but fails to mention that, when a court "decides that [a] contract is not reasonably susceptible to more than one interpretation, the court can reject the [party's] assertion of ambiguity."  *Skilstaf, Inc. v. CVS Caremark Corp.*, 669 F.3d 1005, 1015 (9th Cir. 2012).  The contracts at issue here are not reasonably susceptible to more than one interpretation.

/ / /

**B.**  **The Original Rights Agreement Conveyed Only Narrow Rights to the Screenplay.**

Miramax does not dispute that the language of the Original Rights Agreement assigns rights ***to the Film***.  Instead, Miramax argues that the assignment of certain rights in the Film encompassed an assignment of full rights in the Screenplay because the Screenplay was a required "element" of the Film.  But the transfer of rights in the Screenplay extend only insofar as the Screenplay is embodied in the Film, not to the underlying rights in the Screenplay itself.  The reservation of rights makes that clear, as does the express acknowledgment of the parties in the July 10, 1993, letter agreement.

Miramax premises its argument on the assertion that the Tarantino Reserved Rights were "limited" and that Mr. Tarantino "assigned away nearly all of his rights in Pulp Fiction to Miramax, including most of his rights in the Screenplay." (Opp., p. 4).  This assertion is contradicted by the clear language of the contractual reservation, which encompasses literally all the rights allocated under copyright other than the right to distribute and exploit the finished film.  The Copyright Act grants four exclusive rights relevant to the Screenplay under 17 U.S.C. § 106: (1) the right to make copies of the Screenplay; (2) the right to make derivative works of the Screenplay; (3) the right to distribute copies of the Screenplay; and (4) the right to perform the Screenplay publicly.  Except as implicated by Miramax's rights to distribute and exploit the particular finished Film contemplated in the Agreement, Mr. Tarantino expressly reserved each of these rights.

The right to make copies of the Screenplay under 17 U.S.C. § 106(1) was reserved to Tarantino because he reserved the right to "print publications (including without limitation screenplay publication …)."  (Complaint, Ex. A [Original Agreement ¶ 2]).  By definition, the right to publish involves the right to make copies, which means that the reproduction right was expressly reserved as it applied to the Screenplay.  Tarantino also reserved the right to make any and all conceivable

**4**

derivative works under 17 U.S.C. § 106(2) based on the Screenplay (other than the particular finished Film contemplated in the Agreement) —including specifically the right to create "'making of' books, comic books and novelization, theatrical and television sequel and remake[s], and television series and spinoff[s]," based on the Screenplay. *Id.* In reserving the rights to "print publication," including the right to publish the Screenplay, Tarantino also reserved the distribution right under 17 U.S.C. § 106(3), as distribution is necessary to the publication right. And, finally, except as embodied in the finished Film, Tarantino reserved the exclusive right to perform the Screenplay under 17 U.S.C. § 106(4) in remakes, television productions and live theatrical performances.

As a result, the Reserved Rights in the Screenplay were not narrow; rather the rights assigned to Miramax were extremely narrow and encompassed rights to the Screenplay only as embodied in the finished Film, as necessary for the assigned distribution right in that derivative work.[1] Indeed, other than the right to distribute the final Film (which uses the Screenplay), Miramax does not identify a single right in the ***Screenplay*** itself as an independent work that was ***not*** reserved under the Original Rights Agreement.[2] That is because no such other rights were granted to

---

[1] Miramax also argues that, if the parties' intent were for Tarantino to retain unencumbered copyright to the Screenplay, "Tarantino's reservation of more limited, specific rights makes no sense." That assertion is wrong. What makes no sense is Miramax's failure to recognize that the Reserved Rights are not narrow or limited, but rather encompass every right relevant to a screenplay that is granted in 17 U.S.C. § 106. The reserved rights cover the reproduction right, the distribution right, the right to make derivative works, and the right to perform works based on the Screenplay (other than the particular completed Film contemplated in the agreement) publicly.

[2] This device was common at the time; it went under the rubric of "negative pickup." In other words, the assignee picked up a negative made by a third party, and acquired only the right to strike and exploit positive prints of that exact negative—as opposed to the right to create its own motion picture version. *See Gen. Star Int'l Indemnity Ltd. v. The Chase Manhattan Bank*, 2002 WL 32818241 (S.D.N.Y. 2002) ("Prior to the 1990's, one of the prevalent methods of financing film production was a 'negative pickup' transaction, in which a distributor would pay the producer for worldwide distribution rights upon delivery to the distributor of the completed film"); *see generally Chapter 11 Movie Studio Bankruptcy and Negative Pickup Deals*, 17 Colum.-VLA J.L. & Arts 127 (1992).

Miramax.[3]

Miramax attempts to create some ambiguity by arguing that "[t]he Original Rights Agreement is explicit that the 'Screenplay' is one of th[e] many 'elements' to which Miramax owns the rights, so Miramax holds virtually all rights to the Pulp Fiction screenplay …." (Opp., p. 10). But as noted above, the Reserved Rights encompassed every aspect of the rights granted in the Screenplay under the Copyright Act except the right to distribute this particular completed Film based on the Screenplay. The fact that the Screenplay was a required "element" of the Film is irrelevant to the contractual reality that all of the rights in the Screenplay other than the right to distribute the Film based on the Screenplay remained expressly reserved.

Moreover, Miramax's contention that any sort of broad conveyance of copyright in the Screenplay was contemplated in the Original Rights Agreement is belied by the fact that paragraph 14 of the Original Rights Agreement grants Miramax only a limited right to "meaningful consultation" regarding any changes to the Screenplay. If all rights in the Screenplay had been transferred to Miramax, any alteration to the Screenplay would have constituted the creation of a derivative work, and Messrs. Tarantino and Bender would have had to have sought and obtained Miramax's full permission to make that change. No such permission was required because no rights in the Screenplay (aside from the right to distribute the Film) were assigned. Instead, in listing the Screenplay as a required element of the Film, paragraph 14 of the agreement specifically states: "Miramax may not alter screenplay." That provision contradicts Miramax's claims that Mr. Tarantino assigned broad rights in the Screenplay to it.

/ / /

---

[3] Miramax attacks the clear language to which the parties agreed as problematic because, it asserts, "Tarantino retained limited Reserved Rights, but Miramax's rights necessarily include *at least some rights* in the screenplay." (Opp., at 14). Miramax is correct, but the point fails to rescue its Complaint: In assigning the right to distribute the final Film, Tarantino granted to Miramax the right to exploit the Screenplay *as embodied in the Film*. Other than that circumscribed right, as explained above, Tarantino retained all rights under 17 U.S.C. § 106.

DEFENDANTS' REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

**C.** **The Limited Nature of the Transfer of Rights Was Clarified in the July 10, 1993 Agreement.**

To the extent that there could have been any ambiguity over whether broad rights in the Screenplay were assigned in the Original Rights Agreement, that ambiguity was expressly clarified by the parties in the July 10 Agreement. The most salient feature of Miramax's Opposition is that it does not even attempt to grapple with that agreement signed by all parties, but instead buries its head in the sand as if the July 10 Agreement did not exist. *See Hill v. Norfolk & Western Ry.*, 814 F.2d 1192, 1198 (7th Cir. 1987) (condemning "the ostrich-like tactic of pretending that potentially dispositive authority against a litigant's contention does not exist"). Miramax's posture attempts to deflect the Court's attention from the following crucial language:

> It hereby further is acknowledged that, ***for the avoidance of doubt***, the rights granted by Tarantino to Miramax pursuant to the Miramax Agreement are limited to the right to distribute and otherwise exploit the completed Picture as more particularly set forth in the Miramax Agreement. ***Such grant of rights did not include any literary rights in the Screenplay***, the right to produce a motion picture based on the Screenplay, and/or any rights reserved by Tarantino under Paragraph 2 of the Miramax Agreement.

Miramax's claim that the assignment of the right to produce the Film based on the Screenplay from Tarantino to Brown 25 is "void" as inconsistent with the original agreement is countermanded by Miramax's acknowledgement in the July 10 agreement. "Miramax acknowledges that the rights granted by Tarantino to [Brown 25] are not inconsistent with the rights granted by Tarantino to Miramax under the Miramax Agreement." It is further countermanded by Miramax's admission that the Film was "produced by Lawrence Bender, in collaboration with Brown 25 Production, Inc." Compl. at ¶ 18.

Miramax's argument that some "sweeping grant of rights [to Miramax] was

necessary for the production of the motion picture," thus makes little sense.  As it admits in its Complaint, Miramax did not produce the motion picture.  Brown 25 produced the picture pursuant to the July 10 agreement, which clarified that no rights to produce a picture had been assigned to Miramax.[4]  As a result, no rights need ever have been assigned to Miramax to produce the Film.[5] Moreover, following the production of the motion picture, all remaining rights Brown 25 had **"to the Picture"** were granted to Miramax.  Such rights do not include any assignment of rights to the Screenplay except insofar as necessary to exploit the rights assigned in the Film.[6]

### D.   An NFT is an Electronic Publication.

#### 1.   There is no contractual ambiguity.

Miramax does not dispute that the public sale of electronic copies of the handwritten Screenplay constitutes publication under the Copyright Act, nor could it. The Copyright Act's definition of "publication" as "the distribution of copies of a work to the public by sale or other transfer of ownership, or by rental, lease or lending" clearly encompasses distribution of one or more electronic copies, whether those copies are associated with NFTs or any other electronic medium or asset.  17 U.S.C. § 101.

---

[4] As previously noted, the contract embodied a negative pickup of a film produced by a third party.  *See* fn. 2 *supra*.

[5] Miramax premises its argument on what is "customary in the film industry."  (Opp., at 3 n.2).  But the source that it cites deals with typical productions in which the studio is in charge of putting together the various elements of the motion picture, not with negative pickups.  *See* 1 *Nimmer on Copyright* § 6.05

[6] Miramax's argument that recognizing separate rights in a screenplay would somehow "make swiss cheese" out of copyright is incomprehensible.  Copyright law has always recognized separate rights in a screenplay and a film that is a derivative work of the screenplay.  In fact, that is the example that is used in the text of the Copyright Act itself.  17 U.S.C. § 101 (definition of "derivative work")  Miramax's citation to *Garcia v. Google, Inc.*, 786 F.3d 733 (9th Cir. 2015), to suggest otherwise misrepresents the facts of that case.  *Garcia* had nothing to do with the established rights that exist in a screenplay, but instead addressed the novel argument that an actor has some copyright in her performance as that performance is captured on film.  The Ninth Circuit correctly recognized that such a result would potentially grant rights to every actor and camera operator who worked on a film.  That ruling has nothing whatsoever to do with the facts of this case, which involves established rights in the Screenplay that (there is no dispute) is an original work of authorship with all rights therein belonging, in the first instance, to Mr. Tarantino, its author.

8

Instead, Miramax focuses on how (according to Miramax) the parties would have understood the term "print publication" in 1993 (a term in the original agreement which explicitly included both "audio and electronic formats")[7] and points to *past* examples of Mr. Tarantino's exploitation of his print publication rights as though these somehow define the outer boundaries of what those terms can mean.  But that stance gets the Tarantino/Miramax Film Assignment Agreement backwards: Mr. Tarantino's Reserved Rights include any form of print publication—whether physical or electronic—that was not expressly granted to Miramax.  Plainly, NFT publication rights were not among those granted to Miramax.  *See* part 2 *infra*.

Miramax further asserts that, "if Tarantino's 'publication' rights were the same as the statutory right to 'publication' under the Copyright Act, the parties' spelling out of specific publication rights would be superfluous."  (Opp., p. 16 n.13).  That construction of Paragraph 2 of the Tarantino/Miramax Film Assignment Agreement assertion cannot withstand scrutiny:  The subject Paragraph 2 starts with a grant to Miramax of "all rights (including copyright and trademark)" and then goes on to specify various particulars, such as "including without limitation the right to distribute the Film in all media…"  But, based on Miramax's logic just quoted, had the parties intended to refer to rights as contained in the Copyright Act, those specifications should have been "superfluous"—with the result that it would be open to question whether Miramax has acquired any rights that give it standing to file suit.  *See Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1003 (9th Cir. 2015) (citing 3 *Nimmer on Copyright* § 12.02[B][1]).  Rather than adopt that preposterous result, the simple fact is that the parties drafted Paragraph 2 to treat rights under copyright

---

[7] The contractual reservation of rights provided as follows: "soundtrack album, music publishing, live performance, print publication (including without limitation screenplay publication, 'making of' books, comic books and novelization, **in audio and electronic formats** as well, as applicable), interactive media, theatrical and television sequel and remake rights, and television series and spinoff rights. Exercise of certain of the Reserved Rights is subject to restrictions set forth elsewhere in this agreement. Tarantino shall have the right to use the title of the Film in connection with the exploitation of the Reserved Rights." (Complaint, Ex. A, at § 2) (Emphasis added).

DEFENDANTS' REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

law, as to which they spelled out various particulars.  Thus, the initial sentence grants rights under copyright to Miramax, subject to various specifics, and the very next sentence reserves rights under copyright to Mr. Tarantino, again subject to various specifics.[8]  Any other interpretation leads to absurdity.[9]

## 2.   <u>Future technologies are presumptively reserved by grantors</u>.

Miramax is correct in one respect: "non-fungible tokens were not (nor could they have been) contemplated by the parties" in 1993.  (Opp., p. 17).  The result is that Mr. Tarantino could not have given any rights therein absent express language. But, here, again, Miramax attempts to advance its own interpretation of the original agreements as undisputed fact by pointing to the words "now or hereafter known" in Mr. Tarantino's grant of rights to Miramax in the Tarantino/Miramax Film Assignment Agreement.  The fatal flaw in that stance is that this grant was expressly subject to Mr. Tarantino's reserved rights, which included all publication rights in his screenplay—necessarily including rights in technologies to be developed in the future.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[8]  Additionally, Miramax fails to mention that Mr. Tarantino's reserved right of print publication includes screenplay publication and numerous other forms of publication "without limitation."  Tarantino/Miramax Film Assignment Agreement, ¶ 2.  These two words, fatally omitted by the Opposition, debunk Miramax's position that Mr. Tarantino's publication rights were limited.

[9]  Miramax's position boils down to treating the Agreement as a copyright license with respect to rights granted to it, and then turning around to claim that the terms in the very next sentence relating to Mr. Tarantino's reserved rights have nothing to do with copyright.

A number of reported cases discuss grants of rights that purport to extend to technologies "now or hereafter known."[10]  Not surprisingly, those future technologies clauses uniformly clarify the scope of a *grantee's* rights (for example, to distribute a motion picture or recording using future technologies).[11]  Exactly zero of those cases implicated a contract that included such a future technologies clause as to the *grantor's* reservation of rights for the obvious reason that there is absolutely no need to include such a specification: By their very nature, the grantor's reserved rights apply across the board, to existing technologies as well as to any that might be invented in the future.[12]  Thus, the lack of any explicit reference to future technologies in Mr. Tarantino's reserved rights is without substance.

/ / /

/ / /

---

[10] *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 568-69 (N.Y. 2002) (contract granting defendant "the right to make phonograph records, tape recordings or other reproductions of the performances embodied in such recordings by any method now or hereafter known . . . ."); *Muller v. Walt Disney Productions*, 871 F. Supp. 678, 682 (S.D.N.Y. 1994) (contract defining "photoplay" as including "all other improvements and devices which are now or hereafter may be used in connection with the production, exhibition and/or transmission of any present or future kind of motion picture production."); *Platinum Record Co., Inc. v. Lucasfilm, Ltd.*, 566 F. Supp. 226, 227 (D. N.J. 1983) (contract granting right to record and synchronize music recordings into the motion picture *American Graffiti* and, *inter alia*, to exhibit the film "perpetually throughout the world by any means or methods now or hereafter known."); *Wexley v. KTTV, Inc.*, 108 F. Supp. 558, 559 (S.D. Cal. 1952), *aff'd*, 220 F.2d 438 (9th Cir. 1955) (contract granting "sole and exclusive right throughout the world to . . . exhibit . . . motion picture versions of the said dramatic composition . . . in any manner and method now or any time hereafter ever known or made available"); *Rooney v. Columbia Pictures Industries, Inc.*, 538 F. Supp. 211, 220 (S.D.N.Y. 1982) (contract granting to producer rights of "production, manufacture, distribution, exhibition, advertising, exploitation, recordation and reproduction by any art or method, whether now or hereafter known or devised").

[11] *See, e.g.*, *Greenfield*, 98 N.Y.2d at 568-69 (N.Y. 2002) (contract granting defendant "the right to make phonograph records, tape recordings or other reproductions of the performances embodied in such recordings by any method now or hereafter known . . . .").

[12] *See Cohen v. Paramount Pictures Corp.*, 845 F.2d 851, 854 (9th Cir. 1988) (rejecting defendant's argument that a grant of rights to exhibit a motion picture "by means of television" included the distribution of videocassettes for home viewing, noting the underlying contract reserved to the grantor "all rights and uses in and to said musical composition, except those herein granted to the Licensee . . . .").

---

DEFENDANTS' REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS

3.   **WGA Basic Agreements are irrelevant at bar.**

Miramax also leans heavily on the Writer's Guild of America ("WGA") Basic Agreement to support its strained interpretation of the term "screenplay."  (Opp., pp. 5, 18 n.14) (asserting that the parties intended to rely in their negotiations on the WGA's definition of "screenplay" as "the final script with individual scenes, full dialogue and camera setups").  What Miramax fails to mention is that neither the Tarantino/Miramax Film Assignment Agreement nor the Tarantino/Brown 25 Screenplay Assignment Agreement actually make any reference to the WGA's definition of this term.  Instead, the Tarantino/Miramax Film Assignment Agreement specifically identifies and defined the Screenplay as the then-existing version: "May 1993, 159 pages (Except that Quentin Tarantino may make minor revisions that do not materially affect the storyline or characters or increase the Approved Budget. Miramax may not alter screenplay)." (Complaint, Ex. A [Tarantino/Miramax Film Assignment Agreement at ¶ 14]).  If the parties had wished to incorporate the WGA's definitions of "screenplay" instead of specifically identifying the screenplay that existed at that time, they could have easily done so.  They did not. Instead, the agreements' references to the WGA are made in the context of residuals (Tarantino/Miramax Film Assignment Agreement, ¶ 20; Tarantino/Brown 25 Screenplay Assignment Agreement ¶ 7) and warranty and indemnification (Tarantino/Brown 25 Screenplay Assignment Agreement, ¶ 4), with no reference whatsoever even to the WGA Basic Agreement's Definitions section, let alone its specific definition of "screenplay."   These provisions have no relation to the underlying definitions that would change the clear meaning of central terms in the Tarantino/Miramax Film Assignment Agreement or alter the assignment of rights between the parties to that agreement.

Judicial decisions to construe the WGA Basic Agreement tend to arise in the posture of construing those aspects relating to writing credits and payments.  *See Stone v. Writer's Guild of America West, Inc.*, 101 F.3d 1312, 1314-15 (9th Cir. 1996)

(considering claims of fraud and intentional infliction of emotional distress related to writing credits). Concomitantly, they reject attempts by plaintiffs to subordinate governing factors under copyright law to the collective bargaining agreement signed by a member of the Writer's Guild of America. *See Horror Inc. v. Miller*, 335 F. Supp. 3d 273, 284, 296-98 (D. Conn. 2018), *aff'd*, 15 F.4th 232, 254 (2d Cir. 2021) (status of work for hire reached as a matter of copyright doctrine, not by virtue of signing WGA agreement). The Second Circuit's logic applies *a fortiori* to a party, such as Mr. Tarantino, who has not signed onto the WGA agreement.

### E.   The Complaint Fails to Allege that the NFTs Copied Original Elements from the Film.

Realizing that it possesses rights only to the Film but not the Screenplay (except those limited rights necessary to exploit the distribution of the Film), Miramax's Opposition falsely suggests that the Complaint adequately alleges that the NFTs copied original elements of the Film and "consists of more than just 'electronic images of the Screenplay,' as Defendants suggest." (Opp., pp. 20-21). To support that conclusion, Miramax merely cites to language from the Press Release and Website stating that the NFTs contain "secrets." (Opp., pp. 20-21; Complaint, ¶¶ 1, 41).

That the NFTs' content was secretive in nature, however, has no bearing on whether such content incorporated original elements from the Film. Rather, describing such content as "secret" merely goes to whether the content had previously been seen. Absent from the Complaint are any allegations that the NFTs contain any original elements from the Film, or what those elements are.[13] Given the Complaint's allegations that the Film has been widely publicized (Complaint, ¶ 17), it is unclear how any of the Film's original elements could possibly be secret. Clearly, the "secret" content in the NFTs was something along the lines of the never-before-seen portions

---

[13] Miramax admits in its Opposition that it is unaware of the precise content of the NFTs. (Opp., p. 21; Casazza Decl., ¶ 12). If Miramax has never seen and is unaware of the NFTs' contents (other than the fact that the NFTs include portions of the original Screenplay), Miramax cannot possibly claim that the NFTs contain original elements from the Film.

of the original handwritten Screenplay. Accordingly, the Complaint fails to allege that the NFTs included original content from the Film.

### F.    The Alleged Infringement Based on the Marketing Materials.

Miramax asserts that "misuse of Miramax's intellectual property intensified" after the initial announcement of the *Pulp Fiction* NFT sale, when "the Twitter account for the NFT sale used not only unauthorized imagery relating to *Pulp Fiction*, but also an animated scene from a different Miramax film." (Opp., p. 8). Putting aside the fact that the aforementioned Twitter account removed this post and all other content that included imagery from any Miramax film as soon as Miramax raised its concerns, the legal standard that governs this case affords no basis for relief as to this conduct.

Miramax has not alleged that, based on "an animated scene from a different Miramax film," the Defendants in *this case* have violated any law. The Complaint alleges that the "unauthorized imagery" from Miramax films discussed in the Complaint was included in a tweet shared by a separate entity called @TarantinoNFTs account; pointedly, the Complaint fails to allege that this entity fell under Defendants' control. *See* Complaint, ¶¶ 47-49; 54-65.[14] Such general references to "misuse of Miramax's intellectual property" by "a Twitter account for the sale," *id.* at ¶ 47, are insufficient to state claims for copyright or trademark infringement.

Parties are not liable under copyright law for the activities undertaken by the entities with whom they enter into contracts, unless their relationship amounts to a partnership. *See Navarro v. Procter & Gamble Co.*, 515 F. Supp. 3d 718, 772 (S.D. Ohio 2021) ("joint undertaking must be something more than a mere buyer-seller

---

[14] Separately, the Opposition references a promotional website for the NFTs…." *Id.* at 8, 21. The reference is to Complaint ¶¶ 40 – 42, which focus on "confusion, mistake, and deception among the relevant consuming public as to the source of Pulp Fiction NFTs." *Id.* ¶. 42. Those matters appear to sound in trademark law, rather than copyright. In any event, any allegations that Mr. Tarantino "established" the Website or was somehow responsible for the Website's content is far too conclusory to plausibly state any claim. *See Moss v. United States Secret Service,* 572 F.3d 962, 969 (9th Cir. 2009).

contractual relationship, indemnification agreement, or royalties agreement"). The Complaint fails to include factual allegations that a practical or actual partnership existed between Defendants and the owner of the @TarantinoNFTs account. Miramax's attempt to cast a non-party's activities as Defendants' culpable conduct should therefore be rejected.

At a minimum, any residual copyright case that relates to scenes from different Miramax films raises issues far afield from the nub of the current case. Accordingly, regardless of how the instant issue is resolved, the Complaint should still be dismissed insofar as it alleges violations of law through sales of NFTs.[15]

### G.   Miramax's Claim for Breach of Contract Fails.

Miramax opposes the Motion on the contract claims based on the assertion that Tarantino assigned "virtually all of his rights in and to *Pulp Fiction*, pursuant to Paragraph 2 of the Original Rights Agreement." (Opp., p. 22). But, for the reasons articulated above, that premise is false. Mr. Tarantino retained virtually all rights in the Screenplay, and to the extent that the copyright claim is decided on that basis, the contract claim must fall as well.[16]

Furthermore, Miramax cites no case under which a defendant's use of a work beyond the scope of a grant of rights—without a violation of an express covenant— constituted a breach of contract, as opposed to a copyright violation. Neither the Complaint nor the Opposition articulates any express covenant or other express term of the contract that Mr. Tarantino allegedly violated. As a result, Miramax's claims for breach of contract must fall as well.

---

[15] To the extent that the matters discussed in the previous footnote are deemed, contrarily, to relate to copyright law rather than trademark, then the only remaining live matters concern that promotional website, prior to its being taken down promptly upon Miramax's request. It therefore remains equally operative that the Complaint should be dismissed insofar as it alleges violations of law through sales of NFTs.

[16] Similarly, Miramax concedes that, to the extent that Mr. Tarantino retains the rights in the Screenplay, as described above, his use of the PULP FICTION trademark is in accordance with his rights under the Tarantino/Miramax Film Assignment Agreement, and does not constitute a Lanham Act violation. (Opp., pp. 23-24). As a result, that claim fails as well.

**H.    Defendants are Not Judicially Estopped.**

Miramax incorrectly contends that Defendants are judicially estopped from arguing that Miramax or its alleged predecessor were assigned virtually no rights in the Screenplay based on Defendants' answer to one of Judge Chooljian's specific questions at a discovery hearing about Mr. Tarantino's reserved rights under the 1993 Tarantino/Miramax Film Assignment Agreement.   (Opp., pp. 12-13).   Judicial estoppel, an equitable doctrine, precludes a party from gaining an advantage by asserting one position, and then later seeking an advantage by taking a "clearly inconsistent position." *Hamilton v. State Farm Fire & Casualty Co*., 270 F.3d 778, 782 (9th Cir. 2001); *Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 600-601 (9th Cir. 1996).   The purpose of the doctrine is to promote the orderly disposition of justice and preserve the integrity of judicial proceedings by preventing litigants from "playing fast and loose with the courts." *Id*.

Courts consider three factors in determining whether to apply the doctrine of judicial estoppel.   *Id*. "First, a party's later position must be '**clearly inconsistent**' with its earlier position." *Id*. (emphasis added).   "Second, courts regularly inquire whether the party has **succeeded in persuading a court to accept that party's earlier position**, so that judicial acceptance of an inconsistent position in a later proceeding would create 'the perception that either the first or the second court was misled.' " *Id*.  (emphasis added).  If the party to be estopped did not succeed in a prior proceeding, the party's later inconsistent position creates no "risk of inconsistent court determinations" and thus no threat to judicial integrity.   *Id*.   Third, courts consider "whether the party seeking to assert an inconsistent position **would derive an unfair advantage or impose an unfair detriment** on the opposing party if not estopped." *Id*. at 783.  (emphasis added).  Miramax has failed to satisfy any of these factors.

**1.    Defendants have not taken inconsistent positions.**

Defendants' answer to Judge Chooljian's specific question at the April 12 hearing on Miramax's Motion to compel is not inconsistent, let alone clearly

inconsistent, with any position in Defendants' Motion.  As an initial matter, without context, Miramax ignores the narrowly focused question that Judge Chooljian initially posed to Defendants at the April 12 hearing.  Following Miramax's argument on Request for Production No, 24 ("RFP 24") which concerned Defendants' intellectual property rights in Pulp Fiction,[17] Judge Chooljian simply asked Defendants to identify the reserved right in the reserved rights section of the 1993 Tarantino/Miramax Film Assignment Agreement (aka the "original contract") that Defendants were relying on in connection with the NFTs.  (Casazza Decl., Ex. D [Hearing Transcript, pp. 12-13).  Specifically, Judge Chooljian asked the following initial question:

> THE COURT:  All right. I'll allow Defendant to respond, and specifically, it's not really I guess teed up precisely for this particular motion, but I don't see any down side to having Defendant state for the record are you relying solely on the screenplay publication provision or are you relying on any other reserved right in the -- in the reserved rights provision of the original contract?

(*Id*. at pp. 12-13).

After Defendants explained the components in each of the NFTs at issue, Defendants confirmed that the screenplay publication reserved right was the reserved right from the Tarantino/Miramax Film Assignment Agreement that gave Defendants the right to publish the Screenplay through NFTs.  (*Id*., at 14-15).  Notably, Judge Chooljian did not ask what rights in the Screenplay, if any, were assigned to Miramax. Of equal importance, Defendants' answer to that question (*i.e.*, that Defendants' reserved screenplay publication rights in the Tarantino/Miramax Film Assignment Agreement provides Defendants with the right to publish portions of his Screenplay through an NFT) was specifically asserted in Defendants' Motion for Judgment on the Pleadings.  (Motion, pp. 19-20).  Critically, there is absolutely no inconsistency

---

[17] RFP 24 sought the following: "All DOCUMENTS and COMMUNICATIONS CONCERNING any copyrights, trademarks, or other intellectual property rights that YOU contend YOU have CONCERNING Pulp Fiction."

between (a) Mr. Tarantino's reserved right to publish his Screenplay allows him to publish it through an NFT and (b) pursuant to the applicable agreements and instruments attached to the Complaint, Mr. Tarantino did not grant Miramax rights in the Screenplay except those necessary to exploit the distribution of the Film.  In short, the essential element of **clear inconsistency** is lacking.

## 2.   The Court did not accept Defendants' position.

In ruling on Miramax's Motion to Compel, Judge Chooljian did not "accept" Defendants' answer to her question concerning which reserved right in the reserved rights section of the 1993 Tarantino/Miramax Film Assignment Agreement (aka the "original contract").  Judge Chooljian did not limit Defendants' discovery obligations based on Defendants' answer to her question.  The Opposition glosses over this factor, concluding without any analysis that "Defendants successfully evaded production of all documents" and that Defendants "prevailed by arguing that a limited, 'Reserved Right' to 'screenplay publication' is the 'only thing [Tarantino] is relying on,' …". (Opp., pp. 12-13).  Miramax is wrong.

On April 1, 2022, prior to the April 12 hearing, Judge Chooljian issued a detailed eight page tentative ruling on Miramax's Motion to Compel.  (Docket No. 27).  At the conclusion of the April 12 hearing on the Motion to Compel, Judge Chooljian adopted her prior tentative ruling in full.  (Casazza Decl., Ex. D [Hearing Transcript, pp. 27-29]).[18]  In doing so, Judge Chooljian stated that she had not heard anything new that would cause her to change her tentative ruling.  (*Id*., at pp. 27-28).[19]  Consequently, the essential element of **succeeding in persuading a court to accept that party's earlier position** is likewise absent.

---

[18] Even earlier, Judge Chooljian expressed that her question and any answers were not material to her ruling and were designed for future contemplated discovery disputes. (Casazza Decl., Ex. D [Hearing Transcript, pp. 12-13).  Notably, in asking her question, Judge Chooljian noted that "it's not really I guess teed up precisely for this particular motion …". (*Id*.).

[19] Indeed, it is unclear how Defendants' articulation of its reserved rights under the "original agreement" would cause Judge Chooljian to determine that Miramax was entitled to less discovery from Defendants.

3.   **Defendants did not obtain any unfair advantage**.

Defendants also did not obtain any unfair advantage, a factor that Miramax conspicuously ignores.   Judge Chooljian simply narrowed Request No. 24 so that Defendants would not be required to produce **all documents and communications** concerning Defendants' copyright, trademark and other intellectual property rights to Pulp Fiction which may exist over the course of approximately 28 years since Mr. Tarantino wrote the Screenplay.   At the same time, Judge Chooljian ordered Defendants to produce documents sufficient to reflect their intellectual property rights related to the NFTs at issue.

Defendants fully complied with Judge Chooljian order, supplemented its responses, and produced documents sufficient to reflect any NFTs, the source thereof, whether such copyrights/trademarks have been registered, and if so, registration numbers.   (Kaplan Decl., Ex. 1).[20]   Given that Defendants produced documents reflecting all of their rights consistent with those identified in the Motion, the third essential element of **deriving an unfair advantage or imposing an unfair detriment** is likewise lacking.

III.   **CONCLUSION**

For all the above reasons, Defendants' Motion for Judgment on the Pleadings should be granted.

Dated:  July 7, 2022                          IRELL & MANELLA, LLP

By:   /s/ David Nimmer
David Nimmer
Connor He-Schaefer
Attorneys for Defendants Quentin
Tarantino and Visiona Romantica, Inc.

---

[20] Among other things, Defendants produced all of the agreements and instruments that were attached to the Complaint and relied on in the Motion for Judgment on the Pleadings along with printouts from the U.S. Copyright Office's Public Records Online Catalog for Registration Number Pau001810781 and TX0004031560, among others.  (Kaplan Decl., Ex. 2).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FREEDMAN + TAITELMAN, LLP

Bryan J. Freedman
Jesse A. Kaplan
Theresa Troupson

Attorneys for Defendants Quentin
Tarantino and Visiona Romantica, Inc.

DEFENDANTS' REPLY TO OPPOSITION TO MOTION FOR JUDGMENT ON THE PLEADINGS